**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| J.B.B.C., A MINOR CHILD, by and through his father and Next Friend, Carlos Emilio Barrera Rodriguez, | ) ) ) ) |
| *Plaintiff,* | ) ) ) |
| v. | )    No. 2020-cv-_____ ) |
| CHAD F. WOLF, Acting Secretary of Homeland Security, in his official capacity, et al., | ) ) ) |
| *Defendants.* | ) ) |

## INTRODUCTION

### (TRO TO STAY REMOVAL SCHEDULED FOR TOMORROW, JUNE 10)

Plaintiff respectfully requests an immediate TRO tonight to stay his removal until the Court can set this matter down for briefing.

Plaintiff J.B.B.C. is a sixteen-year-old boy from Honduras who fled that country to escape persecution and possibly death.  He entered the United States by himself (and so is deemed by statute an unaccompanied minor).  He is subject to deportation back to Honduras, tomorrow based on an unprecedented and unlawful CDC Order authorizing the expulsion of unaccompanied minors without any hearing, even where, as here, the minor has no symptoms of COVID-19.  The Order, which has never been tested in the courts, is based on the government's supposed expulsion powers under the public health provisions of Title 42.

The government's new Title 42 expulsion process (hereafter the "Title 42 process") is patently unlawful for two basic reasons.  First, Title 42 does not authorize deportations of individuals, like Plaintiff, who entered the country.  Rather, it authorizes testing, and in extreme

cases, detention and quarantine.  Title 42 provides, in short, public health measures.  It is not a deportation statute.

Second, even assuming that Title 42 somehow could be construed to authorize deportations of some noncitizens, it does not override the later-enacted statutes protecting children and those seeking protection.  Indeed, Congress specially addressed communicable diseases in the immigration laws.  Those laws allow the government to bar entry of some individuals with communicable diseases, but it is well established that unaccompanied children and those seeking protection must be provided the protections to which they are entitled, and may not be automatically deported even if they actually have a communicable disease (which Plaintiff does not have).  Specifically, for unaccompanied minors from non-contiguous countries like Honduras, that means that the child must be transferred within 72 hours of his apprehension to the care of the Office of Refugee Resettlement (ORR), placed in a children's facility, and provided a full hearing on their asylum claims.  They must also be released to a close relative or sponsor as soon as possible; Plaintiff's father lives in the United States.

At bottom, this is a separation of powers case.  The Administration has circumvented the process created by Congress to deal with unaccompanied minors, those seeking protection and those with communicable diseases.J.B.B.C. respectfully requests a temporary stay of deportation (whether denominated expulsion, removal, or any other term).  The balance of harms strongly supports a temporary stay of deportation while this Court decides the merits of the case.

Counsel for Plaintiffs have communicated with government counsel regarding this request.  As of this filing, government counsel informed Plaintiff's counsel that the relevant agency actors had not offered any assurances that  Plaintiff's deportation would not occur as scheduled on June 10 as scheduled. Plaintiff is therefore submitting this emergency request.

**BACKGROUND**

The following facts are set forth in the declaration accompanying this motion.

Plaintiff J.B.B.C. is a 16-year-old boy from Honduras.  He faced severe persecution in Honduras.  He witnessed killings and other violence in his neighborhood by gang members, and gang members threatened him after he witnessed one of them kill a person in his neighborhood.

As someone who witnessed gang murders and has been targeted by those gangs, the danger of persecution and torture to J.B.B.C. is extreme and well-documented in numerous public reports about gangs in Honduras.  Honduras has one of the highest murder rates in the world and children are not exempt from this widespread violence.  Indeed, many children are targeted specifically by gang members for recruitment, or retaliated against and threatened because of their family connections or what they know about the gangs as witnesses.  Children have experienced extreme harms ranging from threats against their lives and physical abuse to rape, kidnapping, and murder.

J.B.B.C. fled Honduras because he was afraid for his life and journeyed to the United States to seek safety and reunite with his father, who lives in the United States and can safely take care of him.

On or around June 4, 2020, J.B.B.C. entered the United States in the El Paso, Texas area, where CBP apprehended him.  CBP officials did not give him any opportunity to raise his fear of return to Honduras.

On the afternoon of June 4, J.B.B.C.'s father received a call from a government official asking for his name, address, and to confirm that he was J.B.B.C.'s father.  The official on the phone said that they would call the father again with more information.  The next day, the father received a call from the same phone number and was able to speak with J.B.B.C. briefly.

On or about June 6, J.B.B.C. was moved from a CBP detention facility to a hotel.  He has remained in the hotel while government officers seek to put him on a flight back to Honduras.

When J.B.B.C. and his father spoke on the phone, his father also sought to tell the officers that his son was fleeing danger in Honduras but there was no action taken by the government.

As of Tuesday, June 9, 2020, J.B.B.C. has spent at least five days in government custody, while he awaits deportation.  J.B.B.C. has not exhibited any symptoms of COVID-19 and is in good health.

J.B.B.C.'s removal to Honduras is imminent.  J.B.B.C.'s counsel and father have attempted to obtain information from CBP about his whereabouts and whether Defendants plan to deport him to Honduras.  On June 9, 2020, at 8:20 am CST, a DHS official confirmed via email to J.B.B.C.'s counsel that the boy "is pending expulsion under Title 42" and that, "[a]t this time, there is no legal impediment to the imminent expulsion of [J.B.B.C.]."   Later on June 9, at 11:17 am CST, a DHS official further stated in email to J.B.B.C.'s counsel that J.B.B.C. is "scheduled to depart via an ICE Air flight within the next few days" and that the Honduran consulate "has been advised."  At 6:00 pm EDT, DHS stated that his removal would occur on June 10.

If J.B.B.C. is allowed to remain the United States, he could live with his father, who has a home waiting for J.B.B.C. in Texas.

As explained more fully in Plaintiffs' Complaint, the Title 42 Process is a new immigration system  established under the government's public health powers codified in Title 42 of the U.S. Code.  Specifically, in a series of agency documents the Centers for Disease

Control and U.S. Customs and Border Protection ("CBP") have invoked 42 U.S.C. § 265 to bar and expel noncitizens who arrive at the border or enter the country without documents.[1]

The government has implemented this Title 42 process as an alternative immigration system, ignoring the various protections for vulnerable noncitizens, including unaccompanied minors, and deporting people with no hearings, purportedly under its Title 42 authority rather than the immigration system established under Title 8 of the U.S. Code.  Public reporting indicates that deportations (or "expulsions") pursuant to Title 42 take place within a matter of days after apprehension, including for unaccompanied children.  The government has largely carried out this new expulsion process in secret.

## LEGAL STANDARD

The general four-factor test for injunctive relief applies to applications for stays of removal from noncitizens.  *See Nken v. Holder*, 556 U.S. 418, 434 (2009).  Courts deciding whether to grant a stay of removal weigh:  "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Id*.  The first two prongs of the stay inquiry (likelihood of success and irreparable harm) are the "most critical."  *Id.*; *see also*

---

[1] *See* Control of Communicable Diseases; Foreign Quarantine:  Suspension of Introduction of Persons into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16559-01 (Mar. 24, 2020) (effective date Mar. 20, 2020); Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists." 85 Fed. Reg. 17,060-17088 (Mar. 26, 2020) (effective date Mar. 20, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 22,424 (Apr. 22, 2020) (effective date Apr. 20, 2020); Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 31,503 (May 26, 2020) (effective date May 21, 2020); U.S. Customs and Border Protection and U.S. Border Patrol "Operation Capio" memo, *available at* https://www.documentcloud.org/documents/6824221-COVID-19-CAPIO.html.

*Leiva-Perez v. Holder*, 640 F.3d 962, 967 (9th Cir. 2011); *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999).  This Court should grant a stay of deportation, especially given that the balance of harms tips so decidedly in Plaintiff's favor.  A stay  will allow the Court to fully consider the novel questions raised by this case.

## ARGUMENT

### I.    Plaintiff is Facing Irreparable Injury

Plaintiff—a seven-year-old boy fleeing abuse and violence in his home country, and who seeks to reunite with his father in this country—would suffer grave harm absent a stay of deportation.  As the declaration of Plaintiff's lawyer explains, Plaintiff has experienced and witnessed violence and threats in Honduras, and will be subject to harm or even death at the hands of gangs if he is deported.  Deportation would also deprive him of the statutorily guaranteed opportunity to seek bona fide claims for asylum, withholding, and relief under CAT.

Moreover, Honduras is one of the most violent countries in the world.  *See* Bureau of Democracy, Human Rights, and Labor, U.S. Dept' of State, 2019 Country Reports on Human Rights Practices: Honduras at 1-2, https://www.state.gov/wp-content/uploads/2020/02/HONDURAS-2019-HUMAN-RIGHTS-REPORT.pdf (describing extreme gang violence directed at vulnerable populations, including "acts of homicide, torture, kidnapping, extortion, human trafficking, intimidation, and other threats").  The State Department reports that "child abuse remain[s] a serious problem" in the country, and that youth are particularly vulnerable to forced displacement, targeting by gangs, domestic violence, and other forms of discrimination and oppression.  *See id.* at 17.

These facts more than satisfy the stay standard, which requires "*only a likelihood* of irreparable injury."  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016)

(preliminary injunction request) (emphasis added).  Nor is there any doubt that the harms

Plaintiff faces are *irreparable*; indeed, they would be "beyond remediation."  *Damus v. Nielsen*,

313 F. Supp. 3d 317, 342 (D.D.C. 2018); *see, e.g.*, *Devitri v. Cronen*, 289 F. Supp. 3d 287, 296–

97 (D. Mass. 2018) (significant risk of persecution if removed is irreparable harm); *Orantes-*

*Hernandez v. Meese*, 685 F. Supp. 1488, 1504–05 (C.D. Cal. 1988) (plaintiffs would suffer

irreparable harm if they were summarily removed without being afforded the opportunity to

exercise their right to apply for asylum); *Nunez v. Boldin*, 537 F. Supp. 578, 586–87 (S.D. Tex.

1982) ("Deportation to a country where one's life would be threatened obviously would result in

irreparable injury."); *cf. R.I.L-R v. Johnson*, 80 F.Supp. 3d 164, 191 (D.D.C. 2015) (granting

preliminary injunction because harm from detention pursuant to an unlawful policy is beyond

remediation).

## II.      Plaintiff Is Likely to Succeed on the Merits of His Claims.

Plaintiff is likely to succeed on the merits of his challenge to the government's novel

efforts to deport him under the supposed authority of 42 U.S.C. § 265.  As explained below,

§ 265 does not authorize deportation at all.  But even if such deportations were permitted,

Plaintiff is entitled to explicit statutory procedures and protections as an unaccompanied child

seeking humanitarian protection in this country.  Those specific, later-enacted statutes control

over whatever § 265 may authorize in general.

### A.  Title 42 Does Not Authorize Deportation.

The CDC Immigration Orders were issued under the purported authority of 42 U.S.C.

§ 265, a provision that has laid dormant and largely forgotten in the U.S. Code for over a

hundred years.  Defendants claim to have discovered in this statute a source of unlimited

authority to execute summary deportations as they see fit, without regard for the carefully crafted

policy judgments of the Nation's immigration laws.  But when an agency claims to discover "an unheralded power" lying dormant "in a long-extant statute," courts "typically greet its announcement with a measure of skepticism." *Util. Air Reg. Group v. EPA*, 573 U.S. 302, 324 (2014).  And, indeed, this novel, sweeping assertion of Executive dominance in the realm of immigration exceeds the power granted by § 265.  Nothing in § 265, or Title 42 more generally, purports to authorize *any* deportations, much less deportations in violation of the specific protections described below.

Section 265 authorizes the CDC to prohibit the "introduction of persons" under certain circumstances.  It says nothing about any power to physically remove people from the United States.  Nor does a neighboring provision laying out the "penalties" for violation of "any regulation prescribed" under § 265 make any mention of such deportation or expulsion authority. *See* 42 U.S.C. § 271.  Instead, § 271 provides for fines and imprisonment of individuals for violation of public health regulations.  Nowhere in Title 42 does any statute mention the newly asserted power to deport, in the name of public health, independent of Congress's carefully reticulated immigration scheme.

That silence speaks volumes.  The Supreme Court has "long recognized that deportation is a particularly severe 'penalty.'" *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) (quoting *Fong Yue Ting v. United States,* 149 U.S. 698, 740 (1893)).  Thus, the extreme exercise of governmental power involved in physically removing a person from the country is one that must be granted by Congress, as "the Constitution creates no executive prerogative to dispose of the liberty of the individual." *Valentine v. U.S. ex rel. Neidecker*, 299 U.S. 5, 9 (1936) (holding that extradition power "does not exist save as it is given by act of Congress or by the terms of a treaty").

8

Such powers of physical removal from the country—whether called deportation, removal, extradition, or expulsion—"in order to exist must be *affirmatively* granted" by Congress. *Id.* at 12 (emphasis added) (rejecting argument that power to extradite U.S. citizens could be implied from provision stating that United States was not bound to extradite them). Accordingly, where Congress seeks to authorize that extraordinary physical control, it does so in explicit terms. *See, e.g.*, 8 U.S.C. § 1231 (immigration removals); *id.* § 1225(b)(2)(c) ("may return the alien" to contiguous country); 18 U.S.C. §§ 3185, 3186, 3196 (extradition authority). Courts do not—and, given the gravity of the asserted power, must not—lightly read expulsion powers into statutes that do not explicitly grant it. *Valentine*, 299 U.S. at 12; *cf. Util. Air Regulatory Grp.*, 573 U.S. at 324 ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance.") (internal quotation marks omitted). Nowhere in Title 42 has Congress granted that power.

That is not to say that Congress has ignored public health considerations in crafting immigration policy. To the contrary, from the earliest days of immigration regulation— predating the 1893 enactment of the predecessor to § 265—Congress has explicitly authorized the deportation of individuals based on public health concerns. *See* Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084, 1085. And similar statutes exist today. *See* 8 U.S.C. § 1182(a)(1) ("[h]ealth-related grounds" of inadmissibility, including communicable diseases); 8 U.S.C. § 1222 (medical detention and examination as part of immigration processing).

Title 42 authorizes testing and quarantines, not expulsions. Indeed, § 265, the provision on which the Administration relies for its new power, could not be read to authorize expulsions because that section applies without differentiation to citizens and noncitizens alike. If the government is correct that § 265 authorizes expulsions, it would therefore mean that Congress

gave the executive branch the power to expel citizens as well as noncitizens.  It is inconceivable that Congress would seek to give the executive branch that (plainly unconstitutional) power.

Had Congress sought to authorize the mass deportations on health-related grounds which are now underway, and particularly had it authorized the removal of vulnerable unaccompanied children like Plaintiff who are entitled to unique statutory safeguards, it would have needed to clearly say so.

**B.  Plaintiff's Deportation Violates The Specific Protections Established By Congress.**

**1. Plaintiff's Deportation Violates Mandatory Duties Imposed by the TVPRA**

Congress has carefully and repeatedly worked to ensure that unaccompanied children like Plaintiff are afforded unique, mandatory, and protective procedures when they face deportation. Defendants have jettisoned that entire statutory scheme.

In 2002, Congress included provisions in the Homeland Security Act ("HSA") to "ensur[e] that the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child."  6 U.S.C. § 279(b)(1)(B).  Through the HSA, Congress vested responsibility for the care of unaccompanied children, including the provision of housing and access to legal services to pursue claims for immigration relief, in an agency— ORR—that had demonstrated experience working with vulnerable immigrants and refugees.  6 U.S.C. § 279(a).  In 2008, Congress enacted the Trafficking Victims Protection Reauthorization Act "TVPRA," which strengthened those protections by providing for the swift referral of unaccompanied children to ORR custody, who would then take responsibility for their safety and release to community members in the United States.  *See J.D. v. Azar*, 925 F.3d 1291, 1301-02 (D.C. Cir. 2019) (describing TVPRA statutory scheme and ORR shelter system).

Thus, Congress prescribed a careful and comprehensive set of directions to federal agencies—including some Defendants here—for how unaccompanied children should be processed and cared for upon their apprehension.  Among other protections, Congress required agencies, including CBP, to expeditiously transfer children like Plaintiff to ORR custody.  8 U.S.C. § 1232(b)(3).  It required ORR to provide safe and secure placements for all children in its care, and to facilitate their release to sponsors.  8 U.S.C. § 1232(c)(2)-(3).  And it prevented DHS from removing such children absent placement in full removal proceedings before an immigration judge.  8 U.S.C. § 1232(a)(5)(D)(ii).  Through these provisions, Congress sought to satisfy its domestic and international obligations to protect a uniquely vulnerable set of children, most (if not all) of whom likely qualify for various forms of humanitarian protection.  Indeed, the legislative history of the TVPRA is replete with statements describing this country's "special obligation to ensure that [unaccompanied] children are treated humanely and fairly."  154 Cong. Rec. S10886-01, S1088–S10887, 2008 WL 5169970 (Dec. 10, 2008); *see also* 153 Cong. Rec. H14098-01, H14118 (Dec. 4, 2007) (discussing statute's purpose of "provid[ing] critical immigration mechanisms to protect children").

Through its creation of an alternative immigration system for unaccompanied children, Defendants have circumvented the reticulated scheme Congress set forth for their treatment and care.

Whatever Title 42 authorizes in general, it cannot override the provisions of the immigration laws providing protection to unaccompanied minors and those seeking protection, *see infra* – even where such individuals are suspected of having a communicable disease.  Such an interpretation would violate numerous canons of statutory construction, including that the specific should be read to control over the general.  *See, e.g.*, *Air All. Houston v. EPA*, 906 F.3d

1049, 1061 (D.C. Cir. 2018) ("[A]n agency may not circumvent specific statutory limits on its

actions by relying on separate, general rulemaking authority.").  The TVPRA embodies

Congress's focus on a particularly vulnerable group of noncitizens seeking safety in this country.

The general terms of § 265, which do not refer to the treatment of minors, should not be

construed to bypass the specific provisions of the TVPRA.  *See Radzanower v. Touche Ross &*

*Co.*, 426 U.S. 148, n.2 (1976) ("[T]he more specific legislation will usually take precedence over

the more general."); *cf. Clinton v. City of New York*, 524 U.S. 417, 443 (1998) (holding Congress

may not give the President "the power to cancel portions of a duly enacted statute").  This

interpretive principle has particular force where the more specific statute is the later-enacted one;

that is the case here, as § 265 was originally enacted in 1893 and last amended in 1944.  *See*

*United States v. Juvenile Male*, 670 F.3d 999, 1008 (9th Cir. 2012) (explaining that "[w]here two

statutes conflict, the later-enacted, more specific provision generally governs").  Recent

Congresses have spoken clearly and explicitly regarding the required treatment of

unaccompanied minors; the Executive is not at liberty to ignore those commands.

### 2. Plaintiff's Deportation Violates the Asylum and Withholding Statutes, and FARRA.

Plaintiff also has a right to seek protection from persecution and torture, as Congress has

long prescribed.  But the Title 42 Process unlawfully sidesteps these safeguards.

First, the asylum statute, 8 U.S.C. § 1158, provides that any noncitizen physically in the

United States has a right to apply for asylum, regardless of their status.  Specifically, the statute

provides that "[a]ny alien who is physically present in the United States or who arrives in the

United States (whether or not at a designated port of arrival . . .), irrespective of such alien's

status, may apply for asylum . . ."  8 U.S.C. § 1158(a)(1).

The asylum statute provides a narrow list of bars to asylum, none of which apply to Plaintiff.[2]  Moreover, Congress expressed a special concern with expanding access to asylum for unaccompanied children like Plaintiff, by exempting them from the one-year deadline that ordinarily applies to asylum applications, 8 U.S.C. 1158(a)(2)(B), preventing their removal to a "safe third country," *id.* 1158(a)(2)(A), and by providing them the opportunity to apply for asylum in the first instance before an asylum officer in a non-adversarial setting, *id.* 1158(b)(3)(C).

Second, the withholding of removal statute, 8 U.S.C. § 1231(b)(3), provides that a noncitizen "may not" be removed to a country where their "life or freedom" would be threatened based on a protected ground.  A grant of withholding is mandatory if the individual meets the statutory criteria.  *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999).  Congress enacted this statute to "conform[] it to the language of Article 33 [of the 1951 U.N. Convention of Refugees]," *INS v. Stevic*, 467 U.S. 407, 421 (1984), in several respects, including by making withholding "mandatory" where the eligibility criteria are satisfied, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 n.25 (1987), and by giving it broad application where a noncitizen fears return, *see Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1088 (9th Cir. 2020).  Congress again outlined specific and narrow bars to withholding of removal, none of which apply to Plaintiff.[3]

---

[2] The statute makes asylum unavailable to an applicant who, inter alia, previously applied for and was denied asylum, *id.* § 1158(a)(2)(C) (previous denial bar); engaged in persecution or terrorist activities, see *id.* § 1158(b)(2)(A)(i) (persecution of others bar); *id.* at § 1158(b)(2)(A)(v) (terrorist bar); *id.* § 1158(b)(2)(A)(iv) (national security bar); has committed certain crimes, *id.* § 1158(b)(2)(A)(ii) (particularly serious crime bar); *id.* § 1158(b)(2)(A)(iii) (serious non-political crime bar); and who "was firmly resettled in another country prior to arriving in the United States," *id.* § 1158(b)(2)(A)(vi) (firm settlement bar).

[3] A withholding applicant who assisted in Nazi persecution is barred from withholding.  8 U.S.C. § 1231(b)(3)(B).  The other bars address persecutors, *id* § 1231(b)(3)(B)(i); particularly serious crimes , *id* § 1231(b)(3)(B)(ii); serious non-political crimes, *id* § 1231(b)(3)(B)(iii); and security and terrorism, *id* § 1231(b)(3)(B)(iv).

Third, protections under Convention Against Torture ("CAT") prohibit returning a noncitizen to a country where it is more likely than not that she would face torture.  Article 3 of CAT provides that "[n]o State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."  Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20 (1988). Congress subsequently implemented Article 3 of CAT.  *See* Foreign Affairs Reform and Restructuring Act of 1998 § 2242(a), Pub. L. No. 105-207, Div. G. Title XXI, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note); 8 C.F.R. § 1208.16-.18 (implementing regulations).  There are no bars to eligibility for CAT protection.  *See Negusie v. Holder*, 555 U.S. 511, 514 (2009).

In short, Congress carefully crafted the statutory provisions governing asylum, withholding, and CAT to ensure that noncitizens within our country or at the border could seek relief from persecution.  In so doing, Congress sought to satisfy its domestic and international obligations to protect those fleeing persecution and torture.  And, critically, Congress enshrined procedural access to these forms of protection before a person can be deported from the country. The Title 42 Process jettisons all those protections and safeguards, subjecting Plaintiff to summary deportation back to persecution and torture.[4]

---

[4] The only humanitarian protection provided under the Title 42 Process is limited to CAT, and is totally inadequate—especially for an unaccompanied child like Plaintiff.  Noncitizens are only be referred for a CAT screening if they "make an *affirmative, spontaneous and reasonably believable* claim that they fear being tortured in the country they are being sent back to."  CBP Memo 4 (emphasis added).  This means that children must know precisely what to say when they arrive in the U.S., and may be summarily returned to the countries they fled without the government ever even asking whether they would face torture in that country.

Unsurprisingly, this screening offers essentially no protection: As of May 13, 2020, out of thousands of expulsions under Title 42, Defendants reportedly conducted a mere 59 screening interviews for CAT, of which only two applicants passed the screening stage.  Nick Miroff, Under Trump Border Rules, U.S. Has Granted Refuge to Just Two People Since Late March, Records Show, Wash. Post (May 13, 2020),

**C.  The Removal of Plaintiff is Arbitrary and Capricious**

Defendants' application of the Title 42 Process to Plaintiff also violates the APA in several respects.  *First*, Defendants have provided no reasoned explanation for their actions.  "An agency action that lacks explanation is a textbook example of arbitrary and capricious action." *Mori v. Dep't of the Navy*, 917 F. Supp. 2d 60, 64 (D.D.C. 2013).  Nowhere do any of the documents setting forth the Title 42 Process offer any reasoned explanation for their failure generally to exempt unaccompanied children, including unaccompanied children fleeing abuse, persecution, and torture.  Nor have Defendants offered any explanation for their decision specifically to apply the Title 42 Process to J.B.B.C., despite his fears of persecution—and the ready availability of a parent in the United States to whom he can be released.

*Second*, in applying the Title 42 Process to Plaintiff, Defendants "entirely failed to consider [multiple] important aspect[s] of the problem," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), because they did not "adequately analyze the . . . consequences" of their actions on an unaccompanied child and asylum seeker like Plaintiff, *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017). The APA requires the agency to "analyze the impact" of its actions on affected individuals. *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1105-06 (D.C. Cir. 2019).  As demonstrated above, Congress through the TVPRA clearly expressed a paramount concern for the protection and well-being of unaccompanied children who arrive at ports of entry or are apprehended near the border.  *See, e.g.*, *Flores v. Sessions*, 862 F.3d 863, 880-81 (9th Cir. 2017) ("The overarching

---

https://www.washingtonpost.com/immigration/border-refuge-trump-records/2020/05/13/93ea9ed6-951c-11ea-8107-acde2f7a8d6e_story.html; Camilo Montoya-Galvez, Only 2 Migrants Allowed to Seek Humanitarian Protection Under Trump's Coronavirus Border Order, CBS News (May 13, 2020), https://www.cbsnews.com/news/only-2-migrants-allowed-to-seek-humanitarian-protection-under-trumps-coronavirus-border-order/.

purpose of the HSA and TVPRA was quite clearly to give unaccompanied minors more protection, not less."). Defendants were required to consider and address this clear and weighty concern, and how their adoption of the Title 42 Process would impact unaccompanied children like Plaintiff, who Congress has sought to protect. *See Nat'l Lifeline Ass'n*, 921 F.3d at 1113 (holding action was arbitrary and capricious for failing to consider that eliminating a subsidy would cause "many low-income consumers on Tribal lands [to] lose access to affordable telecommunications service"). Defendants' failure to consider or address how their new process would impact unaccompanied children renders the process arbitrary and capricious.

Defendants also failed to consider and address the need to protect individuals fleeing persecution. Removing asylum seekers is "replete with danger." *Cardoza-Fonseca*, 480 U.S. at 449. None of the documents comprising the Title 42 Process addresses the obvious dangers of returning asylum seekers—let alone unaccompanied child asylum seekers like Plaintiffs here—to the countries they fled.

*Third*, the Title 42 process exempts numerous categories of individuals, such as students and commercial truck drivers, who carry at least as great a risk of COVID-19 as asylum seekers unaccompanied minors. Public health experts have overwhelmingly concluded that the Title 42 process cannot be justified on public health grounds, especially as applied to children.

## IV.     The Remaining Injunction Factors Weigh Heavily in Favor of a

Because of the severity of injury that Plaintiff faces, the balance of harms weighs strongly in favor of a stay. Preventing Defendants from removing one young boy until the Court can address these novel issues would not substantially injure the government.

The public interest also weighs strongly in favor of granting a stay here. First, the Supreme Court has recognized that the public interest lies "in preventing aliens from being

wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436.  Treating asylum seekers with basic fairness and dignity is among our nation's best traditions.  *See, e.g.*, Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102 ("[I]t is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including . . . admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States.").

Second, the TVPRA embodies this nation's commitment to vulnerable children seeking humanitarian relief.  The public interest is also served when the government complies with its obligations under U.S. law, including the Administrative Procedure Act.  *See O'Donnell Const. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992); *Damus*, 313 F. Supp. 3d at 342; *R.I.L-R*, 80 F. Supp. 3d at 191.  The public also "has an interest in ensuring that its government respects the rights of immigrants[.]"  *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 124 (D.D.C. 2018) (enjoining immigration authorities from removing Plaintiffs pursuant to expedited removal orders).

In short, the balance of harms and the public interest decisively favor affording Plaintiff the statutory safeguards to which he is entitled, and affording him a meaningful opportunity to seek relief in full removal proceedings

## CONCLUSION

This Court should stay Plaintiff's deportation (whether denominated expulsion, removal, or any other term) and set a briefing schedule for Plaintiff's motion for a TRO or preliminary injunction.

Dated: June 9, 2020

Respectfully submitted,

/s/Celso J. Perez

Stephen B. Kang*
Cody Wofsy*
Morgan Russell*
Adrienne Harrold*
American Civil Liberties Union Foundation,
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770

Andre Segura*
Kathryn Huddleston*
Rochelle Garza*
Brantley Shaw Drake*
American Civil Liberties Union Foundation
of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, Texas 77007
Tel. (713) 942-8146

Jamie Crook (D.C. Bar No. 1002504)
Blaine Bookey
Karen Musalo
Center for Gender & Refugee Studies
200 McAllister St.
San Francisco, CA 94102
Tel: (415) 565-4877

*Pro hac vice application forthcoming

Lee Gelernt*
Daniel A. Galindo*
Celso J. Perez (D.C. Bar No. 1034959)
American Civil Liberties Union Foundation,
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2600

Robert Silverman*
Oxfam America
226 Causeway Street, Suite 500
Boston, MA 02114
Tel: (617) 482-1211

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation of
the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel: (202) 457-0800

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify on or after June 9, 2020, I will cause a copy of this motion, supporting

exhibits and proposed order to be served on the following, together with the summons and

complaint:

Chad F. Wolf
Acting Secretary of the Department of Homeland Security
245 Murray Lane, SW,
Washington, DC 20528;

Mark A. Morgan
Acting Commissioner of U.S. Customs and Border Protection
1300 Pennsylvania Ave, NW
Washington, DC 20229;

Todd C. Owen
Executive Assistant Commissioner, CBP Office of Field Operations
1300 Pennsylvania Ave. NW
Washington, DC 20229;

Rodney S. Scott
Chief of U.S. Border Patrol
U.S. Border Patrol
1300 Pennsylvania Ave, NW
Washington, DC 20229;

Matthew T. Albence
Deputy Director of U.S. Immigration and Customs Enforcement,
500 12th Street, SW
Washington, DC 20536;

Alex M. Azar II
Secretary of the U.S. Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C. 20201;

Dr. Robert R. Redfield
Director of the Centers for Disease Control and Prevention
1600 Clifton Road,
Atlanta, GA 30329 USA;

Heidi Stirrup
Acting Director of the Office of Refugee Resettlement,
330 C Street SW
5th Floor
Washington, D.C. 20201

William Barr
Attorney General of the United States
950 Pennsylvania Avenue, NW
Washington, DC  20530

Michael R. Sherwin
Acting U.S. Attorney for the District of Columbia
United States Attorney's Office
555 4th Street, NW
Washington, DC  2001

/s/ Celso J. Perez
Celso J. Perez