**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

J.B.B.C., a MINOR CHILD, by and through his father and next friend, Carlos Emilio Barrera Rodriguez,

        *Plaintiff,*

   v.

CHAD F. WOLF, Acting Secretary of Homeland Security, in his official capacity, et al.,

        *Defendants.*

Civil Action No. 1:20-cv-01509 (CJN)

---

**BRIEF OF *AMICUS CURIAE* THE INTERNATIONAL REFUGEE ASSISTANCE PROJECT, INC. IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

Mariko Hirose (D.C. Bar No. NY0262)
Kathryn Austin (N.Y. Bar No. 5251178)*
Geroline Castillo (N.Y. Bar No. 5784434)*
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 4th Floor
New York, N.Y. 10004
Tel: (516) 701-4620

*Counsel for Amicus Curiae*

*\* Non-members of the bar of this Court
appearing under LCvR 83.2(c)(1)*

Dated:  June 12, 2020

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Civil Rule 7(o)(5) and Federal Rules of Appellate Procedure 29(a)(4)(A) and 26.1, *amicus curiae* submits the following corporate disclosure statement:

The International Refugee Assistance Project, Inc. is a private, non-profit organization. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE*.................................................................................... 1

INTRODUCTION ..............................................................................................................1

ARGUMENT .....................................................................................................................3

   I. DEFENDANTS' EXPULSION POLICY CONTRAVENES THE TEXT OF THE
   REFUGEE ACT AND RELATED HUMANITARIAN PROTECTION LAWS .......................3

      A. Congress requires the Executive to follow specific procedures to identify and evaluate
      humanitarian protection claims ..................................................................................3

      B. Congress has prohibited the Executive from blocking access to the humanitarian
      protection system on health-related grounds ...........................................................5

   II. DEFENDANTS' EXPULSION POLICY CONTRAVENES CONGRESS'S INTENT ........8

      A. Congress understood our obligations to asylum seekers in stark moral terms ...................8

      B. Congress required the Executive to follow specific procedures so that the Executive
      would not undercut the rights of asylum seekers .................................................12

CONCLUSION..............................................................................................................14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Grace v. Whitaker*,
  344 F. Supp. 3d 96 (D.D.C. 2018) ........................................................................ 11

*I.N.S. v. Cardoza-Fonseca*,
  480 U.S. 421 (1987) .............................................................................................. 9

**Statutes**

8 U.S.C. § 1101 ........................................................................................................ 4

\* 8 U.S.C. § 1158 ............................................................................................... *passim*

8 U.S.C. § 1159 ........................................................................................................ 4

\* 8 U.S.C. § 1182 ................................................................................................... 6, 7

8 U.S.C. § 1222 ........................................................................................................ 7

\* 8 U.S.C. § 1225 ............................................................................................. 4, 5, 13

\* 8 U.S.C. § 1229a .................................................................................................... 4

\* 8 U.S.C. § 1231 .............................................................................................. 3, 4, 6

8 U.S.C. § 1232 ........................................................................................................ 5

8 U.S.C. § 1252 .................................................................................................. 4, 13

8 U.S.C. § 1427 ........................................................................................................ 4

\* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242(a), 112
  Stat. 2681, 2681-822 ...................................................................................... 11, 14

Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102, 102 ....................... 10

**Regulations**

8 C.F.R. § 34.5 ......................................................................................................... 7

8 C.F.R. § 108.1 ...................................................................................................... 12

8 C.F.R. § 208.16 ...................................................................................................... 3

8 C.F.R. § 208.17 ................................................................................................... 3, 6

8 C.F.R. § 208.30 ...................................................................................................... 5

8 C.F.R. § 1208.16 ................................................................................................................ 4

8 C.F.R. § 1208.17 ................................................................................................................ 4

42 C.F.R. § 34.3 ................................................................................................................... 7

42 C.F.R. § 71.1 ................................................................................................................... 7

42 C.F.R. § 71.20 ................................................................................................................. 7

42 C.F.R. § 71.36 ................................................................................................................. 7

**Rules**

Local Civil Rule 7 ................................................................................................................ 1

Federal Rule of Appellate Procedure 29 .............................................................................. 1

**Agency Materials**

Amendment and Extension of Order Suspending Introduction of Certain Persons from Countries
    Where a Communicable Disease Exists, 85 Fed. Reg. 31,503, 31,508 (May 26, 2020) ............ 5

Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8481 (Feb. 19,
    1999) ............................................................................................................................... 11

USCIS Policy Manual Vol. 7, Part M, Ch. 3 (2020), *available at* https://www.uscis.gov/policy-
    manual/volume-7-part-m-chapter-3 ................................................................................. 7

USCIS Policy Manual Vol. 8, Part B, Ch. 3 (2020), *available at* https://www.uscis.gov/policy-
    manual/volume-8-part-b-chapter-3 .................................................................................. 7

U.S. Customs and Border Protection, "Nationwide Enforcement Encounters:  Title 8
    Enforcement Actions and Title 42 Expulsions," https://www.cbp.gov/newsroom/stats/cbp-
    enforcement-statistics/title-8-and-title-42-statistics (last visited June 12, 2020) ...................... 2

U.S. Dep't of Justice, Executive Office for Immigration Review, Immigration Court Practices
    During the Declared National Emergency Concerning the COVID-19 Outbreak, PM 20-10, at
    1 n.1 (Mar. 18, 2020), *available at* https://www.justice.gov/eoir/file/1259226/download ........ 6

**Legislative History**

114 Cong. Rec. 27,758-59 (1968) ...................................................................................... 10

114 Cong. Rec. 29,391 (1968) ............................................................................................. 9

114 Cong. Rec. 29,607-08 (1968) ........................................................................................ 9

125 Cong. Rec. 11,973 (1979) ................................................................................. 11

126 Cong. Rec. 4507 (1980) ................................................................................... 13

142 Cong. Rec. 11,491 (1996) ................................................................................. 11, 13

H.R. Rep. No. 96-608 (1979) .......................................................................... 9, 10, 12, 13

H.R. Rep. No. 104-469 (1996) ................................................................................. 11

S. Rep. No. 96-256 (1979) ...................................................................................... 13

*Admission of Refugees into the United States, Hearings before the Subcomm. on Immigration, Citizenship, and Int'l Law, H. Comm. on the Judiciary*, 95th Cong. 126 (1977) .................... 12

*The Refugee Act of 1979, S. 643:  Hearing Before the S. Comm. on the Judiciary*, 96th Cong. 36 (1979). ...................................................................................................... 10

## Periodicals

Jeff Abbott, *Outrage as Guatemalan Maya spiritual guide is tortured and burned alive*, Guardian, June 10, 2020, https://www.theguardian.com/world/2020/jun/10/guatemalan-maya-spiritual-guide-tortured-burned-alive ........................................................................... 2

*Deadly blast hits Kabul Mosque during Friday prayers*, Al Jazeera, June 12, 2020, https://www.aljazeera.com/news/2020/06/deadly-blast-hits-kabul-mosque-friday-prayers-200612092826021.html ......................................................................................... 2

Nathan Hodge & Mary Ilyushina, Anti-gay viral video stirs outrage ahead of Russian referendum, CNN, June 3, 2020, https://www.cnn.com/2020/06/03/europe/anti-lgbtq-video-russia-referendum-intl/index.html ........................................................................... 2

Ruth Ingram, *CCP Stepping Up the Pace of Uyghur Forced Labor into Inner China*, Bitter Winter, May 23, 2020, https://bitterwinter.org/ccp-stepping-up-the-pace-of-uyghur-forced-labor-into-inner-china/ ............................................................................................ 2

Jared Olson, *Pandemic response a partisan war on the people in Honduras,* Toward Freedom, May 26, 2020, https://towardfreedom.org/story/pandemic-response-a-partisan-war-on-the-people-in-honduras/ ............................................................................................ 2

*Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols," as compiled by Human Rights First*, Human Rights First, May 13, 2020, https://www.humanrightsfirst.org/sites/default/files/PubliclyReportedMPPAttacks5.13. 2020.pdf .................................................................................................... 2

Hector Silva Avalos, *Inside an MS13 Clique's Campaign of Terror at the Honduras-El Salvador Border*, InSight Crime, June 5, 2020, https://www.insightcrime.org/news/analysis/ms13-clique-honduras-el-salvador/ .............................................................................. 2

Gilad Thaler & Kate Smith, "*They don't know our reality": Lives impacted by El Salvador's abortion ban*, CBS News, June 3, 2020, https://www.cbsnews.com/news/abortion-ban-el-salvador-lives-affected/ ................................................................................................................ 2

Jose Miguel Vivanco, *Mexican Journalism in Mourning*, Human Rights Watch, June 11, 2020, https://www.hrw.org/news/2020/06/11/mexican-journalism-mourning ..................................... 2

**Other Authorities**

Affidavit of Louis Henkin, Resp'ts' Br*., McNary v. Haitian Centers Council, Inc.*, 1992 WL 541267 (U.S. Dec. 21, 1992) ...................................................................................... 9

Exec. Comm. of the High Commissioner's Programme, Note on International Protection, U.N. Doc. A/AC.96/815 (1993), *available at* https://www.refworld.org/docid/3ae68d5d10.html..... 9

The Refugee Convention, 1951:  The Travaux Preparatoires Analysed with a Commentary by Dr Paul Weis 235, *available at* https://www.unhcr.org/en-us/protection/travaux/4ca34be29/refugee-convention-1951-travaux-preparatoires-analysed-commentary-dr-paul.html......... 9, 10

Report of the Working Group on a Draft Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, U.N. Doc. E/CN.4/L.1470, at ¶ 44 (Mar. 12, 1979), *available at* http://hr-travaux.law.virginia.edu/document/catcidtp/ecn4l1470/nid-159 ........... 11

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae* the International Refugee Assistance Project, Inc. ("IRAP") is a nonprofit organization dedicated to advancing and defending the rights of refugees and other displaced people through systemic litigation, direct representation, and policy and media advocacy.  As counsel to hundreds of refugees and asylum seekers before administrative agencies and in the federal courts since its founding in 2008, IRAP has direct insight into the worldwide refugee crisis and a strong interest in ensuring that the Refugee Act and related laws are enforced in a manner that is consistent with Congress's humanitarian objectives.

IRAP files this brief pursuant to Local Civil Rule 7(o)(1) and the Court's Scheduling Order dated June 11, 2020, ECF No. 9.  No counsel for a party authored this brief in whole or in part; no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief; and no person other than *amicus curiae*, its members, or its counsel made such a monetary contribution.  *See* LCvR 7(o)(5); Fed. R. App. P. 29(a)(4)(E).

## INTRODUCTION

Since March 2020, officers of U.S. Customs and Border Protection have been expelling people from the United States on asserted public health grounds without regard for the system Congress created to ensure protection for those fleeing persecution and torture.  Congress's system requires the executive branch to follow specific procedures to identify and evaluate humanitarian protection claims whenever it seeks to expel, turn away, or otherwise remove someone from the United States.  And it bars the executive branch from discounting the rights of people at or within our borders who seek humanitarian protection (or "asylum seekers") when providing for the public health.  Yet even as acts of persecution and torture continue to be documented in the Northern

1

Triangle, Mexico, and many other places worldwide,[1] our government has returned tens of thousands of people to Mexico or their countries of origin without respecting the safeguards Congress created.[2]

Defendants purport to have authority under the Public Health Service Act to expel asylum seekers like Plaintiff—a child who fled Honduras and entered the United States alone—without these safeguards.  Plaintiff is likely to succeed on the merits of his claims that Defendants' expulsion policy is in fact unlawful because, among other things, the U.S. humanitarian protection system that Defendants ignore is comprehensive, and its procedures are mandatory.  IRAP agrees with Plaintiff that the Court should grant his motion for a temporary restraining order for all the

---

[1] *See, e.g.*, UN News, *Coronavirus lockdowns in Central America, exploited by criminal gangs*, May 15, 2020, https://news.un.org/en/story/2020/05/1064172; Jared Olson, *Pandemic response a partisan war on the people in Honduras,* Toward Freedom, May 26, 2020, https://toward freedom.org/story/pandemic-response-a-partisan-war-on-the-people-in-honduras/; Jeff Abbott, *Outrage as Guatemalan Maya spiritual guide is tortured and burned alive*, June 10, 2020, Guardian, https://www.theguardian.com/world/2020/jun/10/guatemalan-maya-spiritual-guide-tortured-burned-alive; Gilad Thaler & Kate Smith, "*They don't know our reality": Lives impacted by El Salvador's abortion ban*, CBS News, June 3, 2020, https://www.cbsnews.com/news/abortion-ban-el-salvador-lives-affected/; Hector Silva Avalos, *Inside an MS13 Clique's Campaign of Terror at the Honduras-El Salvador Border*, InSight Crime, June 5, 2020, https://www.insightcrime.org/news/analysis/ms13-clique-honduras-el-salvador/; *Publicly reported cases of violent attacks on individuals returned to Mexico under the "Migrant Protection Protocols," as compiled by Human Rights First*, Human Rights First, May 13, 2020, https://www.humanrightsfirst.org/sites/default/files/PubliclyReportedMPPAttacks5.13.2020.pdf; Jose Miguel Vivanco, *Mexican Journalism in Mourning*, Human Rights Watch, June 11, 2020, https://www.hrw.org/news/2020/06/11/mexican-journalism-mourning; *Deadly blast hits Kabul Mosque during Friday prayers*, Al Jazeera, June 12, 2020, https://www.aljazeera.com/news/2020/06/deadly-blast-hits-kabul-mosque-friday-prayers-200612092826021.html; Nathan Hodge & Mary Ilyushina, *Anti-gay viral video stirs outrage ahead of Russian referendum*, CNN, June 3, 2020, https://www.cnn.com/2020/06/03/europe/anti-lgbtq-video-russia-referendum-intl/index.html; Ruth Ingram, *CCP Stepping Up the Pace of Uyghur Forced Labor into Inner China*, Bitter Winter, May 23, 2020, https://bitterwinter.org/ccp-stepping-up-the-pace-of-uyghur-forced-labor-into-inner-china/.

[2] U.S. Customs and Border Protection, "Nationwide Enforcement Encounters:  Title 8 Enforcement Actions and Title 42 Expulsions," https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42-statistics (last visited June 12, 2020).

reasons set out in Plaintiff's brief.  It submits this brief to further detail how the expulsion policy is contrary to the laws Congress enacted to protect asylum seekers, even setting aside the special and critical protections to which Plaintiff is entitled under the Trafficking Victims Protection Reauthorization Act.  IRAP urges the Court to grant Plaintiff's motion for a temporary restraining order.

**ARGUMENT**

I. **DEFENDANTS' EXPULSION POLICY CONTRAVENES THE TEXT OF THE REFUGEE ACT AND RELATED HUMANITARIAN PROTECTION LAWS**

Under U.S. law, the federal government is prohibited from returning people to places where they will be persecuted or tortured and is required to give people who reach our borders an opportunity to seek asylum.  *See* 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 208.16, 208.17; 8 U.S.C. § 1158(a)(1).  To ensure that the Executive does not run afoul of these mandates, Congress requires it to follow specific procedures to identify and adjudicate humanitarian protection claims whenever it seeks to remove a person from the United States.  This system is comprehensive, and there is no legal basis for the Executive to circumvent it on public health grounds.

A. **Congress requires the Executive to follow specific procedures to identify and evaluate humanitarian protection claims**

Congress requires the Executive to follow specific procedures to protect the rights of asylum seekers at or within U.S. borders.  As Plaintiff explains, unaccompanied children like him are entitled to special protections under the Trafficking Victims Protection Reauthorization Act. *See* Pl.'s Br. at 10-11.  Even in the ordinary course, however, the protections to which asylum seekers are entitled are robust.

Ordinarily, when the government seeks to remove a person from the United States, it must provide a removal hearing with many procedural safeguards—including access to counsel (at no

3

government expense) and opportunities to present evidence and cross-examine government witnesses—to afford that person, among other things, a fair opportunity to present claims for humanitarian protection.  *See* 8 U.S.C. § 1229a.  To demonstrate that the government must protect them from persecution, a person may apply for withholding of removal under 8 U.S.C. § 1231(b)(3), which, with limited exceptions, bars the government from removing someone to a place where their "life or freedom would be threatened . . . because of [their] race, religion, nationality, membership in a particular social group, or political opinion."  To demonstrate that the government must protect them from torture, the person may apply for deferral or withholding of removal under law implementing the U.N. Convention Against Torture, which bars the government from removing anyone to any place where it is "more likely than not" that he or she would be tortured.  8 C.F.R. §§ 1208.16(c), 1208.17(a).  In removal proceedings, a person may also apply for asylum status, which confers additional rights beyond protection from removal.  A person is generally eligible for asylum if they are a "refugee"—that is, they cannot return to their home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1158(b)(1)(A); 8 U.S.C. § 1101(a)(42).  Asylum status, unlike withholding or deferral of removal, provides a pathway to lawful permanent resident status, *see* 8 U.S.C. § 1159(b), and, ultimately, U.S. citizenship, *see* 8 U.S.C. § 1427(a).  A person who does not prevail in the administrative removal hearing has the right to an appeal, *see* 8 U.S.C. § 1229a(c)(5), and ultimately has access to federal judicial review, *see* 8 U.S.C. § 1252(b).

Congress has also created an expedited removal process to permit quick removals of certain narrowly delineated classes of recent arrivals.  *See* 8 U.S.C. § 1225(b)(1)(A) (applying to people arriving in the United States who are determined to lack valid entry documents or to be seeking

4

admission through material misrepresentation, subject to limited expansion by the Attorney General); 8 U.S.C. § 1232(a)(5)(D) (exempting certain unaccompanied children).  Yet even as to those people who are subject to expedited removal, Congress took care to ensure that any who might be eligible for asylum or entitled to withholding or deferral of removal would not be removed unlawfully:  In the expedited removal system, a person who expresses a fear of persecution or torture is referred for a "credible fear" screening, *see* 8 U.S.C. § 1225(b)(1)(A), (b)(1)(B)(ii), where they are given an opportunity to consult with a person of their choosing, *see* 8 U.S.C. § 1225(b)(1)(B)(iv); to be interviewed by an asylum officer with specialized training and under proper supervision, *see* 8 U.S.C. § 1225(b)(1)(B), (E); 8 C.F.R. § 208.30(d); and, so long as their fear is deemed credible, to be placed in full removal proceedings, *see* 8 C.F.R. § 208.30(f). This initial screening process sets a low evidentiary threshold so that anyone who might possibly have a claim for humanitarian protection can present it in full removal proceedings with proper procedural protections.

### B. Congress has prohibited the Executive from blocking access to the humanitarian protection system on health-related grounds

Congress further requires the Executive to make public health decisions in a manner that respects the rights of people seeking humanitarian protection.  Defendants suggest that guarding the public health requires them to overlook the specific rights of asylum seekers.  *See, e.g.*, *supra* n.2; Amendment and Extension of Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 31,503, 31,508 (May 26, 2020). But Congress was clear that potential health concerns are not grounds for preventing asylum seekers from accessing humanitarian protection.

First, Congress drafted the humanitarian protection laws such that a person's health would be irrelevant to whether they could be granted asylum status, withholding of removal, or protection

under the Convention Against Torture.  Under the Convention Against Torture, the government is

prohibited from returning a person to their torturers without exception.  *See* 8 C.F.R. § 208.17(a).

With respect to withholding of removal under 8 U.S.C. § 1231(b)(3), a person facing persecution

is ineligible for protection only if they have persecuted others; participated in Nazi persecution,

genocide, or the commission of any act of torture or extrajudicial killing; or pose a serious threat

to the security of the United States.  *See* 8 U.S.C. § 1231(b)(3)(B).  A person is barred from asylum

only for the narrow set of reasons set out in 8 U.S.C. § 1158(a)(2), (b)(2), which overlap in part

with the exceptions for withholding of removal under 8 U.S.C. § 1231(b)(3) and similarly have

nothing to do with health.  *See also* Pl.'s Br. at 12-14 & nn.2-3.

Second, even though Congress created a mechanism in the immigration laws for the

government to remove a person from the country on health-related grounds, it specifically declined

to make such health-related grounds barriers to applying for and being granted humanitarian

protection from removal.  Ordinarily, a person who seeks to enter the country or to be granted

certain immigration statuses must be "admissible."  This means that they must not fall within any

of the grounds of exclusion specified in 8 U.S.C. § 1182(a), such as lacking valid entry documents,

8 U.S.C. § 1182(a)(7)(A)(i), having crossed the border without inspection, 8 U.S.C.

§ 1182(a)(6)(A)(i), or having been convicted of certain crimes, 8 U.S.C. § 1182(a)(2)(A), (B).  A

person may also be inadmissible on "health-related grounds," including being "determined . . . to

have a communicable disease of public health significance," 8 U.S.C. § 1182(a)(1)(A)(i);

according to the government, COVID-19 is one such disease.[3]  Yet Congress was clear that a

person may apply for and be granted humanitarian relief regardless of whether there might be

---

[3] U.S. Dep't of Justice, Executive Office for Immigration Review, Immigration Court Practices During the Declared National Emergency Concerning the COVID-19 Outbreak, PM 20-10, at 1 n.1 (Mar. 18, 2020), *available at* https://www.justice.gov/eoir/file/1259226/download.

grounds, including a health-related inadmissibility ground, to remove them:  A person may apply for and be granted asylum "irrespective" of whether they are admissible.  8 U.S.C. § 1158(a)(1). As the government itself has acknowledged:  an individual seeking asylum is simply "not subject to inadmissibility grounds at the time of [an] asylum grant."  USCIS Policy Manual Vol. 7, Part M, Ch. 3 (2020), *available at* https://www.uscis.gov/policy-manual/volume-7-part-m-chapter-3; *see also* USCIS Policy Manual Vol. 8, Part B, Ch. 3 (2020), *available at* https://www.uscis.gov/policy-manual/volume-8-part-b-chapter-3 (no specific medical examination or vaccination required for granting asylum).  Withholding and deferral of removal, for their part, by definition are available when a person could otherwise be removed.

Third, though it rejected the notion that asylum seekers might be barred from humanitarian protection on health-related grounds, Congress accounted for the public health by permitting the Executive to screen asylum seekers on arrival.  Asylum seekers may be screened under the federal laws relating to quarantine, isolation, and contact-tracing that apply to citizens and noncitizens alike.  *See* 42 C.F.R. §§ 71.1, 71.20, 71.36.  And under the immigration laws, asylum seekers, like other noncitizens, may be screened for inadmissibility grounds, including "communicable diseases of public health significance," according to procedures specified by Congress and the Department of Health and Human Services.  *See* 8 U.S.C. § 1182(a)(1)(A)(i).  These procedures permit the government to conduct medical exams and to detain for medical screening certain individuals arriving at ports of entry or from places "where any [relevant] diseases are prevalent or epidemic." *See, e.g.*, 8 U.S.C. § 1222; 42 C.F.R. § 34.3 (describing the scope of medical exams).  And they specify that when a medical examiner cannot make a diagnosis, the government must postpone the medical examination until a diagnosis can be made and, in the meantime, refer the noncitizen for any medical care that might be necessary.  *See* 8 C.F.R. § 34.5.  The medical screening and its

result may lead the government to charge an asylum seeker with a health-related inadmissibility ground in removal proceedings and, ultimately, to remove them—but only if they are not granted asylum or withholding or deferral of removal.  Whatever the result of the screening, what the government may not do is bypass credible fear interviews or removal proceedings, deprive asylum seekers of the opportunity to apply for humanitarian protection from removal, or prevent asylum seekers from being granted such protection on health grounds.

In adopting the challenged policy, the Executive has upended Congress's carefully delineated system.  Congress has accounted for the public health and taken care to ensure that health considerations will not prevent a person from applying for or being granted protection.

## II.   DEFENDANTS' EXPULSION POLICY CONTRAVENES CONGRESS'S INTENT

That Congress did not give the Executive discretion to expel asylum seekers as Defendants are doing is also evident from the legislative history of the Refugee Act, the laws implementing the U.N. Convention Against Torture, and procedural reforms enacted in 1996.  This legislative history shows that Congress recognized an urgent, morally grounded need for strong protections for asylum seekers.  And it shows that Congress anticipated that the executive branch might attempt to circumvent its laws and specifically aimed to prevent the executive branch from doing so.

### A.  Congress understood our obligations to asylum seekers in stark moral terms

Congress was mindful of the dangers of returning people to their abusers and understood our obligation to protect asylum seekers in stark moral terms.  The laws Congress enacted originated in the *non-refoulement* provision of the 1951 U.N. Convention Relating to the Status of

Refugees, which had urgent moral underpinnings.[4]   As Louis Henkin, an American framer of the

treaty, explained:  In the years following the Second World War, "there had been stories, and some

evidence, that police of some countries had pushed refugees back into the hands of the pursuing

Nazis."  "[G]overnments," therefore, "were asked to commit themselves not to prevent a person

from escaping oppression and not to become an accomplice to their oppression."  Henkin Aff.

¶¶ 4, 6, Resp'ts' Br., *McNary v. Haitian Centers Council, Inc.*, 1992 WL 541267 (U.S. Dec. 21,

1992).   Universal recognition of the *non-refoulement* principle was considered essential to an

effective refugee protection system.   *See* The Refugee Convention, 1951:   The Travaux

Preparatoires Analysed with a Commentary by Dr Paul Weis 235, *available at*

https://www.unhcr.org/en-us/protection/travaux/4ca34be29/refugee-convention-1951-travaux-

preparatoires-analysed-commentary-dr-paul.html [hereinafter "Travaux"] ("The Chairman felt

that if the work of the Committee resulted in the ratification of [the *non-refoulement* provision]

alone, it would have been worth while."); *see also* Exec. Comm. of the High Commissioner's

Programme, Note on International Protection ¶ 10, U.N. Doc. A/AC.96/815 (1993), *available at*

https://www.refworld.org/docid/3ae68d5d10.html ("It would be patently impossible to provide

international protection to refugees if States failed to respect this paramount principle of refugee

law and human solidarity.").   *See generally I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 436-39

(1987) (treating negotiating history and UNHCR material as persuasive authority).

---

[4] Though the United States did not ultimately ratify the Convention, the Convention's provisions
were carried through in relevant part to the U.N. Protocol Relating to the Status of Refugees,
which the United States did ratify.  114 Cong. Rec. 29,391 (1968); 114 Cong. Rec. 29,607-08
(1968); *see also* H.R. Rep. No. 96-608, at 17 (1979) (noting that the enactment of asylum and
*non-refoulement* provisions "conforms United States statutory law to our [Protocol]
obligations").

Because of the strong interests at stake, the framers of the Refugee Convention specifically rejected the notion that people seeking humanitarian protection might be expelled on health-related grounds.  The U.S. delegate maintained that "refugees should not be expelled . . . because they had been sick or indigent," and the treaty's Committee Notes reflect consensus around this position: the treaty "would not," the Committee explained, "permit the deportation of [refugees] on 'social grounds,' such as indigence or illness."  Travaux 222, 225.  When transmitting the U.N. Protocol Relating to the Status of Refugees—which incorporated the protections of the Refugee Convention—to President Johnson for ratification, Secretary of State Rusk echoed these sentiments:  Since "refugees by definition are without a homeland, deportation of a refugee is a particularly serious measure, and it would not be humanitarian to deport a refugee for reasons of health or economic dependence." 114 Cong. Rec. 27,758-59 (1968).

When Congress codified the protections of the Refugee Convention and Protocol in the 1980 Refugee Act, Congress remained all too aware of the grave dangers asylum seekers would face were the United States to turn its back on them, and thus sought to conform statutory protections to the *non-refoulement* mandate.  *See, e.g.*, H.R. Rep. No. 96-608, at 17 (1979) (noting that the asylum and *non-refoulement* provisions are designed to "conform[] United States statutory law to our obligations under [the Convention and Protocol]"); Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102, 102 ("declar[ing] that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands").  Senator Kennedy pointed to the "tragic results" of the country's lack, at the time, of a consistent asylum policy, including "instances where people came up to our embassies[,] were rejected, and were later shot." *The Refugee Act of 1979, S. 643:  Hearing Before the S. Comm. on the Judiciary*, 96th Cong. 36 (1979).  In the House debates, Representative Chisholm held up the "tragic plight" of

thousands of Haitians who had sought asylum in Florida, citing evidence of "the arrest and indeed execution of Haitians deported by the Immigration and Naturalization Service."  125 Cong. Rec. 11,973 (1979).

When Congress enacted an expedited removal process in 1996, it remained attentive to the risks of removal.  Even as it recognized some utility in permitting the Executive to remove certain people more quickly, Congress deliberately made the central, credible fear standard for avoiding expedited removal "a low screening standard for admission into the usual full asylum process," 142 Cong. Rec. 11,491 (1996) (statement of Sen. Hatch), to avoid the "danger that an alien with a genuine asylum claim w[ould] be returned to persecution," H.R. Rep. No. 104-469, at 158 (1996). *See also Grace v. Whitaker*, 344 F. Supp. 3d 96, 107 (D.D.C. 2018).

When implementing the *non-refoulement* provision from the U.N. Convention Against Torture, Congress similarly recognized the dangers many asylum seekers faced outside the United States, announcing that it would be the policy of the United States "not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture."  Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242(a), 112 Stat. 2681, 2681-822. At the direction of Congress, the Department of Justice promulgated regulations making protection mandatory, with no exceptions.  *See* Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8481 (Feb. 19, 1999).  This was in keeping with the aim of the framers of the Convention Against Torture, who desired "to afford the greatest possible protection against torture."  *See* Report of the Working Group on a Draft Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, U.N. Doc. E/CN.4/L.1470, at ¶ 44 (Mar. 12, 1979), *available at* http://hr-travaux.law.virginia.edu/document/catcidtp/ecn4l1470/nid-159.

**B. Congress required the Executive to follow specific procedures so that the Executive would not undercut the rights of asylum seekers**

In creating the modern asylum system Congress mandated specific procedures for identifying and evaluating protection claims, *see supra* Part I.A., to prevent the Executive from undercutting asylum seekers' rights.  Under the previous system, claims for asylum domestically were left completely to the discretion of the executive branch and did not require any particular procedure.  *See* 8 C.F.R. § 108.1 (1979).  Congress considered this system to be unfair and inadequate, and too susceptible to the whims of political climate and world events.  *See, e.g.*, H.R. Rep. No. 96-608, at 1, 17-18 (1979) (seeking "to eliminate current discrimination on the basis of outmoded geographical and ideological considerations" and deeming domestic asylum provision "necessary and desirable" for a "fair and workable asylum policy which is consistent with this country's tradition of welcoming the oppressed of other nations and with our obligations under international law").  Representative Holtzman, a House sponsor of the Refugee Act, explained the problem:  "One of the matters that has concerned me greatly about the admission of . . . persons who seek asylum is the fact that there really are no specific procedures that would assure that due process is granted when such persons are questioned in order [to] determine[] whether or not they meet the present statutory standards." *Admission of Refugees into the United States, Hearings before the Subcomm. on Immigration, Citizenship, and Int'l Law, H. Comm. on the Judiciary*, 95th Cong. 126 (1977).  "[W]hen Congress creates a statutory scheme and does not really specify how that scheme is to be implemented," she continued, "it can be thwarted by the executive branch." *Id.* at 127; *see also id.* (statement of John E. McCarthy, Chairman, Comm. on Migration and Refugee Affairs, Am. Council of Voluntary Agencies for Foreign Serv.) ("You're treading on very dangerous ground when you're examining these people because if you're wrong and the person is

12

forced to return you have got a terrible problem. . . .  We don't have the standards here which are so necessary."); *id.* (pointing to politicized denials of protection to Chilean refugees).

With the 1980 Refugee Act, which was designed to be comprehensive, Congress sought to remedy this problem.  *See, e.g.*, H.R. Rep. No. 96-608, at 1 (1979) ("The purpose of the bill is to establish a coherent and comprehensive U.S. refugee policy.  This objective is accomplished by creating a systematic and flexible procedure for the admission and resettlement of refugees."); S. Rep. No. 96-256, at 1 (1979) (proposed bill would "establish[] for the first time a comprehensive United States refugee resettlement and assistance policy").  It created a new, "specific statutory basis for United States asylum policy," and directed the Attorney General to establish uniform procedures that would bind the executive branch.  H.R. Rep. No. 96-608, at 17-18 (1979); *see also* 126 Cong. Rec. 4507 (1980) (statement of Rep. Holtzman) (the bill "mandates a procedure for the consideration of asylum claims by people who are here on our shores").  And it amended the terms of the then-existing statutory withholding of removal provision to use mandatory language, to avoid any suggestion that whether to grant withholding might be within the Executive's discretion. *See* H.R. Rep. No. 96-608, at 18 (1979).  When Congress created a threshold asylum screening process in 1996, it again set limits on the Executive by, among other things, taking care to specify the training, supervision, and review to which the immigration officers conducting screenings would be required to be subjected.  *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III), (b)(1)(E); 8 U.S.C. § 1252(e)(3); *see also* 142 Cong. Rec. 11,491 (1996) (statement of Sen. Hatch) ("I feel very strongly that the appropriate, fully trained asylum officers conduct the screening in the summary exclusion process").  And Congress similarly cabined the Executive's discretion in implementing the Convention Against Torture, making clear that its prohibitions applied notwithstanding any

other government policy.  *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242(a), 112 Stat. 2681, 2681-822.

In short, understanding our humanitarian responsibilities to be urgent moral obligations, Congress acted deliberately to prevent them from being circumvented by the executive branch. Defendants' expulsion policy contravenes Congress's clear aim.

## CONCLUSION

Because Defendants are expelling people from our country without regard to Congress's carefully crafted system for identifying and protecting those who fear persecution and torture, IRAP urges the Court to grant Plaintiff's motion for a temporary restraining order.

Dated:  June 12, 2020
     New York, N.Y.

Respectfully submitted,

*/s/ Mariko Hirose*
Mariko Hirose (D.C. Bar No. NY0262)
Kathryn Austin (N.Y. Bar No. 5251178)*
Geroline Castillo (N.Y. Bar No. 5784434)*
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 4th Floor
New York, N.Y. 10004
Tel: (516) 701-4620

*Counsel for Amicus Curiae*

*\* Non-members of the bar of this Court*
*appearing under LCvR 83.2(c)(1)*