# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

J.B.B.C., a MINOR CHILD, by and through
his father and next friend, Carlos Emilio
Barrera Rodriguez,

        Plaintiff,

    v.

CHAD WOLF, Acting Secretary of
Department of Homeland Security, et al.,

        Defendants.

Civil Docket No. 1:20-cv-01509 (CJN)

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

I.      FACTUAL BACKGROUND ...................................................................................... 3

    A.      The COVID-19 Pandemic.................................................................................. 3

    B.      COVID-19 in Canada and Mexico ................................................................... 5

    C.      CBP's Operations at or Near the U.S.-Canada and U.S.-Mexico Borders ............ 6

II.     STATUTORY AND REGULATORY BACKGROUND................................................. 7

    A.      The Public Health Service Act.......................................................................... 7

    B.      The Interim Final Rule...................................................................................... 8

    C.      The CDC's Section 265 Order .......................................................................... 9

    D.      The Immigration Processing of Aliens at the Border .......................................... 13

        1.   Asylum, Withholding of Removal, and the CAT .................................................13

        2.   The Processing of Unaccompanied Alien Children................................................14

III.    The Plaintiff and His Request for Emergency Relief ........................................ 15

STANDARD OF REVIEW .................................................................................................... 16

ARGUMENT…………….......................................................................................... 16

I.      PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS ................................... 16

    A.      Plaintiff Is Unlikely to Succeed in Showing that the CDC Order Is
        Unauthorized by Section 265 ............................................................................. 16

    B.      Plaintiff Is Unlikely to Succeed in Showing that the CDC Order Violates
        the CAT, the TVPRA, and the Asylum and Withholding of Removal
        Statutes .............................................................................................................. 21

        1.   The Government's plan to return Plaintiff to Honduras does not violate its
            obligations under the CAT...................................................................................21

        2.   Congress intended the Public Health Service Act provisions to temporarily take
            precedence over the procedures afforded under the immigration laws. ................23

        3.   The CDC's interpretation of the public health provisions is entitled to
            deference...........................................................................................................31

C.      Plaintiff Is Unlikely to Succeed on His Arbitrary and Capricious
        Challenge ............................................................................................. 33

    1.   The CDC Order sufficiently explained its necessity................................34

    2.   The CDC's well-reasoned orders appropriately considered the problem. .............36

    3.   Public health concerns justify the CDC Order.......................................37

II.   THE BALANCE OF HARMS WEIGHS AGAINST ENTRY OF A TEMPORARY
      RESTRAINING ORDER ................................................................................ 39

      A.   Plaintiff Cannot Show That He Will Suffer Irreparable Harm. ........................... 39

      B.   The Balance of Harms and the Public Interest Weigh Against an
           Injunction ............................................................................................. 40

CONCLUSION.............................................................................................................. 41

# TABLE OF AUTHORITIES

**CASES**

*Am. Civil Liberties Union Found. v. Wash. Metro. Area Transit Auth.*,
　303 F. Supp. 3d 11 (D.D.C. 2018) ........................................................................ 40

*Am. Wild Horse Preservation Campaign v. Perdue*,
　873 F.3d 914 (D.C. Cir. 2017) ............................................................................. 36

*Arriva Med. LLC v. Dep't of Health & Human Servs.*,
　239 F. Supp. 3d 266 (D.D.C. 2017) ...................................................................... 40

*Aurelius Inv., LLC v. Puerto Rico*,
　915 F.3d 838 (1st Cir.), *rev'd on other grounds sub nom. Fin. Oversight Bd. for P.R. v.*
　*Aurelius Inv., LLC*, -- S. Ct. --, 2020 WL 2814298 (S. Ct. June 1, 2019) ............... 24

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
　462 U.S. 87 (1983) ......................................................................................... 34, 35

*Bragdon v. Abbott*,
　524 U.S. 624 (1998) ............................................................................................ 41

*Brown v. United States*,
　327 F.3d 1198 (D.C. Cir. 2003) ........................................................................... 31

*Bulova Watch Co. v. United States*,
　365 U.S. 753 (1961) ............................................................................................ 24

*Cardinal Health, Inc. v. Holder*,
　846 F. Supp. 2d 203 (D.D.C. 2012) ...................................................................... 37

*Career Coll. Ass'n v. Riley*,
　74 F.3d 1265 (D.C. Cir. 1996) ........................................................................ 23, 32

*Castro v. United States Dep't of Homeland Sec.*,
　835 F.3d 422 (3d Cir. 2016) ................................................................................ 17

*Cellular Phone Taskforce v. FCC*,
　205 F.3d 82 (2d Cir. 2000) .................................................................................. 36

*Chaplaincy of Full Gospel Churches v. England*,
　454 F.3d 290 (D.C. Cir. 2006) ............................................................................. 39

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
　467 U.S. 837 (1984) ...................................................................................... 18, 23

*Coal. for Common Sense in Gov't Procurement v. United States,*
  576 F. Supp. 2d 162 (D.D.C. 2008) ............................................................... 39

*Coal. for Parity, Inc. v. Sebelius,*
  709 F. Supp. 2d 6 (D.D.C. 2010) ................................................................... 16

*Cruz v. Dep't of Homeland Sec.,*
  No. 19-CV-2727, 2019 WL 8139805 (D.D.C. Nov. 21, 2019) ...................... 17

*Davis v. Mich. Dep't of Treasury,*
  489 U.S. 803 (1989) ....................................................................................... 29

*Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry
  Dock Co.,*
  514 U.S. 122 (1995) ....................................................................................... 27

*Epic Sys. Corp. v. Lewis,*
  138 S. Ct. 1612 (2018) ................................................................................... 30

*Epsilon Elecs., Inc. v. U.S. Dep't of Treasury,*
  857 F.3d 913 (D.C. Cir. 2017) ....................................................................... 33

*FERC v. Elec. Power Supply Ass'n,*
  136 S. Ct. 760 (2016) ............................................................................... 33, 37

*Fiallo v. Bell,*
  430 U.S. 787 (1977) ....................................................................................... 28

*Fourco Glass Co. v. Transmirra Prods. Corp.,*
  353 U.S. 222 (1957) ....................................................................................... 23

*Freeman v. Quicken Loans, Inc.,*
  566 U.S. 624 (2012) ....................................................................................... 27

*Friends of Animals v. U.S. Bureau of Land Mgmt.,*
  232 F. Supp. 3d 53 (D.D.C. 2017) ................................................................. 40

*Garcia v. San Antonio Metro. Transit Auth.,*
  469 U.S. 528 (1985) ......................................................................................... 3

*Guttenberg v. Emery,*
  26 F. Supp. 3d 88 (D.D.C. 2014) ................................................................... 39

*Inv. Co. Inst. v. Commodity Futures Trading Comm'n,*
  720 F.3d 370 (D.C. Cir. 2013) ....................................................................... 38

*Jacobson v. Massachusetts*,
  197 U.S. 11 (1905) .......................................................................... 3, 37

*Kaplan v. Tod*,
  267 U.S. 228 (1925) ............................................................................ 26

*Keppel v. Tiffin Sav. Bank*,
  197 U.S. 356 (1905) ............................................................................ 26

*Landon v. Plasencia*,
  459 U.S. 21, (1982) ............................................................................ 17

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ................................................................ 39

*Leng May Ma v. Barber*,
  357 U.S. 185 (1958) ............................................................................ 17

*Lewinsohn v. United States*,
  278 F. 421 (7th Cir. 1921) .................................................................. 24

*Louisiana v. Mathews*,
  427 F. Supp. 174 (E.D. La. 1977) ...................................................... 29

*Luis v. United States*,
  136 S. Ct. 1083 (2016) ....................................................................... 17

*Marshall v. United States*,
  414 U.S. 417 (1974) ............................................................................. 3

*Maryland v. King*,
  133 S. Ct. 1 (2012) ............................................................................. 41

*Mathews v. Diaz*,
  426 U.S. 67 (1976) ............................................................................. 28

*Mayo v. Reynolds*,
  875 F.3d 11 (D.C. Cir. 2017) .............................................................. 33

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ........................................................................... 16

*Morton v. Mancari*,
  417 U.S. 535 (1974) ........................................................................... 30

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................................... 33, 34, 37

*Munaf v. Geren*,
    553 U.S. 674 (2008) ........................................................................................... 16

*Mylan Labs., Inc. v. Thompson*,
    389 F.3d 1272 (D.C. Cir. 2004) ........................................................................ 32

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007) ........................................................................................... 23, 31

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ........................................................................................... 31

*Nat'l Immigration Project of Nat'l Lawyers Guild v. Exec. Office [for] Immigration Review*,
    --- F. Supp. 3d ----, No. 1:20-CV-00852 (CJN), 2020 WL 2026971
    (D.D.C. Apr. 28, 2020) ...................................................................................... 38, 40, 41

*Nat'l Lifeline Ass'n v. FCC*,
    921 F.3d 1102 (D.C. Cir. 2019) ........................................................................ 36

*Nat'l Propane Gas Ass'n v. U.S. Dep't of Homeland Sec.*,
    534 F. Supp. 2d 16 (D.D.C. 2008) .................................................................... 41

*Nitro-Lift Techs., LLC v. Howard*,
    568 U.S. 17 (2012) ............................................................................................ 23

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................................... 39, 40, 41

*Omar v. McHugh*,
    646 F.3d 13 (D.C. Cir. 2011) ............................................................................ 22

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
    551 U.S. 224 (2007) ........................................................................................... 29, 30

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ........................................................................................... 23

*Radzanower v. Touche Ross & Co.*,
    426 U.S. 148 (1976) ........................................................................................... 24, 26

*Randall v. Loftsgaarden*,
    478 U.S. 647 (1986) ........................................................................................... 27

*Rural Cellular Ass'n v. FCC*,
    588 F.3d 1095 (D.C. Cir. 2009) ............................................................... 37

*S. Bay United Pentecostal Church v. Newsom*,
    No. 19A1044, 2020 WL 2813056 (S. Ct. May 29, 2020).................................. 3, 37

*Sch. Bd. of Nassau Cty. v. Arline*,
    480 U.S. 273 (1987) ............................................................................. 41

*Scialabba v. Cuellar de Osorio*,
    573 U.S. 41 (2014) .............................................................................. 31

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ............................................................... 39

*Shirk v. United States ex rel. Dep't of the Interior*,
    773 F.3d 999 (9th Cir. 2014)................................................................. 29

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ............................................................................ 31

*Stewart v. Smith*,
    673 F.2d 485 (D.C. Cir. 1982) ............................................................... 23

*Trans World Airlines, Inc. v. Thurston*,
    469 U.S. 111 (1985) ............................................................................ 27

*Trinidad y Garcia v. Thomas*,
    683 F.3d 952 (9th Cir. 2012).................................................................. 22

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ..................................................................... 26, 28

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ............................................................................ 28

*United Steelworkers of Am., AFL-CIO-CLC v. Weber*,
    443 U.S. 193 (1979) ............................................................................ 27

*Util. Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014) ............................................................................ 33

*W. Coal Traffic League v. Surface Transp. Bd.*,
    216 F.3d 1168 (D.C. Cir. 2000) ............................................................. 31

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................. 16, 39, 40

*Wisc. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ............................................................... 39

**STATUTES**

5 U.S.C. § 553 .......................................................................................... 8

6 U.S.C. § 279 .................................................................................... 14, 15

8 U.S.C. § 1101 ....................................................................................... 13

8 U.S.C. § 1158 .................................................................................. 13, 14

8 U.S.C. § 1182 .................................................................................. 14, 25

8 U.S.C. § 1222 ....................................................................................... 25

8 U.S.C. § 1225 .................................................................................. 13, 14

8 U.S.C. § 1226 ....................................................................................... 14

8 U.S.C. § 1229 ....................................................................................... 13

8 U.S.C. § 1229a ............................................................................ 13, 14, 15

8 U.S.C. § 1231 ............................................................................. 13, 14, 21

8 U.S.C. § 1232 ............................................................................. 14, 15, 23

19 U.S.C. § 1401 ...................................................................................... 8

20 U.S.C. § 3508 ...................................................................................... 7

42 U.S.C. § 264 .............................................................................. 19, 29, 30

*42 U.S.C. § 265 ................................................................................ *passim*

42 U.S.C. § 268 .......................................................................... 2, 7, 11, 21

42 U.S.C. § 271 ....................................................................................... 19

Pub. L. No. 96-88, 93 Stat. 668 (1979), codified at 20 U.S.C. § 3508 .......................... 7

The Act of February 15, 1893, 27 Stat. 449 ............................................... 7, 20, 24

The Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-207,
Div. G. Title XXI, 112 Stat. 2681, codified at 8 U.S.C. § 1231 note ...................................... 21

The Public Health Service Act of 1944, Pub. L. No. 78-410, 58 Stat. 682 ................................... 7

The Trafficking Victims Protection and Reauthorization Act of 2008,
Pub. L. No. 110-457 .......................................................................................................... 14

## REGULATIONS

8 C.F.R. § 208.16 ................................................................................................... 14, 22

8 C.F.R. § 208.17 ................................................................................................... 14, 22

8 C.F.R. § 208.18 ................................................................................................... 14, 22

8 C.F.R. § 208.30 .......................................................................................................... 14

8 C.F.R. § 1003.1 .......................................................................................................... 13

8 C.F.R. § 1208.16 ............................................................................................. 13, 14, 22

8 C.F.R. § 1208.17 ................................................................................................. 14, 22

8 C.F.R. § 1208.18 ................................................................................................. 14, 22

31 Fed. Reg. 8855, 80 Stat. 1610 (June 25, 1966) ................................................................. 7

42 C.F.R. § 70.1 ........................................................................................................... 30

85 Fed. Reg. 16559-01 (Mar. 24, 2020) ........................................................................ *passim*

*85 Fed. Reg. 17060-02 (Mar. 26, 2020) ....................................................................... *passim*

85 Fed. Reg. 22424 (Apr. 20, 2020) ......................................................................... 5, 10, 12

85 Fed. Reg. 31503-02 (May 21, 2020) ........................................................................ *passim*

## OTHER AUTHORITIES

1 *American Dictionary of the English Language* 113 (Noah Webster ed., 1st ed. 1828)............ 17

1 J. Kent, *Commentaries on American Law* (13th ed. 1884)........................................... 17

24 Cong. Record 470 (Jan. 10, 1893) ........................................................................ 20, 24, 25

CDC, Corona Virus Disease 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html. ................................................................ 5, 40

Dec. 10, 1984, S. Treaty Doc. No. 20, 100th Cong., 2d Sess. 19 (1988), 1465 U.N.T.S. 85 ...................................................................................... 13

Fact Sheet: DHS Measures on the Border to Limit the Further Spread of Coronavirus, https://www.dhs.gov/sites/default/files/publications/20_0519_as1_frn_us-canada-border.pdf ........................................................................................ 4

H.R. 9757, 52nd Cong., 2d Sess., Report No. 2210 (Jan. 9, 1893) ........................................ 20, 24

Noah Webster, *American Dictionary of the English Language: Intended to Exhibit* (1828)....... 17

Proclamation on Suspension of Entry as Immigrants and Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting Novel Coronavirus, https://www.whitehouse.gov/presidential-actions/proclamation-suspension-entry-immigrants-nonimmigrants-certain-additional-persons-pose-risk-transmitting-novel-coronavirus/.................................................................................................... 4

Thomas Cooley, *Constitutional Limitations* 63 (1868) ................................................ 17

*Universal English Dictionary* 1067 (John Craig ed. 1861) ........................................ 17

World Health Organization, Coronavirus Disease (COVID-19), Situation Report 148, at 8, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200616-covid-19-sitrep-148-draft.pdf?sfvrsn=9b2015e9_2 ........................................................ 4, 6

**INTRODUCTION**

This Court should deny Plaintiff's request for extraordinary injunctive relief.

The world is facing a historic, unprecedented outbreak of the Coronavirus Disease 2019 (COVID-19).  The virus that causes COVID-19, known as SARS-CoV-2, spreads easily and quickly across national borders.  At this time, COVID-19 has no widely available therapeutics or vaccine, and it can have a high mortality rate for some of the most vulnerable members of society. The World Health Organization has classified the outbreak as a pandemic.  Across the world, countries are implementing emergency measures to help curb the spread of this highly contagious disease.  Nations have closed their borders and imposed severe travel restrictions.  In the United States, the President has declared a National Emergency, and the Secretary of Health and Human Services similarly declared a public health emergency.  The Department of State has issued a global Level 4 "do not travel" advisory—the highest level it can issue.  And the United States and its two neighboring countries, Mexico and Canada, have closed their shared borders to nonessential travel.

To help avert the serious danger of COVID-19 further spreading into the United States, the Director of the U.S. Centers for Disease Control ("CDC") invoked, for the first time in the Nation's history, his authority under section 362 of the Public Health Service Act, 42 U.S.C. § 265 ("Section 265"), to temporarily suspend the movement of certain aliens who are without valid travel documents into the United States from Canada and Mexico.  In an order issued in March 2020, the Director found that that suspension is necessary because aliens covered by the Order potentially are vectors of COVID-19, and they are typically held in congregate settings for immigration processing at ports of entry and Border Patrol stations.  Those facilities are not equipped to quarantine, isolate, or enable social distancing for large populations, and the use of their congregate holding areas for quarantine or isolation would present a significant risk of transmitting COVID-19.  Nor are they designed to provide the level of medical care that vulnerable populations with COVID-19 may require.  Therefore, allowing the introduction of aliens subject to the Order into the United States, the Director found, would put the American public, U.S. Customs and Border

Protection ("CBP") personnel, and other travelers at risk and potentially strain the American healthcare system. Given such public health risks, the Director determined that it is imperative to return covered aliens to the country from which they entered the United States or to their home country as quickly as possible. The Director requested the assistance of the Department of Homeland Security ("DHS") with implementing his Order pursuant to section 365(b) of the Public Health Service Act, 42 U.S.C. § 268(b), which provides that it shall be the duty of customs officers to aide in the enforcement of such orders.

Plaintiff is a 16-year-old Honduran citizen who was apprehended approximately one mile from the U.S.-Mexico border after illegally entering the United States near El Paso, Texas. He was determined to be subject to the CDC Order and was scheduled to be returned to his home country pursuant to the Order. He seeks to enjoin his return, contending that (1) Section 265 does not authorize the return of individuals to their home countries after they have already crossed the U.S. border; (2) his return would violate the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") and the procedures afforded under certain immigrations laws; and (3) the CDC Order is arbitrary and capricious.

Plaintiff is unlikely to succeed on these arguments. *First*, Section 265 plainly authorizes his return. In adopting Section 265, Congress gave the Executive Branch the power to prohibit the introduction of persons into the United States during an outbreak of a communicable disease. By granting that broad power, Congress necessarily gave the Executive Branch the authority to take actions needed to exercise that power. That includes, in the circumstances here, the prompt return of covered aliens who have crossed the U.S. border and would otherwise be introduced into congregate settings. *Second*, the Government has complied with its obligations under the CAT. It has conducted a screening interview to assess whether he meets the threshold screening standard required to place Plaintiff in removal proceedings in order to seek protection under the CAT, and has determined that he does not. In any event, this Court does not have jurisdiction to review that determination. Moreover, the statute's text and structure evince Congress's intent that the emergency public health provisions would take precedence over the procedures afforded under the

2

immigration laws in times of a public health crisis, such as the current global pandemic.  Were it otherwise, the public health provisions—intended to curb the potentially irreversible and devastating spread of a communicable disease from the mass migration at the Nation's borders during an outbreak—would be rendered a nullity.  Even if Congress's intent were not clear, the agency's interpretation of Sections 265 and 268(b) as operating without regard to the immigration laws is reasonable and entitled to deference.  *Third*, the CDC fully explained the necessity of the Order, and its action is not arbitrary or capricious.

The equities also weigh decidedly against granting the requested emergency relief here. As Chief Justice Roberts recently observed, "[o]ur Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the [government] 'to guard and protect,'" and "[w]hen those officials 'undertake[ ] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'"  *S. Bay United Pentecostal Church v. Newsom*, No. 19A1044, 2020 WL 2813056, at *1–2 (S. Ct. May 29, 2020) (Roberts, C.J., concurring in denial of application for injunctive relief) (first quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905), and then quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)).  "Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people."  *Id.* at *1 (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 545 (1985)).  "That is especially true where, as here, a party seeks emergency relief in an interlocutory posture, while [government] officials are actively shaping their response to changing facts on the ground."  *Id.* at *2.  The Court thus should deny Plaintiff's motion.

## BACKGROUND

### I.     FACTUAL BACKGROUND

#### A.  The COVID-19 Pandemic

COVID-19 is a communicable disease that primarily transfers from person to person through respiratory droplets from an infected person.  Notice of Order Under Sections 362 & 365

of the Public Health Service Act Suspending Introduction of Persons From Countries Where Communicable Diseases Exist, 85 Fed. Reg. 17060-02 (Mar. 26, 2020) ["Order"] at 3 (attached hereto as Exhibit B).  The disease can also be transmitted through asymptomatic persons, and it spreads easily and rapidly.  *Id.*  Today, there are more than 7.6 million confirmed cases and 426,000 deaths globally.[1]

To curb the spread of COVID-19, countries have imposed sweeping travel restrictions.  *Id.* at 5; *see also* Interim Final Rule, Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into The United States From Designated Foreign Countries of Places for Public Health Purposes, 85 Fed. Reg. 16559-01 (Mar. 24, 2020) ["IFR"] at 10-11 (attached hereto as Exhibit A).  The United States, Mexico, and Canada have closed their shared borders to non-essential travel.[2]  Beginning in March, the President also suspended the entry of most aliens who were present in countries with substantial outbreaks within 14 days of the aliens' entry or attempted entry into the United States, including the People's Republic of China, the Islamic Republic of Iran, the Schengen Area of Europe, the United Kingdom, and the Republic of Ireland.  *Id.* at 10.  On May 24, 2020, the President further suspended the entry of most aliens from Brazil.[3]  The CDC has issued various guidelines to help slow the spread of the disease, while states and localities have shut down businesses or otherwise issued shelter-in-place orders.  Order at 6.

As of May 9, 2020, the United States reported 1,274,036 confirmed cases of COVID-19 and 77,034 deaths.  *See* Amendment and Extension of Order Suspending Introduction of Certain

---

[1]  *See* World Health Organization, Coronavirus 2019, Situation Report 148, at 1, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200616-covid-19-sitrep-148-draft.pdf?sfvrsn=9b2015e9_2.

[2]  Fact Sheet: DHS Measures on the Border to Limit the Further Spread of Coronavirus, https://www.dhs.gov/sites/default/files/publications/20_0519_as1_frn_us-canada-border.pdf.

[3]  Proclamation on Suspension of Entry as Immigrants and Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting Novel Coronavirus, https://www.whitehouse.gov/presidential-actions/proclamation-suspension-entry-immigrants-nonimmigrants-certain-additional-persons-pose-risk-transmitting-novel-coronavirus/.

Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 31503-02 (May 21, 2020) ["May Order"] at 6 (attached hereto as Exhibit D).  By June 16, 2020, there were more than 2.1 million confirmed cases and the death toll reached 116,000.[4]  Although certain early hotspots have shown signs of improvement, and certain areas of the country are beginning a phased reopening of their communities, many cities and states, including several located at or near U.S. borders, continue to experience widespread, sustained community transmission.  *Id.* at 3, 6.

### B.  COVID-19 in Canada and Mexico

The pandemic has severely impacted Canada and Mexico.  By May 9, 2020, Canada reported 66,780 confirmed cases of COVID-19 and a total of 4,628 deaths.  May Order at 4.  Canada's public health agency expects that the number of confirmed COVID-19 cases will continue to increase.  *Id.*  Canadian modeling indicates that Canada could see 940,000 people with infections, 73,000 hospitalizations, and 23,000 people requiring intensive care over the course of the pandemic.  *Id.*

Mexico declared a state of health emergency on March 30, 2020, and temporarily suspended all non-essential activities.  *See* Extension of Order Suspending Introduction of Certain Persons From Countries Where A Communicable Disease Exists, 85 Fed. Reg. 22424 (Apr. 20, 2020) ["April Order"] at 4 (attached hereto as Exhibit C).  On April 20, 2020, the country announced its highest level of public health emergency, and, as of May 9, 2020, Mexico had reported 29,616 confirmed cases of COVID-19 and 2,961 deaths.  May Order at 5.  The Mexican Health Ministry believes that there are approximately eight additional cases for each confirmed case, and the Mexican government's modeling indicates that 250,656 people could be infected during the acceleration phase of the pandemic, with 70 percent of them expected to seek medical care.  *Id.*  Non-governmental models and estimates indicate that there may be between 620,000 and 730,000 symptomatic cases.  *Id.*  Medical experts also believe that the virus will inevitably

---

[4] *See* CDC, Corona Virus Disease 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

spread at migrant camps and shelters along the U.S. border.  Order at 9.  Indeed, the disease has spiked in Mexico.  The World Health Organization reported that as of June 16, 2020, Mexico has 146,837 confirmed cases and 17,141 deaths.[5]

### C.  CBP's Operations at or Near the U.S.-Canada and U.S.-Mexico Borders

The U.S.-Canada border spans nearly 4,000 miles, and the U.S.-Mexico border runs approximately 2,000 miles.  *Id.* at 7, 10.  There are 328 land ports of entry along the borders, where CBP processes aliens to determine their admissibility.  CBP also operates 136 Border Patrol stations to apprehend, process, and temporarily hold aliens who seek to unlawfully enter the country between ports of entry.  *Id.* at 12.

Through February of Fiscal Year ("FY") 2020, CBP processed more than 20,000 inadmissible aliens at ports of entry along the U.S.-Canada border and apprehended an additional 1,200 inadmissible aliens.  *Id.* at 7.  These aliens included nationals of countries with significant COVID-19 outbreaks.  *Id.*  The number of inadmissible aliens CBP processed along the U.S.-Mexico border is much higher; as of March, CBP processed more than 34,000 inadmissible aliens at ports of entry and apprehended an additional 117,000 inadmissible aliens in FY 2020.  *Id.* at 10.  Over 15,000 of the apprehended individuals were nationals of countries other than Mexico that have been experiencing sustained human-to-human COVID-19 transmission.  *Id.*

Aliens who lack proper travel documents would typically be deemed inadmissible and take much longer to screen than U.S. citizens and those with valid travel documents.  *Id.* at 11.  During the extended processing time for those aliens—which may run from several hours to several days—they typically remain in close proximity to CBP personnel and other travelers.  *Id.*  As for aliens apprehended between ports of entry and taken to a Border Patrol station, they too are held in close proximity to others in the ordinary course of the administration of U.S. immigration laws.  Although Border Patrol stations vary significantly in size and layout, they generally have

---

[5] *See* WHO Coronavirus 2019, Situation Report 138, at 8, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200616-covid-19-sitrep-148-draft.pdf?sfvrsn=9b2015e9_2.

congregate holding areas that can temporarily hold only 150 to 300 people standing shoulder-to-shoulder.  *Id.* at 12.  A typical station also has only two to five separate holding areas.  *Id.*  If not released by CBP, an alien subject to the Order would spend an average of roughly 78 hours in a Border Patrol station before being transferred to U.S. Immigration and Customs Enforcement ("ICE").  *Id.*  Only 46 of CBP's 136 Border Patrol stations offer any medical services at all, and those services are limited to basic emergency care, as well as testing for glucose, pregnancy, and influenza.  *Id.*

## II. STATUTORY AND REGULATORY BACKGROUND

### A.  The Public Health Service Act

As previously noted, the CDC Order was issued under the authority found in 42 U.S.C. § 265, which provides:

> Whenever [the Secretary] determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the [Secretary], in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

The provision is substantively identical to its predecessor statute, the Act of February 15, 1893, ch. 114, § 7, 27 Stat. 449, 452, which initially vested the authority in the President.  That authority was later vested in the Surgeon General by the Public Health Service Act of 1944, Pub. L. No. 78-410, 58 Stat. 682, and then in the Secretary of Health and Human Services in 1966.[6]

---

[6] Reorganization Plan No. 3 of 1966 abolished the Office of the Surgeon General and transferred the Surgeon General's statutory powers and functions to the Secretary of Health, Education and Welfare, now the Secretary of Health and Human Services, 31 Fed. Reg. 8855, 80 Stat. 1610 (June 25, 1966); *see also* Pub. L. No. 96-88, § 509(b), 93 Stat. 668, 695 (1979) (codified at 20 U.S.C. § 3508(b)).  Although the Office of the Surgeon General was re-established in 1987, the Secretary of Health and Human Services has retained the authorities previously held by the Surgeon General.

A separate provision of the Public Health Service Act, section 365(b), authorizes "customs officers" to assist in the implementation of any Section 265 order.  *See* 42 U.S.C. § 268(b) ("It shall be the duty of the customs officers . . . to aid in the enforcement of quarantine rules and regulations . . . .").  Pursuant to 19 U.S.C. § 1401(i), U.S. Border Patrol agents have been designated as "customs officers."  *See* Declaration of Robert Danley, ¶ 2, dated June 17, 2020.  Similarly, officers in Enforcement and Removal Operations at the U.S. Immigration and Customs Enforcement ("ICE") have been delegated the authority of "customs officers" identified in the CDC Order.  *See* Declaration of Danielle Hernandez, ¶ 3, dated June 17, 2020.

**B.  The Interim Final Rule**

The COVID-19 pandemic highlighted the need for an efficient regulatory mechanism to suspend the introduction of persons who would otherwise increase the serious danger of introducing a communicable disease into the United States.  *See* IFR at 11.  As the CDC found, "[i]nternational travel and migration play a significant role in the global transmission of infectious biological agents or their toxic products," as travelers can serve as unwitting vectors of disease— *i.e.* carriers of a pathogenic agent and potential sources of infection for others—and thus increase the risk of introducing the disease into the United States.  *Id.* at 5.  That risk increases when travelers are in "congregate settings," such as ships or planes, as well as terminals with shared sitting, sleeping, eating, or recreational areas.  *Id*. at 6.

Accordingly, on March 20, 2020, HHS issued an interim final rule to allow the CDC Director to invoke the authority in Section 265.  The IFR took effect immediately due to the national emergency, *see* 5 U.S.C. § 553(b)(3)(B) and (d), and defines "introduction into the United States of persons from a foreign country" or place to mean "the movement of a person from a foreign country" or place into the United States (1) "so as to bring the person into contact with persons" in the United States or (2) to cause the contamination of property in the United States "in a manner that the Director determines to present a risk of transmission of a communicable disease to persons or property, even if the communicable disease has already been introduced, transmitted, or is spreading within the United States."  IFR at 27.  Further, it defines "[s]erious danger of the

introduction of such communicable disease into the United States" to mean "the potential for introduction of vectors of the communicable disease into the United States, even if persons or property in the United States are already infected or contaminated with the communicable disease." *Id.* at 28.  Finally, the IFR excludes U.S. citizens and lawful permanent residents, among others, from the scope of any Section 265 order.  *Id.* at 18-19.

The comment period for the IFR has since closed.  The CDC is currently considering the public comments it received and expects to issue a final rule in due course.  *Id.* at 13.

### C.  The CDC's Section 265 Order

The same day the Interim Final Rule took effect the CDC Director issued an order temporarily suspending the introduction of certain aliens from Canada and Mexico into the United States.  The Director found a serious danger that COVID-19 will be introduced into ports of entry and Border Patrol stations, as well as the interior of the country, because the disease exists in Canada, Mexico, and the countries or places of origins of the aliens who travel to the United States by crossing our northern and southern borders.  Order at 15–16.

Based on information provided by DHS and a U.S. Public Health Service Scientist Officer's visit to the El Paso del Norte Port of Entry, Paso del Norte Border Crossing, *id.* at 13; Ex. 1 to Order, the CDC Director determined that ports of entry and Border Patrol stations at or near the northern and southern borders are not structured or equipped to effectively mitigate the risks presented by COVID-19—*i.e.*, to implement quarantine, isolation, or social distancing protocols—even for small numbers of aliens.  Order at 14.  Rather, these facilities were designed for short-term holding in a congregate setting.  *Id.*  And many aliens (typically those who lack valid travel documents and would therefore be found inadmissible during immigration processing) are held in the common areas of these facilities, in close proximity to one another, for hours or days, as they undergo immigration processing.  *Id.* at 1; *see also id.* at 12 (noting that, on average, an alien subject to the Order apprehended between ports of entry would otherwise spend approximately 78 hours in a Border Patrol station before being transferred to ICE).

9

The CDC Director also found CBP's then-existing screening protocol for COVID-19 unworkable for large numbers of individuals.  An influx of infected, asymptomatic aliens would present significant infection control challenges for CBP because the screening of such aliens may not trigger testing (to the extent that testing resources are available).  *Id.* at 12.  The aliens would remain in congregate areas while CBP finishes the screening and processing.  *Id.*  During that time, the alien could infect CBP personnel or other aliens with COVID-19.  *Id.*  If CBP determined that an alien may be exposed to or infected with COVID-19, it would notify the local health department and the CDC personnel, if available, to determine whether the individual should be tested for COVID-19 and where that testing should occur.  *Id.*  If testing was to occur, CBP followed guidance from CDC and local health officials regarding transport to the testing site, including disinfecting the vehicles used for such transport.  *Id.*

As of March 20, 2020, testing required analyzing collected specimens in a laboratory setting with results available only after three to four days.[7]  *Id.* at 4.  And for those aliens who test positive for COVID-19 as a result of following the above protocol, the ports of entry and Border Patrol stations lack the capacity to provide the necessary medical care.  *Id.* at 15.  Only a handful of facilities offer medical services directly, and those services are relatively limited.  *Id.*  Thus, DHS must rely on local and regional hospitals (which sometimes can be far away) and emergency medical resources.  *Id.*  But states along the southern border have some of the lowest numbers of hospital beds per 1,000 inhabitants in the United States.  *Id.*  Moreover, Arizona, California, and Texas also have some of the largest numbers of residents living in primary care shortage areas.  *Id.*  Shifting resources to large numbers of infected aliens, the CDC Director found, would divert the

---

[7] Although rapid testing for COVID-19 has since been developed, such testing is not yet widely available.  April Order at 5–6.  The CDC Director also determined that rapid testing should be prioritized at places such as hospitals so as to increase the availability of care providers by eliminating the need for such individuals to self-isolate while awaiting results.  *Id.*

limited resources away from the domestic population, while increasing the risk of exposure to the virus for healthcare workers.[8]  *Id.*

To mitigate the risks presented by COVID-19, the CDC Order requires returning all "covered aliens" as rapidly as possible and with as little time spent in congregate setting as is feasible, to the country from which they entered the United States, their country of origin, or to another location as practicable and appropriate.  *Id.* at 16.  "Covered aliens" are those persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land port of entry or Border Patrol station at or near the U.S. borders with Canada and Mexico.[9]  *Id.* at 2.  Excluded from the scope of the Order are, among others, U.S. citizens and aliens who arrive at a point of entry with valid travel documents or are in the visa waiver program and are not otherwise subject to travel restrictions.[10]  *Id.*   The Director explained that the sooner a covered alien is returned, the lower the risk that alien spreads COVID-19 into ports of entry, Border Patrol stations, and the interior of the country.  *Id.*

The Director also found that conditional release is not a viable option because there is significant uncertainty that covered aliens would be able to effectively self-quarantine, self-isolate, or otherwise comply with existing social distancing guidelines, not to mention that the CDC lacks the resources and personnel necessary to effectively monitor a large number of people so released.  *Id.* at 15; May Order at 11.  Finally, the Order requested DHS's assistance in its implementation because the CDC lacks the capability and resources to do so.  *Id.* at 16.  Such assistance is expected

---

[8] The CDC Director later also determined that, while it is theoretically possible—although not immediately feasible—to structurally expand and retrofit ports of entry and Border Patrol stations, and to equip and train DHS personnel, in order to contain COVID-19, such an endeavor would be ill-advised because it would consume a significant amount of scarce medical resources that could otherwise be used to meet the needs of domestic population.  May Order at 7.

[9] The Director has expanded the scope of the Order to apply it to *coastal* points of entries and Border Patrol stations at or near the U.S.-Canada and U.S.-Mexico borders.  May Order at 6.

[10] In addition, customs officers may, with supervisor approval, except otherwise covered aliens from the Order based on the totality of the circumstances, including considerations of significant law enforcement, officer and public safety, humanitarian, and public health interests.  Order at 2.

within the Title 42 scheme, which imposes a duty on customs officers to help implement any section 265 orders.  42 U.S.C. § 268(b).

The Order was initially effective for 30 days, but the CDC Director has extended it twice. The Order will now remain in effect—subject to periodic review every 30 days—until the CDC Director determines that the danger of further introduction of COVID-19 into the United States has ceased to be a serious danger to the public health, and continuation of the Order is no longer necessary to protect the public health.  May Order at 1.  In extending the Order, the Director found that the public health risks sought to be mitigated by the Order remain and are unlikely to abate in the near term.  *See id.* at 10; April Order at 2.  In the Director's view, limiting the spread of COVID-19 to unaffected or less-affected areas of the United States and slowing the spread of COVID-19 in highly impacted areas are critical as individual states begin to ease public health restrictions on businesses and public activities (in an effort to mitigate the economic and other costs of the COVID-19 pandemic).  May Order at 6.  This requires limiting the number of infected individuals who may enter these areas.  *Id.*; April Order at 5.  And it would be counterproductive to relax restrictions on the introduction of covered aliens who risk transmitting COVID-19 within DHS facilities and the country's interior and crippling DHS's workforce and local and regional healthcare systems.  May Order at 4; April Order at 2.  This is particularly the case given the lack of vaccines or approved and widely available therapeutics for COVID-19.  May Order at 10.

Indeed, the Government has a particularly significant interest in ensuring the protection of DHS personnel, who in addition to performing various immigration functions, also perform important law enforcement functions and work to ensure the smooth flow of goods and essential personnel across the U.S. borders with Canada and Mexico.  Significant outbreaks of COVID-19 among DHS personnel could, for example, have significant adverse impacts on the country's food and manufacturing supply chains.  Finally, in extending the Order in May 2020, the Director also found that the Order has significantly mitigated the specific public health risk identified in the initial issuance of the Order by significantly reducing—by 88 percent—the population of covered

aliens held in congregate settings in ports of entry and Border Patrol stations, thereby reducing the risk of COVID-19 infection among DHS personnel and others within these facilities.  *Id.* at 3.

### D.  The Immigration Processing of Aliens at the Border

#### 1.  Asylum, Withholding of Removal, and the CAT

DHS's infection control challenges must be assessed against the backdrop of immigration processes occurring at ports of entry and Border Patrol stations that otherwise allow aliens to apply for protection from removal from this country.  One such process is an application for asylum, which is a form of discretionary relief.  *See* 8 U.S.C. § 1158(a)(1).  An alien may be eligible for asylum if he demonstrates, *inter alia*, that he is "unable or unwilling to return to" his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  *Id.* § 1101(a)(42)(A); *see id*. § 1158(a)(1) and (b)(1)(B)(i).  In addition, an alien may be entitled to withholding of removal if he establishes the likelihood that his life or freedom would be threatened in the country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion.  *Id.*  § 1231(b)(3).  And an alien may be entitled to protection under Article 3 of the CAT, if he demonstrates that there are "substantial grounds for believing that he would be in danger of being subjected to torture."  Dec. 10, 1984, S. Treaty Doc. No. 20, 100th Cong., 2d Sess. 19 (1988), 1465 U.N.T.S. 85, 114; *see also* 8 C.F.R. § 1208.16(c)(2)(providing for statutory protection of withholding under CAT if it is "more likely than not that he or she would be tortured if removed to the proposed country of removal.").

The Immigration and Nationality Act ("INA") establishes general procedures for DHS to process aliens who are "applicant[s] for admission" to the United States, whether they arrive at a port of entry or cross the border unlawfully.  8 U.S.C. § 1225(a)(1), (3).  Under the INA, all such aliens must be inspected by immigration officers concerning their right to enter the United States. *Id.* § 1225(b)(1), (b)(2)(A).  A full removal proceeding is authorized for any "applicant for admission" whom an immigration officer determines is "not clearly and beyond a doubt entitled to be admitted."  *Id.* § 1225(b)(2)(A); *see also id.* § 1229; § 1229a; 8 C.F.R. § 1003.1.  An

immigration officer, however, may elect to place certain aliens in an expedited removal proceeding described in 8 U.S.C. § 1225(b)(1), in which the alien will be "removed from the United States without further hearing or review," unless he claims a fear of persecution or torture, or expresses an intent to apply for asylum. *Id*. § 1225(b)(1)(A)(i). An alien is detained during inspection or an asylum interview, *id.* § 1225(b)(1)(B)(ii), (iii)(IV), (iv), and may request to be paroled into the United States under § 1182(d)(5), or, in certain cases, under § 1226, pending resolution of his or her immigration proceedings.

The credible fear interview by an asylum officer assesses whether there is a significant possibility that the alien could establish eligibility for asylum, withholding of removal or protection under the CAT. *See id.* §§ 1225(b)(1)(B)(v), 1158, 1231(b)(3); 8 C.F.R. §§ 208.16-.18, 1208.16-.18, 208.30(e). If the officer finds that the individual does not have a credible fear, that finding shall not become final until reviewed by a supervisory asylum officer. 8 C.F.R. § 208.30(e)(8). If the supervisory asylum officer agrees that there is no credible fear, the asylum officer shall provide the alien with a written notice of that decision. *Id.* § 208.30(g). The alien may request review of a negative credible fear determination by an immigration judge. *Id.* § 1225(b)(1)(B)(iii)(III); *see also* 8 C.F.R. § 235.3(b)(4)(i)(C). If the asylum officer or immigration judge determines that the alien has established a credible fear of persecution or torture, the alien is referred for removal proceedings under 8 U.S.C. § 1229a to challenge his or her removability. 8 C.F.R. §§ 1225(b)(1)(B)(ii), 208.30, 1208.30.

All of these procedures affect an alien's length of stay at a port of entry or Border Patrol station and in the United States, and potentially present the public health concerns of further spread of COVID-19 into the United States. Even expedited removal proceedings require examination by immigration officials that could put both aliens held together in congregate setting and DHS personnel at risk of contracting COVID-19.

### 2.  The Processing of Unaccompanied Alien Children

Section 235 of the William Wilberforce Trafficking Victims Protection and Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110-457 (codified in principal part at 8

U.S.C. § 1232), provides certain additional protections to unaccompanied alien minors subject to the removal scheme under the immigration provisions of Title 8 of the U.S. Code, as defined in 6 U.S.C. § 279(g)(2).  For example, an unaccompanied minor from a non-contiguous country sought to be removed generally must be placed in full removal proceedings under 8 U.S.C. § 1229a, in lieu of expedited removal proceedings.  *See* 8 U.S.C. § 1232(a)(5)(D)(i).   And unaccompanied minors who remain in the country, subject to Title 8 immigration provisions, must be placed in the custody of the Office of Refugee Resettlement ("ORR") of the Department of Health and Human Services ("HHS"), which must place the child with a care provider in the "least restrictive setting that is in the best interest of the child," subject to considerations of danger to self, danger to others, and risk of flight.  *See id.* § 1232(c)(2)(A).  ORR also conducts ongoing assessments as to whether a proposed custodian is capable of providing for the child's physical and mental well-being.  *See id.* § 1232(c)(3)(A).

    In addition, in the ordinary course, any federal department or agency that has custody of an unaccompanied minor must transfer custody of the minor to ORR within 72 hours of determining that the child is unaccompanied, as defined by 6 U.S.C. § 279(g)(2).  *See id.* § 1232(b)(3).  This requirement does not apply "in the case of exceptional circumstances."  *Id.*

### III.    Plaintiff and His Request for Emergency Relief

    Plaintiff is a 16-year-old from Honduras.  Compl. ¶ 3, ECF No. 1.  On June 4, 2020, he was apprehended approximately one mile from the border after illegally entering the United States near El Paso, Texas.  *Id*. ¶¶ 17, 80; Danley Decl., ¶ 3.  He asserts that he was afraid for his life in Honduras and journeyed to the United States to join his father, who lives in Texas and is awaiting his own immigration proceedings.  Pl.'s TRO Motion & Br. in Supp. ["Mot."] at 3, 4, ECF No. 2-1; Compl., ¶ 3.  On or about June 4, U.S. Border Patrol determined that he is a "covered alien" under the CDC Order.  Danley Decl., ¶ 4.  Accordingly, he was scheduled to be returned to Honduras and was moved to a hotel to await the next available flight to Honduras, which was scheduled for June 10, 2020.  Hernandez Decl., ¶¶ 4, 5.  In moving him to a hotel, DHS ensured that Plaintiff is provided basic necessities, including daily medical visits, room cleaning, and

telephone (or video) calls with family.  *Id.* ¶ 7.  On June 10, 2020, the U.S. Citizenship and Immigration Services ("USCIS") provided a screening interview.  *Id.* ¶ 6.  Based on that interview, USCIS issued a decision finding that Plaintiff did not meet his burden of establishing that it is more likely than not that he would be subjected to torture if returned to Honduras.  *Id.*  In other words, USCIS determined that Plaintiff does not meet the threshold screening required to place Plaintiff in removal proceedings in order to seek protection under the CAT.

## STANDARD OF REVIEW

"The standard for obtaining injunctive relief through either a temporary restraining order or a preliminary injunction is well established."  *Coal. for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 6, 7–8 (D.D.C. 2010).  The movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  A TRO or a preliminary injunction "is an extraordinary and drastic remedy."  *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted).  It is "never awarded as of right," *id.* at 690, and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  Here, Plaintiff fails to meet his burden.

## ARGUMENT

## I.   PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS

In challenging the Government's plan to return him to his home country, Plaintiff argues that the CDC Order is contrary to law and is otherwise arbitrary and capricious.  He is not likely to succeed on either of those theories.

### A.  Plaintiff Is Unlikely to Succeed in Showing that the CDC Order Is Unauthorized by Section 265

Plaintiff argues that Title 42 does not allow the Government to return aliens like him— who have physically crossed the border into the United States but are apprehended at or near the border—to their home countries.  *See* Mot. at 8.  But Section 265 gives the CDC Director the

"power to prohibit . . . the introduction of persons" from a foreign country to prevent a communicable disease from spreading to the United States.  42 U.S.C. § 265.  To effectuate Section 265's purpose of preventing the transmission of a communicable disease, the power to "prohibit" a person's "introduction" necessarily includes the power to physically remove the person even after he has unlawfully crossed the border into the United States and is apprehended near the border.  Indeed, it has long been recognized that "where a general power is conferred or duty enjoined, every particular power necessary for the exercise of the one, or the performance of the other, is also conferred."  *Luis v. United States*, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring) (quoting Thomas Cooley, *Constitutional Limitations* 63 (1868)); *see also* 1 J. Kent, *Commentaries on American Law* 464 (13th ed. 1884) ("whenever a power is given by a statute, everything necessary to the making of it effectual or requisite to attain the end is implied").  Congress's use of the term "introduction"[11] also signals that the Executive's authority under Section 265 is not limited to the Nation's borders.[12]  As the current pandemic illustrates, the insidious nature of communicable diseases does not lend itself to limitation by geographic boundaries.  Congress clearly intended public health experts to be able to flexibly respond to the exigency posed by the spread a contagious disease, including by suspending the introduction of vectors from abroad.

---

[11] *See Universal English Dictionary* 1067 (John Craig ed. 1861) (defining "introduction" to include, inter alia, "the act of bringing into a country" as well as "the ushering of a person into presence"); 1 *American Dictionary of the English Language* 113 (Noah Webster ed.,1st ed. 1828) (similar definitions).

[12] Moreover, even those aliens who are "apprehended within hours of surreptitiously entering the United States" are still treated as "'alien[s] seeking initial admission to the United States.'"  *Castro v. U.S. Dep't of Homeland Sec.*, 835 F.3d 422, 445 (3d Cir. 2016) (quoting *Landon v. Plasencia*, 459 U.S. 21, 32, (1982)); *see also Cruz v. Dep't of Homeland Sec.*, No. 19-CV-2727, 2019 WL 8139805, at *5 (D.D.C. Nov. 21, 2019) (fact that plaintiff was apprehended within the territorial bounds of the United States after crossing the U.S.-Mexico border does not overcome the fact that he has not "effected entry into this country"); *cf. Leng May Ma v. Barber*, 357 U.S. 185, 188–190 (1958) (alien "paroled" into the United States pending admissibility determination had not effected an "entry").

To the extent the statute leaves any ambiguity, the agency has reasonably interpreted "the introduction of persons" to "encompass those who have physically crossed a border of the United States and are in the process of moving into the interior in a manner the Director determines to present a risk of transmission of a communicable disease." IFR at 16. That interpretation is reasonable and entitled to *Chevron* deference because, again, the public health concerns that Section 265 is designed to address do not evaporate the minute an alien crosses the border into the United States, nor do they depend on how quickly Border Patrol agents are able to apprehend the alien near the border. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

As the CDC Director found, the risk of transmission of COVID-19 into the United States by aliens who have illegally crossed the border is no less than that posed by aliens seeking to enter the United States through a port of entry. *See* Order at 11–13. In both situations, the aliens would be processed or otherwise held in congregate settings if found inadmissible during immigration processing. *Id*. Indeed, "covered aliens" are not likely to present themselves at ports of entry or Border Patrol stations. CBP can apprehend them only after they have crossed into the United States. The border itself is an invisible line defined in cartographic terms, and given these practicalities, Congress surely would not have intended to exempt aliens once they cross into the United States, since that is the only place CBP can apprehend them.

It would be incongruous to say that section 265 orders could be legally applied to aliens seeking to lawfully enter the country at a port of entry but not to aliens who sought to circumvent the law by surreptitiously crossing the border between points of entry. The legality of the Section 265 authority cannot turn on whether an alien happened to be caught before successfully slipping across the border. Otherwise the proper applicability, and lawfulness, of Section 265 would perversely turn on whether an alien had attempted to evade the law. Likewise, it makes no difference whether the alien is captured one foot or, here, approximately one mile from the border. Congress enacted a statute that aims to mitigate the introduction of such aliens altogether; Congress did not limit that aim to the border line alone. For this reason, "covered aliens" under

18

the CDC Order include aliens who unlawfully enter the United States between ports of entry and are apprehended at or near the U.S.-Canada or U.S.-Mexico borders.

Plaintiff makes several arguments, none of which has merit.

*First*, he argues that Title 42 of the U.S. Code, which governs public health, authorizes only "testing, and in extreme cases, detention and quarantine," not "the removal of people from the United States." Mot. at 1–2, 9. This is clearly belied by the relevant statutory text. Section 264 of Title 42 does authorize those public health measures. *See* 42 U.S.C. § 264(b), (d)(1). But as discussed above, Section 265 separately authorizes the Secretary to prohibit the introduction of persons from a designated country or place. The power to return individuals such as Plaintiff to their home countries is necessary for the Secretary to stop the introduction of those persons into the United States.

*Second*, Plaintiff contends that returning him to his home country would be an unauthorized penalty under 42 U.S.C. § 271(a). Mot. at 8. That provision prescribes "[p]enalties for violation of quarantine laws," and as Plaintiff says, it does not mention "removal" from the United States, *id.* at 8. But halting the introduction of the person by returning him to his home country is not a criminal punishment like that specified in section 271(a). It is a measure designed to protect the public health and mitigate the spread of a communicable disease into the interior of the United States. Moreover, section 271(a) has no bearing on the scope of Section 265. By its plain terms, section 271 imposes fines and imprisonment for violations of *regulations* promulgated under Section 265 and other Public Health Service Act provisions related to quarantine. *See* 42 U.S.C. § 271(a). Plaintiff's return, in contrast, occurs under Section 265 itself pursuant to the Interim Final Rule and the CDC Order.

*Third*, Plaintiff argues that Congress could not possibly have intended to authorize "expulsion" because Section 265 applies to citizens and non-citizens alike. Mot. at 9. "It is inconceivable," Plaintiff asserts, "that Congress would seek to give the executive branch that (plainly unconstitutional) power." *Id.* at 10. Plaintiff is wrong. As an initial matter, the Interim Final Rule explicitly excludes U.S. citizens from the scope of any section 265 order. *See* IFR at

18-19.  It is an academic question whether Section 265 could constitutionally be applied to U.S. citizens to temporarily delay their entry into the United States; Plaintiff is not a U.S. citizen and again, the IFR excludes U.S. citizens from any section 265 order.  As relevant here, however, U.S. citizens entering the United States are not similarly situated to persons within the scope of the Order because they would not typically be held in congregate settings at ports of entry or Border Patrol stations.

In any event, Plaintiff's interpretation finds no support in the statute's text or legislative history, which evince Congress's intent to grant the Executive Branch very broad powers to prevent the spread of communicable diseases into the United States.  Section 265 has its origin in the Act of February 15, 1893, ch. 114, § 7, 27 Stat. 449, 452.  As initially proposed, the 1893 Act would have given the President the power to suspend "immigration" from such foreign countries or places that he shall designate.  *See* H.R. 9757, 52nd Cong., 2d Sess., Report No. 2210 (Jan. 9, 1893); *see also* 24 Cong. Record 470 (Jan. 10, 1893) (Senator George Gray explaining that the exigency posed by "invasion of contagious disease[] is sufficient . . . to justify this extraordinary power of the entire suspension of immigration").  But ultimately, the specific reference to immigration was removed, not to circumscribe the Executive's authority but rather, to give the President even broader authority.  As enacted, the Executive had the power to "prohibit, in whole or in part, the introduction of" all "*persons*."  *Id.* 471; *see id.* (Senator William Chandler: "A discretion to do an act of this kind in a great emergency certainly ought to have the authority coupled with it to act either in whole or in part according to the exigency.").  That is, the inclusion of U.S. citizens within the scope of Section 265 in no way indicates the limitation Plaintiff proposes.  *Id.*

Finally, contrary to Plaintiff's argument, his planned return is not a "deportation," "expulsion," or "removal" within the meaning of the INA.  *See* Mot. at 7.  Rather, his planned return is for the express purpose of halting his "introduction" into the United States and thereby protecting the public health, as Section 265 permits.  Indeed, CBP's apprehension of Plaintiff was pursuant to the Public Health Service Act, which provides that "it shall be the duty of customs

officers . . . to aid in the enforcement" of the CDC Order, *see* 42 U.S.C. § 268(b), not as part of CBP's statutory authorities under the immigration laws.  And as the CDC Director found, "[i]t is necessary for the public health to immediately suspend the introduction of covered aliens," and such suspension "requires the movement of all such aliens to the country from which they entered the United States, [ ] their country of origin, or another location as practicable, as rapidly as possible, with as little time spent in congregate settings as practicable under the circumstances." Order at 16.

In sum, Section 265 authorizes the Government to return Plaintiff to his home country and Plaintiff's contrary arguments are unlikely to succeed.

## B.  Plaintiff Is Unlikely to Succeed in Showing that the CDC Order Violates the CAT, the TVPRA, and the Asylum and Withholding of Removal Statutes

Plaintiff contends that whatever Title 42 authorizes, "it cannot override the provisions of the immigration laws providing protection to unaccompanied alien children and those seeking protection."  Mot. at 11.  This is so, according to Plaintiff, because such immigration laws—*i.e.*, the CAT, the TVPRA, and the asylum and withholding of removal statutes—are more specific than Section 265 and were enacted later in time.  Plaintiff is unlikely to succeed on this argument.

### 1.  The Government's plan to return Plaintiff to Honduras does not violate its obligations under the CAT.

As an initial matter, the Government has complied with its obligations under the CAT in this case.  The United States' obligations under Article 3 of the CAT were implemented through the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-207, Div. G. Title XXI, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note).  FARRA provides that "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."  FARRA § 2242(a).  FARRA further specifies that except as provided by regulation, no court shall have jurisdiction to review any claim or determination raised under the

CAT "except as part of the review of a final order of removal pursuant to section 242 of the [INA]." *Id.* § 2242(d); *see also Omar v. McHugh*, 646 F.3d 13, 18 (D.C. Cir. 2011) (Kavanaugh, J.) ("It is true that § 2242(a) of the FARR Act states a broad 'policy' that the Executive Branch presumably has a responsibility to follow with respect to all transfers, at least absent any claim of unconstitutionality under Article II of the Constitution. The Act also plainly says, however, that only immigration transferees may obtain judicial review of conditions in the receiving country before they are transferred."). DHS and DOJ regulations promulgated under FARRA prohibit the "removal" of an alien if it is more likely than not that the alien would be tortured in the country of removal either by or with the acquiescence of a public official. 8 C.F.R. §§ 208.16(c)(2), 1208.16(c)(2); *see also id.* §§ 208.16(c)-.18, 1208.16(c)-.18; FARRA § 2242(b).

Here, Plaintiff's planned return is not pursuant to "a final order of removal" under the INA. Moreover, as Plaintiff concedes, even when implementing the CDC Order, DHS will refer an alien for a CAT interview if the alien claims a fear. *See* Mot. at 14 n.4; *see also* Hernandez Decl., ¶ 6. The screening interview is conducted by an USCIS asylum officer who assesses whether it is more likely than not that the alien would be tortured, as that term is defined by the CAT, in the country to which he or she would be sent. Hernandez Decl., ¶ 6. Here, Plaintiff was given a screening interview on June 10, 2020. *Id.* ¶ 6. Based on that interview, USCIS determined that he does not meet the threshold screening standard required to place Plaintiff in removal proceedings in order to seek protection under the CAT. *Id.* And in any event, the FARRA is clear that this Court has no jurisdiction to review that determination. FARRA § 2242(d); *cf. Trinidad y Garcia v. Thomas*, 683 F.3d 952, 957 (9th Cir. 2012) (en banc) (if process to determine whether alien will not be subject to torture under FARRA has been applied, "the court's inquiry shall have reached its end"). Plaintiff, therefore, is unlikely to be able to show that his planned return to his home country violates the United States' obligations under Article 3 of the CAT.

As discussed below, Plaintiff also is not likely to succeed in showing a violation of the other immigration laws he identified.

### 2. Congress intended the Public Health Service Act provisions to temporarily take precedence over the procedures afforded under the immigration laws.

Using traditional tools of statutory construction, it is evident that Congress did not intend Section 265 to operate alongside the procedures afforded under the immigration laws in times of a public health crisis governed by Section 265—namely when there is a serious danger of a communicable disease spreading into the United States through the introduction of persons.[13]  This Court should give effect to the intent embodied in the Public Health Service Act provisions, Sections 265 and 268(b).  *See Chevron*, 467 U.S. at 843 n.9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); *see, e.g.*, *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (analyzing two statutory provisions to see if they could coexist); *Career Coll. Ass'n v. Riley*, 74 F.3d 1265, 1272 (D.C. Cir. 1996) (analyzing statute to see if Congress resolved a situation where "two statutory provisions are . . . in considerable tension").

At least three canons of statutory construction supports the reading that the immigration laws must temporarily give way.

*First*, the canon of "the specific governs the general" supports the Government's interpretation.  This canon applies to disentangle the interplay between "laws of equivalent dignity," *Nitro-Lift Techs., LLC v. Howard*, 568 U.S. 17, 21 (2012), and resolves the perceived conflict by "carving out an exception from the more general enactment for the more specific

---

[13] Even aside from the congressional intent that immigration laws, including the TVPRA, must give way in times of a public health crisis, the Government did not violate the TVPRA's provision concerning the transfer of an unaccompanied alien child to HHS custody within 72 hours.  *See* Mot. at 11.  By its plain terms, the TVPRA does not require such transfer of custody in "exceptional circumstances," 8 U.S.C. § 1232(b)(3), which plainly are present here, given the current pandemic and the CDC Order requiring the return of covered aliens like Plaintiff as soon as practicable.  As noted before, although Plaintiff could not be immediately repatriated to his home country due to the flight schedule, he was moved to a hotel where his basic necessities are being met.  Hernandez Decl., ¶¶ 4, 7.

statute." *Stewart v. Smith*, 673 F.2d 485, 492 (D.C. Cir. 1982) (citing *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228-29 (1957)); *see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).  Courts have used this rule of construction to interpret provisions in different titles of the U.S. Code, *see, e.g.*, *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976); *Lewinsohn v. United States*, 278 F. 421, 429 (7th Cir. 1921), and clauses in different articles of the Constitution, *see, e.g.*, *Aurelius Inv., LLC v. Puerto Rico*, 915 F.3d 838, 851 (1st Cir.), *rev'd on other grounds sub nom. Fin. Oversight Bd. for P.R. v. Aurelius Inv., LLC*, -- S. Ct. --, 2020 WL 2814298 (S. Ct. June 1, 2019); *Albright v. Oliver*, 510 U.S. 266, 273–74 (1994) (plurality opinion)  It does not matter that the specific statute was enacted earlier than the more general statute.  *See Radzanower*, 426 U.S. at 153 ("It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum."); *Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961) (same).

Here, contrary to Plaintiff's argument, the public health provisions are more specific than the immigration laws, as made clear by the scope of their application.  They apply only in a rare and specific circumstance—when the CDC Director determines that there is a serious danger of a communicable disease spreading into the United States from a foreign country and, consequently, a temporary suspension of introduction of persons from that country is necessary for the public health.  The immigration laws, by contrast, apply across the board whenever an alien seeks to enter the United States without regard to the existence of a public health emergency.

Beyond the plain language of Section 265, which evinces the narrowness of its scope, the legislative history confirms that Congress intended to confer a specific, targeted power that would supersede the immigration laws for the duration of a public health emergency.  As discussed above, the provision's predecessor is the Act of February 15, 1893, ch. 114, § 7, 27 Stat. 449, 452.  As initially proposed, the 1893 Act would have provided the President the "power to suspend immigration" from specified foreign countries or places.  *See* H.R. 9757, 52nd Cong., 2d Sess., Report No. 2210 at 3 (Jan. 9, 1893); *see also id.* at 4 (noting that "[t]housands of immigrants may

pass through inspection at a port of entry, and still upon arriving at their destination . . . may disseminate the poison that has been slumbering in their midst and imperil the lives of any community in which they happen to locate"); 24 Cong. Record 470 (Jan. 10, 1893) (statement of Senator George Gray explaining that the exigency posed by "invasion of contagious disease[] is sufficient . . . to justify this extraordinary power of the entire suspension of immigration"). Ultimately, the specific reference to immigration was removed and replaced with the power to prohibit the introduction of all *persons*.  Importantly, Congress did so not to circumscribe the President's authority, but rather to give the President even broader power to respond to a public health crisis.  *See* 24 Cong. Record 472.  That this is the first time the Government has invoked Section 265 in 127 years—and did so only in the face of the World Health Organization's declaration of an unprecedented global pandemic—underscores the specific, targeted nature of the provision.[14]

Plaintiff and amici argue that Congress has already accounted for public health concerns about communicable diseases in the immigration laws.  *See* Mot. at 9 (citing 8 U.S.C. § 1182(a)(1) ("[h]ealth-related grounds" of inadmissibility, including communicable diseases); 8 U.S.C. § 1222 ("[d]etention of aliens for physical and mental examination")); Br. for Scholars of Refugee & Immigration Law as Amici Curiae at 9, ECF No. 19 (no motion for leave filed).  In amici's view, the purportedly "earlier enacted" Section 265 does not "free the Executive Branch from the restrictions against removal in those later-enacted laws."  *Id.*

But Congress clearly did not intend for the cited immigration law provisions to address the type of national public health emergency the country currently faces.  Those provisions are focused on individual aliens' circumstances, whereas Section 265 is specifically designed to address the public health consequences of allowing persons from other countries to enter the United States

---

[14] Of course, this is not the only travel-related public health measure that the Government is taking to combat the pandemic.  As discussed above, the President has suspended the entry of most aliens from the People's Republic of China, the Islamic Republic of Iran, the Schengen Area of Europe, the United Kingdom, the Republic of Ireland, and Brazil.

during an outbreak of a communicable disease when doing so would risk spreading the disease into the United States.  Moreover, Plaintiff himself concedes that the health-related grounds of inadmissibility have been in existence since "the earliest days of [the Nation's] immigration regulation—predating the 1893 enactment of the predecessor to § 265."  Mot. at 9 (citing Act of Mar. 3, 1891, ch. 551, 26 Stat. 1085, 1085); *see, e.g.*, *Kaplan v. Tod*, 267 U.S. 228, 229 (1925) (alien minor, who was brought to this country in 1914, was "certified to be feeble minded" and "upon examination" was ordered to be excluded).  There is no reasonable basis then to construe those provisions as narrowing Section 265.  Not only did Congress see fit to enact the 1893 Act, but it re-codified the Act in the Public Health Service Act of 1944, fully aware of the existence of these health-related immigration law provisions.

Thus, the cited immigration provisions cannot fairly be read to constrain Section 265.  *See Radzanower*, 426 U.S. at 153 (explaining that the "reason and philosophy of the [specific-over-general] rule is, that when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute in general terms, or treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive previous provisions" (citation omitted)); *cf. Trump v. Hawaii*, 138 S. Ct. 2392 (2018) (refusing to interpret anti-discrimination provision applicable to issuance of immigrant visas to constrain separate provision authorizing the President to suspend entry of classes of aliens because the two provisions "operate in two different spheres"; observing that if the interpretation were correct, the President would not be permitted to suspend entry from particular foreign states in response to an epidemic confined to a single region, among other possible actions, which is an illogical result).

*Second*, the canon that a court should not interpret a statute in a way that frustrates the purpose evident from its text and structure also supports the Government's interpretation.  Nothing suggests that Congress intended for the public health provisions to be applied in tandem with the immigration laws in a way that would undermine the efficacy of the public health provisions during a global pandemic.  *See Keppel v. Tiffin Sav. Bank*, 197 U.S. 356, 361 (1905) (noting the "cardinal

rule" that a statute "should, if possible, be given a meaning in accord with the general purpose which the statute was intended to accomplish").   When the Director invokes Section 265, by definition, he has determined that there is a "serious danger" that a communicable disease in a foreign country would be spread into the United States by persons arriving from that foreign country, and, as such, it is necessary to suspend their introduction to avoid the spread of the disease. *See* 42 U.S.C. § 265.   As the preamble to the Interim Final Rule recognizes, the danger of transmitting a communicable disease through international travel can be significant, and the Government must "respond promptly and effectively" to halt the potential transmission. *See* IFR at 4; *see also id.* at 5–6 ("travelers can serve as unwitting vectors of disease, and . . . the risk increases when travelers are in congregate settings").

To interpret the emergency public health provisions as operating in tandem with the routine procedures afforded under the immigration laws would mean that Congress intended to allow potential vectors of a communicable disease to be introduced into the United States, notwithstanding the dangerous consequences for the public health.   Such an interpretation would "'bring about an end completely at variance with the purpose of [the public health provisions]' and must be rejected."   *United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 201–02 (1979) (collecting cases); *see also Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 (1985) (declining to interpret a statutory provision "in a manner that frustrates [the legislative] intent"); *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 632 (2012) (rejecting interpretation that would undermine the purpose of statute).   It would also directly contradict the means by which Section 265 is designed to achieve its purpose—*i.e.*, by prohibiting the introduction of persons who would otherwise increase the serious danger of spreading a communicable disease into the United States. *See Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co*., 514 U.S. 122, 136 (1995) ("Every statute proposes, not only to achieve certain ends, but also to achieve them by particular means.").

And, it would render Section 265 a nullity. *Randall v. Loftsgaarden*, 478 U.S. 647, 661 (1986) (repeal by implication "is not favored").   If, in suspending the introduction of an alien in

order to avert danger to the public health, the Government must concurrently provide the panoply of procedures to that alien, thereby creating the very public health dangers that the suspension seeks to avoid, then Section 265 would have no effect, defeating the Government's compelling interest in preventing a public health threat to the life and safety of its citizenry.

Temporarily suspending certain procedures afforded under the immigration laws, on the other hand, would not frustrate those provisions' general purpose of providing immigration benefits outside the context of a global pandemic (or other threat to public health of comparable magnitude).  Such an interpretation would also be consistent with established principles governing the admission and exclusion of aliens: (1) that aliens have no "claim of right" to enter the United States, *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542–543 (1950), as "the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments,'" *Trump*, 138 S. Ct. at 2418 (quoting *Fiallo v. Bell,* 430 U.S. 787, 792 (1977)); and (2) that in reviewing immigration-related decisions, courts must exercise the "greatest caution" to avoid inhibiting the political branches' "flexibility . . . to respond to changing world conditions," *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *cf. Knauff*, 338 U.S. at 543 ("because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power . . . for the best interests of the country during a time of national emergency").

For all these reasons, this Court should reject the interpretation offered by the amici—that "Section 265 is about the prohibition of 'the introduction of persons and property' into the United States" and "is not about removal (or expulsion) of persons from the United States."  Br. for Scholars of Refugee & Immigration Law as Amici Curiae at 8.  They essentially proffer that Section 265 should be interpreted to authorize only the turning away of covered aliens who present themselves at ports of entry but not the physical removal of aliens who have illegally crossed the border between ports of entry and are apprehended near the border.  But as already explained, Congress chose the terms "prohibit" and "introduction" for a reason.   And the amici's interpretation would defeat the purpose of Section 265, as both aliens who present themselves at

ports of entry and aliens who have illegally crossed the border can transmit and spread COVID-19 into the United States.  It is telling that the amici do not suggest how the Government might go about offsetting the public health concerns that would flow from their reading, especially considering the fact that few aliens subject to the Order will present themselves at ports of entry (or Border Patrol stations) and, as a practical matter, the amici's interpretation would prevent the CDC from protecting the public health.  In fact, the CDC Director has already determined that the Government cannot do so given the current practical constraints related to the physical structure and operation of CBP facilities, the way in which COVID-19 is transmitted, and prioritization of healthcare resources.

*Third*, the canon "that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989), similarly supports the interpretation that the public health provisions take precedence. The interpretation is consistent with Congress's broad grant of powers in the context of the federal quarantine laws, which generally defer to the expertise of the public health officials to determine how best to protect the country from the dangers of a communicable disease.

Several subsections in the adjacent provision, section 264, highlight the Secretary's broad powers in this area.  The first is section 264(a), which empowers the Secretary to "make and enforce such regulations as *in his judgment are necessary* to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States." 42 U.S.C. § 264(a) (emphasis added); *compare with id.* § 265 ("[w]henever the [Secretary] determines . . . [he] shall have the power to prohibit, in whole or in part, the introduction of persons . . . from such countries or places as he shall designate . . . and for such period of time as he may deem necessary"). This similarly phrased section is broad, deferring entirely to the Secretary's "judgment."  In interpreting the provision, at least one court has observed that "Congress has granted broad, flexible powers to federal health authorities who must use their judgment in attempting to protect the public against the spread of communicable disease." *Louisiana v. Mathews*, 427 F. Supp. 174, 176 (E.D. La. 1977).  Because "[a] basic principle of interpretation is that courts ought to interpret similar

language in the same way, unless context indicates that they should do otherwise," *Shirk v. United States ex rel. Dep't of the Interior*, 773 F.3d 999, 1004 (9th Cir. 2014) (citing *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007)), this Court should interpret the similar language in Section 265 to grant the Secretary broad powers to act in the face of an epidemic.

Next, subsections 264(b) through (d) indicate that the Secretary's powers in this area are especially broad with respect to foreign travelers.  As discussed above, those provisions authorize the Secretary to use various public health measures—apprehension, detention, conditional release, and examination—to prevent the introduction, transmission, or spread of communicable diseases. 42 U.S.C. § 264(b).  They treat foreign and domestic travelers differently; with respect to the latter, the Secretary's authority is limited: he may (1) apprehend them only if they are "reasonably believed to be infected with a communicable disease in a qualifying stage," and (2) detain them only if they are determined to be infected.  *Id.* § 264(d)(1).  But even in limiting the Secretary's apprehension and detention authority for individuals in the United States, the subsection sweeps broadly in that an individual "reasonably believed to be infected" need only be "in a precommunicable stage, if the disease would be likely to cause a public health emergency if transmitted to other individuals."  *Id.* § 264(d)(2).  And as interpreted by regulation, the "precommunicable stage" begins "upon an individual's earliest opportunity for exposure to an infectious agent." 42 C.F.R. § 70.1.

These provisions show that through the federal quarantine laws, Congress gave the Secretary sweeping authority to protect the country from potentially devastating communicable diseases.  Interpreting the public health provisions to supersede temporarily the immigration provisions for the duration of an outbreak would give effect to this clear intent.

In sum, traditional canons of statutory construction demonstrate that the public health and immigration provisions can be harmonized by interpreting the immigration provisions to give way temporarily in a public health emergency.  This interpretation honors both sets of provisions and gives effect to clearly expressed congressional intent, consistent with the Supreme Court's admonition that "[w]hen confronted with two Acts of Congress allegedly touching on the same

topic," the Court "must strive 'to give effect to both.'"  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).

### 3.  The CDC's interpretation of the public health provisions is entitled to deference.

Although this Court need not proceed further on Plaintiff's statutory challenge, the CDC's interpretation of the public health provisions as operating without regard to the immigration laws is permissible and entitled to deference under *Chevron*.  *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("*Chevron* requires a federal court to accept the agency's [permissible] construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.").  At a minimum, it is entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).  *See Brown v. United States*, 327 F.3d 1198, 1205 (D.C. Cir. 2003) ("Under *Skidmore*, the court grants an agency's interpretation only as much deference as its persuasiveness warrants."), *as amended* (May 6, 2003).

In analogous contexts, court have upheld agencies' reasonable interpretations in the face of perceived statutory conflicts.   In *National Ass'n of Home Builders* v. *Defenders of Wildlife*, the Supreme Court examined "the interplay between two federal environmental statutes" that imposed "seemingly categorical—and, at first glance, irreconcilable—legislative commands." 551 U.S. 644, 649, 661 (2007). After analyzing the provisions using the traditional tools of statutory construction, the Court was "left with a fundamental ambiguity that [wa]s not resolved by the statutory text." *Id.* at 666.  Recognizing that one of the "differing mandates . . . must give way," the Court looked to the agency's interpretation to determine which one must give.  *Id.*  The Court ultimately found the agency's interpretation "reasonable in light of the statute's text and the overall statutory scheme." *Id.*; *see also Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 64 (2014) (plurality) ("When an agency thus resolves statutory tension, ordinary principles of administrative deference require us to defer.").

The D.C. Circuit similarly has held that where two unambiguous statutes are in apparent conflict and neither indicates how Congress intended to resolve that conflict, the ambiguity created

by such a conflict may be resolved by the agency's reasonable interpretation.  *See W. Coal Traffic League v. Surface Transp. Bd.*, 216 F.3d 1168, 1173 (D.C. Cir. 2000) ("The statute does not address the unanticipated conflict this case presents . . . .  Because the Congress has not 'directly spoken to the precise question at issue,' . . . we review the [agency's] resolution of that conflict under *Chevron* step two."); *Career Coll. Ass'n*, 74 F.3d at 1271-72 (noting that "the Secretary has some discretion to resolve the apparent conflict between the two [statutory] provisions because "it appears that the draftsmen did not contemplate this scenario"); *Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1281 (D.C. Cir. 2004) (explaining that "the FDA was called upon to construe the statutes so as to resolve these two conflicts" and concluding that the FDA's construction satisfied *Chevron*).

Here, the CDC reasonably interpreted Sections 265 and 268 to operate without regard to the immigration laws.  The Interim Final Rule reasonably interprets "introduction of persons" from foreign countries to mean movements that bring persons from foreign countries into contact with others in the United States in a manner that the Director determines to present a risk of transmission of the communicable disease to persons in the United States.  IFR at 16-17.  Specifically, the term "encompass those who have physically crossed a border of the United States and are in the process of moving into the interior."  *Id.* at 16.  The CDC Order then directs CBP to move covered aliens out of the country, with as little time spent in congregate settings as possible.  In the CDC's expert judgment, it is imperative "to halt the travel of such persons and rapidly mov[e] them outside the United States" to "prevent[] their 'introduction'" because they otherwise would be held for extended periods of time in congregate settings during immigration processing, which would be conducive to the transmission of COVID-19.  Order at 11; *id.* at 12

As discussed before, the limited size and capacity of the congregate holding areas at ports of entry and Border Patrol stations—and the sheer number of covered aliens seeking to enter the United States—would present a serious public health risk during the COVID-19 outbreak.  Moreover, an alien exposed to or infected with COVID-19 would most likely go to healthcare facilities for testing or medical care, increasing the risk of introducing COVID-19 to domestic

healthcare workers as well as burdening the limited domestic healthcare resources.  *Id.* at 13.  Thus, "the faster a covered alien is returned to the country from which [he] entered the United States, to [his] country of origin, or another location as practicable, the lower the risk the alien poses of introducing, transmitting, or spreading COVID-19 into [ports of entry], Border Patrol stations, other congregate settings, and the interior."  *Id.* at 16.

The CDC did not contemplate that CBP would implement the immigration laws concurrently with the CDC Order.  Indeed, such concurrent implementation would defeat the main purpose of the CDC Order by keeping covered aliens in congregate settings for material amounts of time, and then allowing covered aliens to fan out into the interior, where they may act as vectors for spreading COVID-19.  The CDC's interpretation is reasonable because it averts danger to the public health without permanently affecting the application of the immigration laws.  *Cf. Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 332 (2014) (upholding agency interpretation under *Chevron* step two: "[o]ur narrow holding is that *nothing in the statute categorically prohibits* EPA from interpreting the BACT provision to apply to greenhouse gases emitted by 'anyway' sources" (emphasis added)).  Accordingly, the agency's interpretation is entitled *Chevron* to deference, or at a minimum to *Skidmore* deference, and should be upheld.

For all these reasons, the CDC Order is not contrary to law, and Plaintiff is unlikely to succeed in showing otherwise.

### C.  Plaintiff Is Unlikely to Succeed on His Arbitrary and Capricious Challenge

Finally, Plaintiff also argues that the CDC Order is arbitrary and capricious because the CDC (1) did not adequately explain its actions, (2) did not consider important aspects of the problem, and (3) cannot justify the Order on public health grounds.  *See* Mot. at 15–16.  These arguments have no merit.

The scope of review under the "arbitrary and capricious" standard is "narrow," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and "highly deferential," *Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*, 857 F.3d 913, 918 (D.C. Cir.

2017).  "A court is not to ask whether [an agency's] decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016).  Nor is the court to "substitute its own judgment for that of the agency." *Mayo v. Reynolds*, 875 F.3d 11, 19–20 (D.C. Cir. 2017) (citation and alteration omitted).  Rather, the court's "only task is to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made," and to ensure that the agency remained "within the bounds of reasoned decisionmaking." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).  Even if the agency decision is "of less than ideal clarity," it must be upheld "if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43.  The court only considers "whether there has been a clear error of judgment." *Id.* (citation omitted).  Here, the agency's action easily satisfies this highly deferential review.

### 1.  The CDC Order sufficiently explained its necessity.

*First*, the agency's path is clear and there is no clear error of judgment, which is all the APA requires.  The CDC acted in the midst of a historic pandemic with COVID-19 spreading rapidly.  With international travel and migration playing a significant role in spreading the highly contagious disease, IFR 5–6, countries around the globe responded with sweeping travel restrictions, and the United States, Mexico, and Canada closed their shared borders to non-essential travel.  Order at 5, 8.  As already discussed above, the CDC Director fully explained why he chose to focus on CBP's operations at or near those borders.  There are significant practical and operational constraints on CBP's ability to implement effective infection control measures in congregate settings at ports of entry and Border Patrol stations at or near the borders.  Allowing aliens to spend hours or days in those congregate settings during the COVID-19 pandemic "would be fraught with public health risks for not only the aliens but also the DHS personnel nearby." Order at 11–14.

*Second*, Plaintiff is mistaken that the CDC Director should have explained why he did not "exempt unaccompanied children, including unaccompanied children fleeing abuse, persecution, and torture" from the scope of the Order.  *See* Mot. at 15.  The APA requires only that an agency

explain its action well enough for a court to discern the path of the agency's decision-making; it does not require an agency to address every imaginable scenario. *See Balt. Gas & Elec. Co.*, 462 U.S. 87, at 105 (the court's "only task is to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made"). In fact, it is Plaintiff's burden to show why the absence of an exception for children renders the Order arbitrary despite the public health objective of the Order and the fact that children are not immune from this disease. In any event, the CDC Director explicitly recognized that it may be appropriate to exempt certain otherwise covered aliens from the scope of the Order based on humanitarian grounds, and he specifically granted CBP agents and officers the discretion to do so on a case-by-case basis, based on the alien's individual circumstances. *See* Order at 2.

*Third*, contrary to Plaintiff's argument, Defendants are not required, in this instance, to explain their "decision specifically to apply the Title 42 Process to [Plaintiff]." Mot. at 15. Plaintiff clearly is a "covered alien" under the CDC Order. He crossed the border illegally and was taken into custody approximately one mile from the U.S.-Mexico border. Danley Decl., ¶ 3. As an alien who illegally crossed the U.S.-Mexico border between ports of entry who would have otherwise been held in congregate settings in a Border Patrol station to facilitate immigration processing, CBP determined that he is a "covered alien" under the Order. *Id.*, ¶ 4. He was later moved to a hotel to await his flight back to his home country in order to implement the CDC's directive that any "covered alien" be returned as soon as practicable. *See* Hernandez Decl., ¶¶ 4, 5; Order at 16.

It is immaterial to the analysis that Plaintiff does not exhibit any symptoms of COVID-19, Compl. ¶ 86, or, as amici assert, that "children at Plaintiff's age have a lower 'attack rate' of COVID-19." *See* Declaration of Les Roberts, MPH, PHD, and Stephen Patrick Kachur, MD. MPH, in Support of Plaintiff's Motion for Stay of Removal, ¶ 13, ECF No. 18-1 ("Public Health Amici's Declaration") (no motion for leave filed). Even if one is asymptomatic or a minor, and the risk of COVID-19 transmission might be *lower*, there is still some risk. The purpose of the CDC Order is to avert the danger of spreading COVID-19. The presence of covered aliens in

congregate settings—even covered aliens with "a lower 'attack rate' of COVID-19"—would defeat that purpose and undermine the public health.  Plaintiff is therefore unlikely to succeed on any as-applied challenge to the CDC Order.

### 2.   The CDC's well-reasoned Order appropriately considered the problem.

Plaintiff next accuses Defendants of "failing to consider or address how their new process would impact unaccompanied children" or "the need to protect individuals fleeing from persecution."  Mot. at 16.  But the CDC properly promulgated the Order under Section 265, and Congress did not limit the Section 265 authority by requiring the agency to consider statutes administered by other agencies that may be impacted by a section 265 order.  Indeed, this case bears no resemblance to the cases Plaintiff cites, which involve statutory directives that the agency failed to consider.  *See* Mot. at 15; *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1111 (D.C. Cir. 2019) (agency action was arbitrary and capricious because agency failed to consider changes on affordability and access, even though "availability and affordability"  were "long-stated primary tenets for the program," and the statutory principles underlying the program required making "'[q]uality services' . . . 'available at just, reasonable, and affordable rates'" (first alteration in original) (citation omitted)); *Am. Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914, 931 (D.C. Cir. 2017) (statute requires "that an agency's environmental analysis candidly confront the relevant environmental concerns").

But even if the Court concludes that the Director had an obligation to consider the Order's impact on the immigration scheme that the CDC itself is not responsible for administering, the Director satisfied that obligation by consulting with DHS and by relying on that agency's expertise.  *See* Order at 16; *cf. Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 90 (2d Cir. 2000) (promulgation of standards "not arbitrary and capricious" because "[a]ll of the expert agencies consulted . . . found the FCC's approach to be satisfactory").  Again, Plaintiff's argument ignores that the CDC Order allows for case-by-case exceptions based on the totality of the circumstances. The Director's decision to rely on customs officers to make the totality-of-circumstances

determinations is reasonable because DHS has the most expertise with the array of migration and public safety issues that arise at the borders. Plaintiff has not shown that the CDC failed to consider important aspects of the problem when issuing the Order.

### 3. Public health concerns justify the CDC Order.

Plaintiff argues that the CDC Order cannot be justified on public health grounds because "the Title 42 process exempts numerous categories of individuals, such as students and commercial truck drivers, who carry at least as great a risk of COVID-19 as asylum seekers [and] unaccompanied minors." Mot. at 16. But Plaintiff cannot show that the CDC acted arbitrarily and capriciously by not addressing in a single order *all* problems created by travel in a global pandemic. The CDC's measured approach is grounded in its finding that covered aliens without travel documents—in contrast to students and truck drivers who typically arrive at a border with readily verifiable travel authorization—would be held in congregate settings for materially longer periods than other travelers, thus increasing the public health risks for travelers and DHS personnel alike.

This Court should dismiss out of hand Plaintiff's blanket assertion that "public health experts" disagree with the public health rationale of the CDC Order. *See id.* As discussed above, in APA review, the Court "is not to substitute its judgment for that of the agency," *State Farm*, 463 U.S. at 43, 52, nor does the Court ask "whether [an agency's] decision is the best one possible or even whether it is better than the alternatives," *Elec. Power Supply Ass'n*, 136 S. Ct. at 782. Deference to the agency is at its height where, as here, the Court is reviewing the CDC's expert, science-based predictive public health judgment during a global pandemic. *See Jacobson*, 197 U.S. at 30 (explaining that "[i]t is no part of the function of a court or a jury to determine" how best to protect the public from a disease); *S. Bay United Pentecostal Church*, 2020 WL 2813056, at *1 (S. Ct. 2020) (Roberts, C.J., concurring) (explaining that the latitude "to guard and protect" "[t]he safety and the health of the people" "must be especially broad" when acting "in areas fraught with medical and scientific uncertainties"); *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009); *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 225 (D.D.C. 2012).

Plaintiff's mere policy disagreements with the CDC's public health determinations do not render the CDC Order arbitrary and capricious. *See Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 380 (D.C. Cir. 2013) ("This argument amounts to nothing more than another policy disagreement with [the agency], so we must reject it."). Nor does the declaration of amici lend any support to Plaintiff's argument. The amici suggest that CBP can greatly reduce the risk of transmission if they process Plaintiff in accordance with the CDC's public health guidance issued for the domestic population, including conducting "appropriate symptoms screening," "appropriate use of masks, hygiene practices, and social distancing." Health Expert Amici's Declaration, ¶ 14. The CDC Director, of course, has stressed the importance of those public health measures. He issued the Order precisely because he concluded that such public health measures are not feasible to implement at ports of entry or in Border Patrol stations. Order at 14 ("Because [ports of entry] and Border Patrol stations are not structured or equipped for quarantine or isolation for COVID-19, DHS's alternative would be to try to conduct some type of social distancing in congregate holding areas. The numbers of aliens and the size and capacity of the congregate holding areas are not at all conducive to effective social distancing . . . ."). The amici's suggestion ignores the hard, factual realities of ports of entry and Border Patrol stations and should be rejected out of hand.

In sum, the CDC Order is not arbitrary or capricious. *Nat'l Immigration Project of Nat'l Lawyers Guild v. Exec. Office [for] Immigration Review*, --- F. Supp. 3d ----, No. 1:20-CV-00852 (CJN), 2020 WL 2026971, at *11 (D.D.C. Apr. 28, 2020) ("In the wake of the first pandemic the United States has faced since the early twentieth century and the rapidly changing facts and circumstances relating to it, the Court cannot say that Defendants' policies and practices are arbitrary and capricious or otherwise reviewable.").

## II.   THE BALANCE OF HARMS WEIGHS AGAINST ENTRY OF A TEMPORARY RESTRAINING ORDER

### A.  Plaintiff Cannot Show that He Will Suffer Irreparable Harm

Because Plaintiff has failed to establish a likelihood of success on the merits, this Court need not consider the remaining factors for emergency injunctive relief.  *See Winter*, 555 U.S. at 20; *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) ("we read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction" (internal quotation marks and citation omitted)); *see also Nken v. Holder*, 556 U.S. 418, 438 (2009) (Kennedy, J., concurring) ("When considering success on the merits and irreparable harm, courts cannot dispense with the required showing of one simply because there is a strong likelihood of the other."); *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 100 n.5 (D.D.C. 2014) ("Even a narrow reading of the Court's holding in *Winter* supports the view that sliding-scale analysis is obsolete.").  But even if the Court does, the remaining factors support the denial of Plaintiff's request for emergency relief.

Plaintiff has not shown that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.  That requirement "erects a very high bar for a movant," *Coal. for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008), and it is a "well known and indisputable principle[]" that an "unsubstantiated and speculative" harm is not an irreparable injury for purposes of injunctive relief, *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).  Rather, the harm must be "'certain and great,' 'actual and not theoretical,' and so '[i]mminent that there is a clear and present need for equitable relief to prevent irreparable harm.'"  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (alteration in original) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Here, Plaintiff asserts that he will be harmed or even killed by gangs if he is returned to his home country.  Mot. at 6.  Specifically, he alleges that one of his relatives was beaten in his neighborhood, and that a gang threatened him and told his aunt she must close her store and pay

the gang after he witnessed a gang murder while helping at that store.  Corchado Decl. ¶ 6, ECF No. 2-3.  These allegations, however, show only that harm is a "possibility," when he "must, at minimum, 'demonstrate that irreparable injury is likely,'" *Arriva Med. LLC v. Dep't of Health & Human Servs.*, 239 F. Supp. 3d 266, 277 (D.D.C. 2017) (quoting *Winter*, 555 U.S. at 21).  Moreover, contrary to Plaintiff's belief, the alleged "depriv[ation] . . . of the statutorily guaranteed opportunity to seek bona fide claims," such as asylum and withholding, Mot. at 6, is not irreparable.  That argument "link[s] [his] claim of irreparable harm to [his] showing of a likelihood of success on the merits," and thus his "failure to establish the latter is fatal to the former."  *Am. Civil Liberties Union Found. v. Wash. Metro. Area Transit Auth.*, 303 F. Supp. 3d 11, 28 (D.D.C. 2018).  Finally, the Supreme Court has said in the immigration context that removal "is not categorically irreparable."  *Nken*, 556 U.S. at 435.

### B.  The Balance of Harms and the Public Interest Weigh Against an Injunction

As for the remaining factors, the balance of harms and the public interest "merge when the Government is the opposing party."  *Nken*, 556 U.S. at 435.  Plaintiff largely justifies his request by assuming that he will succeed on the merits of his claims, *see* Mot. at 16-17, but as explained above, he is unlikely to do so, "meaning that a preliminary injunction would likely have no effect on public officials' compliance with the law," *Friends of Animals v. U.S. Bureau of Land Mgmt.*, 232 F. Supp. 3d 53, 68 (D.D.C. 2017).  On the other hand, the harm to the Government and the public's interest strongly weigh against injunctive relief.

"It goes almost without saying, of course, that promoting public health—especially during a pandemic—is in the public interest."  *Nat'l Immigration Project of Nat'l Lawyers Guild*, 2020 WL 2026971, at *12.  Here, the Government has taken action that is necessary to protect public health during the worst pandemic since 1918.  At least 116,000 people have died of COVID-19 in the United States, and the death toll continues to rise.[15]  The public health official charged with

---

[15] *See* CDC, Corona Virus Disease 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

implementing the laws that protect the public health concluded that the CDC Order is in the public interest. *See* Order at 2, 3, 14. Plaintiff's requested relief, however, would tie the Government's hands and prevent it from taking action that, in the opinion of the Nation's designated medical expert, is necessary to protect the country from the further spread of a highly contagious virus. *Cf. Bragdon v. Abbott*, 524 U.S. 624, 650 (1998) ("the views of public health authorities, such as the U.S. Public Health Service, CDC, and the National Institutes of Health, are of special weight and authority"); *see also Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 288 (1987). "[W]here[, as here,] the Court is . . . certainly not well-positioned to second-guess those health and safety determinations, the public interest does not point in favor of granting injunctive relief." *Nat'l Immigration Project of Nat'l Lawyers Guild*, 2020 WL 2026971, at *12.

On top of putting the American public, DHS personnel, and other travelers, including even unaccompanied minors, at risk and potentially straining the American healthcare system, an injunction would cause additional harm because "[a]ny time [the government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury," *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (citation omitted); *see also Nat'l Propane Gas Ass'n v. U.S. Dep't of Homeland Sec.*, 534 F. Supp. 2d 16, 20 (D.D.C. 2008). And, as the Supreme Court has recognized, "[t]here is always a public interest in prompt execution of removal orders." *Nken*, 556 U.S. at 435.

For all these reasons, the balance of equities tip against granting injunctive relief.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's motion for a temporary restraining order.

Dated: June 17, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

/s/ *Jean Lin*
JEAN LIN (NY Bar 4074530)
Special Litigation Counsel
KEVIN SNELL
BRADLEY CRAIGMYLE
Trial Attorneys
Civil Division
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 514-3716
Jean.Lin@usdoj.gov
*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that June 17, 2020, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

<u>/s/ *Jean Lin*</u>

JEAN LIN