## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| J.B.B.C., A MINOR CHILD, by and through his father and Next Friend, Carlos Emilio Barrera Rodriguez, | ) ) ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | No. 20-cv-01509-CJN |
| CHAD F. WOLF, Acting Secretary of Homeland Security, in his official capacity, et al., | ) ) ) | |
| *Defendants*. | ) ) ) | |

## <u>PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR EMERGENCY STAY OF REMOVAL</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION................................................................................................1

   I.    SECTION 265 DOES NOT AUTHORIZE PLAINTIFF'S DEPORTATION. .........................1

      A.   Section 265 Provides No Implied Deportation Power.................................................2

      B.   Section 265 Was Designed To Regulate Transportation. ........................................3

      C.   No Deference Is Owed To The Government's Claim To Deportation Power. ...................10

  II.    SECTION 265 DOES NOT OVERRIDE THE PROTECTIONS FOR  UNACCOMPANIED CHILDREN AND ASYLUM SEEKERS...................................................................12

      A. Section 265 Does Not Override The TVPRA And Protection Statutes. ..................................13

      B. The Assertion Of Power To Override Protections Is Not Entitled To Deference..................16

      C.   J.B.B.C.'s Statutory Rights Were Unquestionably Violated..................................................18

  III.    DEFENDANTS' ACTIONS ARE ARBITRARY AND CAPRICIOUS.............................20

  IV.    THE BALANCE OF HARMS TIPS DECIDEDLY IN J.B.B.C.'S FAVOR. ......................23

CONCLUSION....................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Am. Wild Horse Pres. Campaign v. Perdue,*
    873 F.3d 914 (D.C. Cir. 2017) ................................................. 23

*Ass'n of Reptile Keepers, Inc. v. Jewell,*
    106 F. Supp. 3d 125 (D.D.C. 2015) ......................................... 24

*Atl. City Elec. Co. v. FERC,*
    295 F.3d 1 (D.C. Cir. 2002) .................................................... 16

*Brown v. GSA,*
    425 U.S. 820 (1976) ............................................................... 14

*Career College Ass'n v. Riley,*
    74 F.3d 1265 (D.C. Cir. 1996) ................................................ 17

*Cellular Phone Taskforce v. FCC,*
    205 F.3d 82 (2d Cir. 2000) ..................................................... 23

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ................................................. 10, 11, 16, 18

*Christensen v. Harris Cty.,*
    529 U.S. 576 (2000) ............................................................... 16

*Cisneros v. Alpine Ridge Group,*
    508 U.S. 10 (1993) ................................................................. 13

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ............................................................... 20

*Clark v. Martinez,*
    543 U.S. 371 (2005) ............................................................... 2,3

*Demjanjuk v. Holder,*
    563 F.3d 565 (6th Cir. 2009) .................................................. 24

*Devitri v. Cronen,*
    289 F. Supp. 3d 287 (D. Mass. 2018) ..................................... 24

*DHS v. Regents of the Univ. of Calif.,*
    _ S. Ct.  _, 2020 WL 3271746 at *10 (2020) ....................... 18, 20, 22

*Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*,
514 U.S. 122 (1995) ........................................................................................... 4, 10

*District of Columbia v. Dep't of Labor*,
819 F.3d 444 (D.C. Cir. 2016) ......................................................................... 11, 12

*East Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018) ............................................................................ 14, 15

*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018) ..................................................................................... 16,17

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ............................................................................................. 20

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ........................................................................... 13, 14, 15, 19

*Fox v. Clinton*,
684 F.3d 67 (D.C. Cir. 2012) ............................................................................... 11

*Gordon v. New York Stock Exchange, Inc.*,
422 U.S. 659 (1975) ............................................................................................. 17

*Grace v. Whitaker*,
344 F. Supp. 3d 96 (D.D.C. 2018) .................................................................. 11, 24

*Hampton v. Mow Sun Wong*,
426 U.S. 88 (1976) ............................................................................................... 16

*Indep. Ins. Agents of Am., Inc. v. Hawke*,
211 F.3d 638 (D.C. Cir. 2000) ............................................................................. 14

*Judulang v. Holder*,
565 U.S. 42 (2011) .......................................................................................... 10, 16

*Kansas v. Garcia*,
140 S. Ct. 791 (2020) ........................................................................................... 13

*Kaufman v. Nielsen*,
896 F.3d 475 (D.C. Cir. 2018) ........................................................................ 16, 17

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019) .................................................................................... 10, 18

*Louisiana v. Mathews*,
　427 F. Supp. 174 (E.D. La. 1977) ....................................................................... 12

*Loving v. IRS*,
　742 F.3d 1013 (D.C. Cir. 2014) ............................................................. 11, 14, 18

*Luis v. United States*,
　136 S. Ct. 1083 (2016) ......................................................................................... 10

*Merck & Co. v. United States Dep't of Health & Human Servs.*,
　__ F.3d __, 2020 WL 3244013 (D.C. Cir. June 16, 2020) ................................ 3, 4, 10

*Michigan v. EPA*,
　268 F.3d 1075 (D.C. Cir. 2001) ........................................................................... 16

*Michigan v. EPA*,
　576 U.S. 743 (2015) ............................................................................................. 20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
　463 U.S. 29 (1983) ......................................................................................... 20, 21

*Mylan Laboratories, Inc. v. Thompson*,
　389 F.3d 1272 (D.C. Cir. 2004) ........................................................................... 17

*Nasrallah v. Barr*,
　140 S. Ct. 1683 (2020) ........................................................................................... 6

*Nat. Res. Def. Council, Inc. v. Daley*,
　209 F.3d 747 (D.C. Cir. 2000) ............................................................................. 10

*Nat'l Lifeline Ass'n v. FCC*,
　921 F.3d 1102 (D.C. Cir. 2019) ........................................................................... 21

*National Ass'n of Home Builders v. Defenders of Wildlife*,
　551 U.S. 644 (2007) ............................................................................................. 17

*Nken v. Holder*,
　556 U.S. 418 (2009) ............................................................................................. 24

*Osorio-Martinez v. Att'y Gen.*,
　893 F.3d 153 (3d Cir. 2018) ................................................................................ 25

*Pereira v. Sessions*,
　138 S. Ct. 2105 (2018) ......................................................................................... 10

*Prof. Reactor Operator Soc. v. NRC*,
   939 F.2d 1047 (D.C. Cir. 1991) ............................................................. 16

*Radzanower v. Touche Ross & Co.*,
   426 U.S. 148 (1976) .............................................................................. 14

*Ramirez v. ICE*,
   310 F. Supp. 3d 7 (D.D.C. 2018) ........................................................... 25

*Scheduled Airlines Traffic Offices, Inc. v. Dep't of Defense*,
   87 F.3d 1356 (D.C. Cir. 1996) ............................................................... 16

*Scialabba v. Cuellar de Osorio*,
   573 U.S. 41 (2014) ................................................................................ 17

*Soeung v. Holder*,
   677 F.3d 484 (1st Cir. 2012) ........................................................... 18, 19

*Strawberry v. Albright*,
   111 F.3d 943 (D.C. Cir. 1997) ............................................................... 14

*Thatikonda v. USCIS*,
   No. CV 19-685 (RC), 2020 WL 2126716 (D.D.C. May 5, 2020) ............ 24

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) .......................................................................... 14

*Valentine v. United States ex rel. Neidecker*,
   299 U.S. 5 (1936) .................................................................................... 3

*W. Coal Traffic League v. Surface Transp. Bd.*,
   216 F.3d 1168 (D.C. Cir. 2000) ............................................................. 17

*Walsh v. Preston*,
   109 U.S. 297 (1883) ............................................................................ 4, 5

*Wisc. Cent. Ltd. v. United States*,
   138 S. Ct. 2067 (2018) ....................................................................... 3, 15

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ................................................................................ 5

**Statutes**

42 U.S.C. § 264(c) ........................................................................... 11, 12

42 U.S.C. § 265 ........................................................................................................... passim

42 U.S.C. § 271 ................................................................................................................. 12

42 U.S.C. § 271(a) .............................................................................................................. 6

8 U.S.C. § 1182(f) ......................................................................................................... 12, 14

8 U.S.C. § 1225(b)(1) .................................................................................................... 11, 12

8 U.S.C. § 1225(b)(1)(B)(iii)(III) ..................................................................................... 19

8 U.S.C. § 1229a ............................................................................................................... 20

8 U.S.C. § 1232(a)(5)(D) ................................................................................................. 14

8 U.S.C. § 1232(b)(3) ....................................................................................................... 25

8 U.S.C. § 1325 ................................................................................................................. 12

8 U.S.C. §1182(a)(1) ......................................................................................................... 11

8 U.S.C. §1222 ................................................................................................................... 11

8 U.S.C. §1232(c)(3)(A) ................................................................................................... 22

8 U.S.C.§ 1225(b)(1)(B)(iii)(II) ...................................................................................... 19

Act of Aug. 5, 1892, Pub. L. No. 52- 380, 27 Stat. 349, 366 (1892) ............................ 13

Act of March 3, 1891, ch. 551, §§ 10, 11, 26 Stat. 1084, 1086 ...................................... 6

Act of March 3, 1903, chap. 1012, §§ 8, 9, 19, 20, 21, 32 Stat. 1213 ............................ 6

Chinese Exclusion Act of May 6, 1882, ch. 126, §§ 2, 12, 22 Stat. 58, 59, 61 .............. 6

Coronavirus Aid, Relief, and Economic Security Act,
    Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020) ................................................ 12

Coronavirus Preparedness and Response Supplemental Appropriations Act,
    Pub. L. No. 116-123, 134 Stat. 146 (Mar. 6, 2020) .................................................. 12

Families First Coronavirus Response Act,
    Pub. L. No. 116-127, 134 Stat. 178 (Mar. 18, 2020) ................................................ 12

Paycheck Protection Program and Health Care Enhancement Act,
    Pub. L. No. 116-139, 134 Stat. 620 (Apr. 24, 2020) ................................................. 12

**Other Authorities**

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 93 (2012) .................. 10

COVID-19 Measures Related to Asylum and Migration Across Europe (Apr. 8, 2020),
  https://tinyurl.com/ybahhmro ........................................................................................... 22

*Introduce*, *Webster's Collegiate Dictionary* 453 (1st ed. 1898) .................................... 4

*Letter to HHS Secretary Azar and CDC Director Redfield Signed by Leaders of Public Health
  Schools*, Medical Schools, Hospitals, and Other U.S. Institutions, Columbia Mailman School
  of Public Health (May 18, 2020), https://tinyurl.com/y8q3asun ............................................ 25

Minimizing the Risk of Exposure to COVID-19 in Canada Order, P.C. 2020-0161, § 4(2)(d)
  (Mar. 20, 2020), https://tinyurl.com/y888f7yh. ......................................................... 22

*Twenty Days Quarantine*, N.Y Times, Sept. 2, 1892 ................................................. 10

U.S. Dep't of State, *2019 Country Reports on Human Rights Practices: Honduras* 16 (2020) .. 24

*Universal English Dictionary* 1067 (John Craig ed. 1861) .......................................... 4

**Regulations**

70 Fed. Reg. 71,892 (Nov. 30, 2005)................................................................................ 8

8 C.F.R. § 208.30(e)....................................................................................................... 19

8 C.F.R. § 235.3(b)(7)................................................................................................... 19

80 Fed. Reg. 16,400 (Mar. 27, 2015)............................................................................... 8

81 Fed. Reg. 54230 (Aug. 15, 2016)................................................................................ 8

85 Fed. Reg. 16,559 (Mar. 24, 2020)............................................................................. 11

85 Fed. Reg. 17,060 (Mar. 26, 2020)........................................................................ 11, 25

85 Fed. Reg. 7874 (Feb. 12, 2020) .................................................................................. 8

85 Fed. Reg. at 17065 ................................................................................................... 21

85 Fed. Reg. at 31503 (May 26, 2020) ........................................................................... 22

**Legislative History**

24 Cong. Rec. 359 (1893) ........................................................................................ 7

24 Cong. Rec. 378 (1893) ........................................................................................ 6

24 Cong. Rec. 470 (1893) ........................................................................................ 8

98 Cong. Rec. 4423 (1952) ...................................................................................... 12

**INTRODUCTION**

The issue before the Court is whether to allow J.B.B.C. to be sent back to danger pending the outcome of this Court's merits ruling (which can of course be placed on expedited schedule). Defendants do not, and could not, dispute that this boy can be safely kept in the United States. And while Defendants assert that Plaintiff's proffered evidence of harm if he is returned is insufficient, Defendants have not presented any contrary evidence.

On the merits, Defendants do not grapple with the text, structure, and history of the relevant public health and immigration statutes. Instead, Defendants' argument reduces to one proposition: Congress *must* have intended to authorize any action Defendants now believe is necessary. Congress has afforded the government extensive powers, but nowhere authorized deportations outside the immigration law framework. And that makes sense, because the statute on which Defendants rely has always operated as a regulation on transportation companies—meaning that Congress had no reason to authorize deportations. In any event, Congress's careful and specific safeguards for unaccompanied children and those seeking protection cannot be disregarded. The new Title 42 Process is also arbitrary and capricious, particularly when it comes to children seeking protection, like J.B.B.C.

**I.      SECTION 265 DOES NOT AUTHORIZE PLAINTIFF'S DEPORTATION.**

Defendants assert that 42 U.S.C. § 265 empowers them to deport Plaintiff. Yet they concede that Title 42 nowhere explicitly grants any deportation power—indeed, the concept is never mentioned in § 265. Although Defendants have *never*, in the 127 years since § 265 was first enacted, used the statute to deport anyone from the country, they claim to have discovered an *implied* deportation power in this long-dormant, nearly forgotten statute. But as already explained, Courts greet such claims of late-discovered authority with skepticism, and here all the tools of statutory construction underscore that deportations are not authorized. TRO Br. 7-10.

Congress's choice not to pair § 265 with a deportation power makes sense. Section 7 of the Act of February 15, 1893, ch. 114, 27 Stat. 449, 452, which became § 265 without material change in the Public Health Service Act, Pub. L. 78-410, § 362, 58 Stat. 682, 704 (1944), was designed to regulate *transportation* entities that brought persons and goods to the United States,

1

and it imposed fines and imprisonment on such transportation entities if they violated a public health order.  *See also* Decl. of Adrienne Harrold ("Harrold Decl."), Ex. A (copy of 1893 Act). If an individual's entry or presence was unlawful, the immigration system provided the sole mechanism for returning the individual to his home country.  Past practice bears out this design: When § 265 was used in 1929 to combat meningitis, another deadly disease transmitted by asymptomatic carriers via airborne respiratory droplets, deportation was not authorized.

Defendants thus misapprehend Plaintiff's position.  Plaintiff does not argue that § 265 authorizes the deportation of an individual at a port of entry but not someone, like Plaintiff, who enters the country.  Gov't Br. 18-19.  Section 265 authorizes no deportations at all.  Rather, it provides authority to halt transportation companies from introducing people (noncitizen and citizen alike) from countries suffering an epidemic to the United States, by, for example, ship, train, and, in modern times, aircraft.  And even if § 265 could be read also to operate against individuals seeking to come to the United States, it would still not authorize deportations, but only those penalties Congress has established, namely fines and imprisonment.

**A.  Section 265 Provides No Implied Deportation Power.**

Nothing in § 265 can be read to grant Defendants any deportation power.  To the contrary, Congress established specific penalties for violations of a § 265 order and has *explicitly* authorized deportations in the immigration laws when vesting the government with that extreme power.  TRO Br. 7-9.

Defendants respond that the Court should nevertheless read an *implied* power of deportation into the statute.  Gov't Br. 17.  The implications of Defendants' implied-power argument are enormous.  The statute refers only to "persons," and in no way differentiates between citizens and noncitizens.  Thus, if removal from the country could be implied as a power "necessarily included" in § 265 to "effectuate" its "purpose," Gov't Br. 17, that would be true for all "persons" covered by the statute—including citizens.  Defendants shrink from that clear consequence of their position, suggesting that the statute might not even permit a "temporar[y] delay" for citizens, much less removal.  Gov't Br. at 20.  But if the statute implicitly provides for removal as a means of enforcement, it does so for everyone, including citizens.  *See Clark v.*

*Martinez*, 543 U.S. 371, 386 (2005) (rejecting "the dangerous principle that judges can give the same statutory text different meanings in different cases" even if only some applications raise constitutional concerns).  Defendants also try to escape the implications of their position by noting that the regulation at issue here exempts U.S. citizens.  Gov't Br. 19.  But that is irrelevant to determining what powers the *statute* authorizes.  *Merck & Co. v. United States Dep't of Health & Human Servs.*, __ F.3d __, 2020 WL 3244013, at *7 (D.C. Cir. June 16, 2020) ("[T]he breadth of the Secretary's asserted authority is measured not only by the specific application at issue, but also by the implications of the authority claimed.").

The extraordinary power of physically removing a person from the United States must be "affirmatively granted," not divined by implication, and that is especially true when finding an implicit (and unconstitutional) power to remove a citizen.  *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 12 (1936); TRO Br. 9.  Defendants do not respond to *Valentine*.  The public health statutes provide explicit penalties for § 265 violations, but make no mention of deportation—even though Congress has always provided any such authority in the immigration statutes *expressly*, including in immigration legislation authorizing exclusion on public health grounds passed contemporaneously with the 1893 Act.  TRO Br. 8-9; Part I.B, *infra*.  Courts "presume differences in language like this convey differences in meaning[,]" particularly where contemporaneous statutes address related issues.  *See Wisc. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2071-72 (2018) (internal quotation marks omitted).[1]

## B.  Section 265 Was Designed To Regulate Transportation.

The omission of deportation authority from § 265 was no mistake.  To the contrary, it reflects Congress's design of that statute—as a means to stop travel from countries experiencing an outbreak of disease by regulating the transportation companies that bring people to the United States.  The text, context, structure, and history all make clear that § 265 was designed to operate

---

[1] Moreover, nothing in the text of § 265 would limit Defendants' claim of an implied enforcement regime to *deportation*.  In theory, the government could assert an implied power for even more extreme measures.  *See Merck*, 2020 WL 3244013, at *7 (rejecting agency's "construction of the statute [which] would seem to give it unbridled power").

on transportation entities.  It therefore makes sense that § 265 does not silently authorize a whole new deportation process, devoid of the procedural protections Congress created for noncitizens, including for those with communicable diseases.

Defendants' core argument is that a power to deport would best effectuate Congress's "purpose of preventing the transmission of a communicable disease."  Gov't Br. 17.  But as Defendants concede, "[e]very statute proposes, not only to achieve certain ends, but also to achieve them by particular means."  Gov't Br. 27 (quoting *Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co*., 514 U.S. 122, 136 (1995)); *see Merck*, 2020 WL 3244013, at *3 (agencies are "bound" by Congress's choice of "means").  And here, the "means" Congress granted to Defendants in § 265—prohibiting the "introduction" of persons—authorizes regulation only of *transportation* entities.

The 1893 Act was aimed squarely at travel to this country *by ship*—and operated as a regulation of the transportation companies that would bring potentially infected individuals to the United States.  Congress believed that the regulation of transportation entities would be sufficient to keep out almost all of those with communicable diseases, and accordingly did not create a parallel deportation process on top of the quarantine laws and extensive immigration laws enacted just a few years before, which permitted the detention and removal of any individual with a communicable disease who might still find a way to come to the United States.

**1.** The text of the 1893 provision demonstrates that the "means" Congress chose was the regulation of *transportation*, not of individual travelers, and underscores that Congress never authorized deportations.  Section 7 of the 1893 Act granted the "power to prohibit, in whole or in part, the *introduction* of persons and property" into the country.  27 Stat. 452 (emphasis added).  As Defendants concede, that term—"introduction"—meant then, as now, "'the act of bringing into a country.'"  Gov't Br. 17 n.11 (quoting *Universal English Dictionary* 1067 (John Craig ed. 1861)); *see also Introduce*, *Webster's Collegiate Dictionary* 453 (1st ed. 1898) ("[t]o lead, bring, or usher in").  But Defendants fail to grapple with the implications of that textual choice.  As a matter of ordinary language and usage, introducing a person into a country or place is an action taken by a *third party*—here, the shipping company.  *See, e.g.*, *Walsh v. Preston*, 109 U.S. 297,

4

298, 314, 315 (1883) ("colonization" contract requiring party to "introduce" immigrant families into Texas was unsatisfied, where there was no evidence individuals who came "were brought to Texas by [the party];" rather, "they came and settled of their own accord").  The plain text of § 265 is thus directed not at individuals seeking to *come to* the United States, but rather those proposing to *bring* such individuals here.[2]

To the extent Defendants address the meaning of "introduction," they contend that the term "signals" that § 265 "is not limited to the Nation's borders."  Gov't Br. 17.  But that does not help Defendants with the relevant distinction here: whether § 265's use of the term "introduction" regulates individuals coming to the United States or only transportation entities who bring them into the country, *i.e.*, *who* the statute regulates.[3]

**2.** The statutory context reinforces the plain text.  The 1893 Act was shot through with provisions specifically directed at the regulation of ships.  *See* Act of Feb. 15, 1893, ch. 114, § 1 (unlawful for ships to enter U.S. ports from abroad except in accordance with public health regulations); § 2 (requiring ships abroad to obtain a bill of health); § 3 (authorizing, *inter alia*, regulation of "vessels sail[ing] from any foreign port or place"); § 4 (charging the Surgeon General with, *inter alia*, obtaining sanitary information about foreign ports); § 5 (issuance of regulations for, *inter alia*, "vessels in foreign ports," and prohibition on vessels arriving without a bill of health); § 6 (providing for "an infected vessel" to be "remand[ed]" to quarantine station).

---

[2] The 1893 Act's title was "An act granting additional quarantine powers and imposing additional duties upon the Marine-Hospital Service."  When recodified in 1944, § 265 was titled "Suspension of entries and imports from designated places."  That title is consistent with § 265's text, in that suspending transportation companies' right to "introduce" people has the effect of suspending those individuals' entry.  Regardless, the title cannot overcome the statute's text and also sheds no light on what the term "introduction of persons" meant in *1893*—which Defendants concede is the relevant question.  *See* Gov't Br. 17 & n.11.

[3] Immigration law has long treated those who enter the country, even unlawfully, differently from those at ports of entry.  *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  If § 265 really *did* authorize an alternative deportation scheme, the Court would need to determine whether and how those immigration doctrines apply to § 265 (which, again, applies equally to citizens).  But given the arguments Plaintiff has made, the Court need not reach that issue.

Critically, the 1893 Act imposed *only* penalties against ships—and set them high enough to deter those vessels from sailing to this country in violation of the Act.  *See id.* § 1 ($5000.00 fine for "vessel" violating the Act); *id.* § 2 (same for "vessel" entering United States without bill of health); *see also id.* § 3 (conditioning penalties on "any vessel or owner or officer thereof" on posting of regulations in consular offices abroad); 24 Cong. Rec. 378 (raising penalties).[4]

Furthermore, an examination of immigration statutes in force in 1893 makes plain that Congress knew exactly how to regulate the removal of individuals.  Those statutes covered those coming by ship and individually by land and *explicitly* authorized deportations, separate and apart from regulations they imposed on ships involved in transporting immigrants.  *See, e.g.*, Chinese Exclusion Act of May 6, 1882, ch. 126, §§ 2, 12, 22 Stat. 58, 59, 61 (establishing penalties for vessels, and separately providing for unauthorized immigrants "to be removed . . . to the country whence [they] came"); Act of Mar. 3, 1891, ch. 551, §§ 10, 11, 26 Stat. 1084, 1086 (establishing penalties for "master, agent, consignee, or owner of" a "vessel" who violates the Act's provisions, and separately providing for unauthorized immigrants to "be immediately sent back on the vessel by which they were brought in" and that "any alien who shall come into the United States in violation of law may be returned"); *id.* § 8 (providing "the Secretary of the Treasury may prescribe rules for inspection along the borders of Canada, British Columbia, and Mexico."); Act of Mar. 3, 1903, ch. 1012, §§ 8, 9, 19, 20, 21, 32 Stat. 1213 1215-16, 1218-19, 1221 (providing for noncitizens to "be immediately sent back . . . on the vessels bringing them," "deported," or "taken into custody and returned to the country whence he came").

It would have been "easy enough for Congress" to include the same kind of provisions in the 1893 Act.  *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020).  Instead, Congress imposed penalties *only* on those involved in transportation, and used the term "introduction" to refer to the

---

[4] Defendants say the current penalties provision in 42 U.S.C. § 271(a) has "no bearing" on § 265's scope because it refers only to the violation of regulations under § 265, not the Act itself. Gov't Br. 19.  But § 265 requires any order issued under its authority to be "in accordance with regulations."  Besides, Defendants concede that what matters is what the language of § 265's predecessor meant in 1893.  Gov't Br. 17 & n.11.  In the original 1893 Act, the penalties put on ships applied to violations of the Act, including Section 7.  Act of Feb. 15, 1893, ch. 114, § 1.

penalty-triggering conduct of such third parties.  But Congress said nothing about any power to deport individuals who came to our shores.  "[I]t is not the proper role of the courts to rewrite [a law] passed by Congress and signed by the President."  *Id*.

**3.**  Defendants invoke the legislative history of the 1893 Act in arguing that the statute should be read more expansively to permit a deportation power.  Gov't Br. 20, 24-25.  But the legislative history strongly confirms what is demonstrated by the text, context, and structure: Section 7 was a regulation of transportation entities and not a deportation power.

The 1893 Act responded to a specific public health threat—a cholera epidemic in Europe.  *See, e.g.*, 24 Cong. Rec. 359 (1893) (letter from physician explaining the "considerable" danger of an imminent cholera outbreak from Europe).  A principal proponent of the 1893 Act, Senator Chandler, explained that "90 or 95 percent of the immigration into the United States comes into the city of New York, and that the most danger of cholera is to be apprehended from vessels arriving at that port."  *Id*. at 360.  He expressed confidence that controlling travel by ship would effectively protect the country.  *Id*. at 363-64 ("there will be no great danger of the introduction of cholera this year unless it comes in the steerages," a class of ship travel).

As one of the 1893 Act's sponsors, Senator Harris, further explained, Section 7 therefore allowed the President "to prevent the coming at all" of "vessels, passengers, crews, and cargo, which are sailing to this country."  *Id*. at 392.  Congress expected that an invocation of Section 7 would cause shipping companies to refuse boarding, halting travel from designated locations at the source, thereby addressing the public health risk.

Indeed, when Senator Harris was asked about individuals crossing at *land* borders, he explained that an *earlier* Act providing general authority to quarantine and inspect individuals—not the new 1893 legislation—"clothes the Marine Hospital Service with ample power to protect the Mexican and Canadian borders."  *Id*. at 370.  The new authority to regulate transportation entities was simply part of the larger framework already in place that included not just the immigration laws but also the public health quarantine powers.

Defendants do not squarely address any of this legislative history.  Instead, Defendants note that the original text of the bill would have authorized the President to "suspend

immigration" but was expanded to cover the "introduction" of "people and goods" generally. Gov't. Br. 20.  But that expansion had no relevance to whether the law applied only to transportation entities.  It simply ensured the law would also apply to the introduction of U.S. citizens by transportation entities.  *See* 24 Cong. Rec. at 470 (statements of Sens. Gray and Mills) (discussing application of Section 7 to U.S. citizens).  Senator Chandler, who was heavily involved in debates on the bill, thus explained: "certainly there can be no objection" to amending Section 7 "to provide that . . . [the President] may, if the exigency demands, exclude all *other passenger travel* as well as immigration."  *Id*. at 471 (emphasis added).

**4.**  The use of the statute since its enactment in 1893 reinforces the absence of any deportation power.  To Plaintiff's knowledge, the only time the statute has been invoked to prohibit the introduction of persons was in 1929, and it did not authorize deportations.[5] President Hoover issued an Executive Order invoking Section 7 of the 1893 Act to restrict the "Transportation of Passengers" from China and the Philippines because of a meningitis outbreak. Exec. Order No. 5143 (June 21, 1929), Harrold Decl., Ex. B.  The Order provided that "no persons may be introduced directly or indirectly by transshipment or otherwise into the United States" except as permitted by the Treasury Secretary.  The use of passive voice—"may be introduced"—makes clear that the Order was directed to third parties, namely transportation companies.  The Treasury Department also issued associated regulations "governing the embarkation of passengers and crew" at ports in those countries "and their transportation to

---

[5] Most invocations of § 265 have involved regulation of goods or delegation of authority to particular officers or agencies.  In addition to the 1929 use of § 265, the provision has been invoked, with additional statutory authorities, four other times to address persons.  None of the four purported to authorize deportations.  One addressed the Do Not Board list, a mechanism to control transportation access, and the Public Health Lookout, a means to refer individuals at ports to CDC for isolation.  Criteria for Requesting Federal Travel Restrictions for Public Health Purposes, 80 Fed. Reg. 16,400 (Mar. 27, 2015).  Another proposed, but unadopted, regulation repeated the language of § 265 without elaboration.  Control of Communicable Diseases, 70 Fed. Reg. 71,892, 71,910 (Nov. 30, 2005).  The two others addressed quarantine and information gathering.  Control of Communicable Diseases, 81 Fed. Reg. 54230 (Aug. 15, 2016); Control of Communicable Diseases; Foreign Quarantine, 85 Fed. Reg. 7874 (Feb. 12, 2020).

United States ports."[6]  The regulations further addressed how to handle vessels which arrived in the United States when a meningitis case had occurred during the voyage, but, notably, only authorized detention, quarantine, and testing—not deportation.

5.  Defendants' argument for an implied deportation power is thus predicated on a faulty assumption: that to effectuate the "purpose" of § 265, "the power to 'prohibit' a person's 'introduction' necessarily includes the power to physically remove."  Gov't Br. 17.  But far from a "nullity," Gov't Br. 27, Congress vested the government with a significant power totally separate from any need to deport individuals from the country: shutting down all international transportation from a particular country by regulating those who made such travel possible, the transportation companies.  And, despite the age of the statute, that tool remains powerful today: § 265 permits the government to halt the vast majority of international travel by barring ships, planes, trains, and other modes of transportation from bringing people from designated places to this country.  But it does not explicitly or implicitly give authority to deport individuals outside of the extensive immigration system Congress has enacted and refined over the decades.

The efficacy of that approach was clear from the beginning.  The statute was passed against the backdrop of an extraordinary Executive action taken just months before, in September 1892.  *See* U.S. Dep't of Treasury, Quarantine Restrictions Upon Immigration to Aid in the Prevention of the Introduction of Cholera into the United States (Sept. 1, 1892), Harrold Decl., Ex. D.  The Surgeon General explained that "vessels conveying" immigrants from certain countries experiencing cholera outbreaks were a "direct menace to the public health," and ordered that "no vessel from any foreign port carrying immigrants shall be admitted" to any U.S. port "until said vessel shall have undergone" 20 days of quarantine.  *Id*.  Contemporaneous media coverage explained this step would "practically put a stop to immigration, for no steamship company will continue to transport people to this country" given the costs of

---

[6] Regulations Governing the Embarkation of Passengers and Crew at Ports in China and the Philippine Islands and Their Transportation to the United States Ports Prescribed in Accordance with Executive Order Approved June 21, 1929, Harrold Decl., Ex. C.

quarantine.  *Twenty Days Quarantine*, N.Y Times (Sept. 2, 1892).[7]  The crisis triggered

significant debate among the Cabinet as to the President's authority to take such a drastic step

without clear statutory authority.  *See id*.  Shortly afterward, Congress enacted the 1893 Act

granting the authority to regulate vessels to prevent the spread of disease.

Defendants' reliance on Justice Thomas's opinion in *Luis v. United States*, 136 S. Ct.

1083, 1097 (2016), is thus misplaced.  A deportation power is in no way "a necessary predicate"

to prohibiting the introduction of persons into the country.  *Id*.  Nor does honoring Congress's

choice of means render § 265 "meaningless."  *Id*.  Halting all flights from China, for example,

would hardly be meaningless.

In short, Defendants are incorrect that because Congress's *goal* was to keep out disease, it

implicitly authorized any means to do so.  But that is not how statutes are interpreted.  *Merck*,

2020 WL 3244013, at *3 ("agencies are 'bound, not only by the ultimate purposes Congress has

selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those

purposes") (internal quotation marks omitted).  "The withholding of agency authority is as

significant as the granting of it, and we have no right to play favorites between the two."

*Newport News*, 514 U.S. at 136; *see also* A. Scalia & B. Garner, Reading Law: The

Interpretation of Legal Texts 93 (2012) (an "absent provision cannot be supplied by the courts").

### C.  No Deference Is Owed To The Government's Claim To Deportation Power.

Defendants fall back on a claim for deference under *Chevron, U.S.A., Inc. v. Nat. Res.*

*Def. Council, Inc.*, 467 U.S. 837 (1984).  But *Chevron* is not a "rubber stamp," *Nat. Res. Def.*

*Council, Inc. v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000), so courts must not embrace statutory

interpretations with "reflexive" deference.  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)

(quoting *Pereira v. Sessions*, 138 S. Ct. 2105, 2120 (2018) (Kennedy, J., concurring)).

Here, deference is unwarranted at the outset because, even assuming these agency

pronouncements might otherwise be subject to *Chevron*, the CDC Order does not actually offer

"an interpretation of any statutory language."  *Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011);

---

[7] https://www.nytimes.com/1892/09/02/archives/twenty-days-quarantine-the-government-takes-
decisive-action-a.htmlsee

*see also Grace v. Whitaker*, 344 F. Supp. 3d 96, 130 (D.D.C. 2018).  Rather, the Order merely states that the suspension of the introduction of "covered aliens . . . requires the movement of all such aliens" out of the country "as rapidly as possible."  CDC Order, 85 Fed. Reg. 17,060, 17,067 (Mar. 26, 2020).  The regulation's preamble is similarly conclusory.  Control of Communicable Diseases, 85 Fed. Reg. 16,559, 16,563 (Mar. 24, 2020) ("moving" individuals "outside the United States constitutes preventing their 'introduction' into the United States for purposes" of regulation).  But those are largely statements of Defendants' perceived policy objectives, not an interpretation of statutory text.  *See Fox v. Clinton*, 684 F.3d 67, 78 (D.C. Cir. 2012) (refusing deference, even where agency purported to interpret statutory text, because it offered "little more than uncited, conclusory assertions of law").

In any event, deference fails at *Chevron*'s first step because Defendants' asserted new deportation power is at odds with "the traditional tools of statutory interpretation—including the statute's text, history, structure, and context."  *Loving v. IRS*, 742 F.3d 1013, 1021-22 (D.C. Cir. 2014) (rejecting interpretation as "foreclosed by the statute"); *see also District of Columbia v. Dep't of Labor*, 819 F.3d 444, 454 (D.C. Cir. 2016) (rejecting "novel reading" of statute that would "significantly enlarge" its effect).  And at *Chevron*'s second step, Defendants' interpretation warrants no deference "because it is unreasonable in light of the statute's text, history, structure, and context."  *Loving*, 742 F.3d at 1022.

In sum, § 265 is a powerful tool permitting the suspension of transportation to this country.  But Defendants have numerous other tools at their disposal under both the public health and immigration laws.  Individuals entering from a foreign country can be apprehended, detained, examined, and quarantined.  42 U.S.C. § 264(c).  They can be deported under the immigration laws, subject to any applicable substantive and procedural protections.  *See* 8 U.S.C. §§ 1182(a)(1), 1222.  Adults without documentation can be put into a special system Congress set up to speed deportations while protecting certain vulnerable migrants.  *See* 8 U.S.C. §

1225(b)(1) ("expedited removal" system).  Defendants can prosecute and fine individuals who violate quarantines, or enter without inspection.  8 U.S.C. § 1325; 42 U.S.C. § 271.[8]

Further, the President has the power to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants" where such entry would be "detrimental to the interests of the United States."  8 U.S.C. § 1182(f).  Notably, Congress specifically contemplated this power might be used in the case of an epidemic abroad.  *See* 98 Cong. Rec. 4423 (1952) (statement of Rep. Walter, bill sponsor) (calling provision "absolutely essential" to have such power "in case of . . . an outbreak of an epidemic in some country").  And the President has used his § 1182(f) authority to address COVID-19.  *See* Gov't Br. 4.  But even the substantial power under § 1182(f) does not override the Trafficking Victims Protection Reauthorization Act ("TVPRA") and protection statutes.  *See infra* Part II.A.

If Defendants believe these vast powers are insufficient, the Constitution prescribes the solution: "When a new situation arises outside the scope of an old statute, the proper approach under our system of separation of powers is for Congress to amend the statute, not for the Executive Branch and the courts to rewrite the statute beyond what the statute's terms can reasonably bear."  *District of Columbia*, 819 F.3d at 450.[9]

## II.  SECTION 265 DOES NOT OVERRIDE THE PROTECTIONS FOR UNACCOMPANIED CHILDREN AND ASYLUM SEEKERS.

In the alternative, the Court can decide this emergency motion on narrower grounds, namely that the specific protections Congress enacted for unaccompanied children and those

---

[8] Defendants cite *Louisiana v. Mathews*, 427 F. Supp. 174 (E.D. La. 1977), to suggest their § 264 powers are broad.  Gov't Br. 29.  But that decision represents an application of the penalties Congress authorized to a violation of a public health measure regarding *turtles*; it offers no support for Defendants' claim to a deportation power Congress never authorized.  Plaintiff takes no issue with Defendants' general point that they enjoy broad authority over the "apprehension, detention, examination, or conditional release of individuals" at the border under § 264(c).

[9] Congress has responded to COVID-19 with extensive legislation.  *See* Coronavirus Preparedness and Response Supplemental Appropriations Act, Pub. L. No. 116-123, 134 Stat. 146 (Mar. 6, 2020); Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 Stat. 178 (Mar. 18, 2020); Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020); Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620 (Apr. 24, 2020).

fleeing persecution prohibit Plaintiff's deportation, regardless of whether § 265 authorizes deportation in general.

Defendants do not dispute that Congress has carefully and repeatedly enacted special safeguards for unaccompanied children and persons fleeing persecution.  TRO Br. 11-14.  These statutes contain specific exceptions from their coverage, but no exception for communicable diseases or public health crises.  TRO Br. 13 & nn.2-3.  Defendants incorrectly quibble with the scope of some of those protections, but do not dispute that (absent § 265) Plaintiff is entitled to special procedures by virtue of Congress's solicitude of children and asylum seekers, and in particular, to be transferred to ORR legal custody and get a full immigration hearing.  Section 265 must be read in conjunction with the specific protections for those groups.  Defendants' far-reaching argument that § 265 permits the Executive to override all such protections is unsupported by the ordinary tools of statutory construction, and not entitled to deference.

**A. Section 265 Does Not Override The TVPRA And Protection Statutes.**

Nothing in the text of § 265 authorizes the government to override the protections for juvenile asylum-seekers like Plaintiff.  There is an established way for Congress to "override conflicting provisions" found elsewhere in the U.S. Code: to use a commonplace phrase like "notwithstanding any other provision of law."  *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993).  That formulation was well known to Congress in 1893, as such language was included in the Constitution itself, and similar "*non obstante*" clauses were regularly included in legislation.  *See Kansas v. Garcia*, 140 S. Ct. 791, 807 (2020) (Thomas, J., concurring); *see also, e.g.*, Act of Aug. 5, 1892, Pub. L. No. 52- 380, 27 Stat. 349, 366 (1892) (appropriations bill addressing immigration, quarantine, and prevention of epidemics, and separately providing for certain taxes "any other law to the contrary notwithstanding").  But Congress did *not* include such language in § 265 to indicate it was authorizing the Executive to override the procedural protections available under the immigration statutes.

Thus, as with all potential conflicts, the Court must read § 265 and the refugee and child protections statutes together, to make sense of all Congress's work without discarding any of it.  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("The classic judicial

task of reconciling many laws enacted over time, and getting them to make sense in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.") (internal quotation marks omitted).  Thus, as Judge Bybee explained in another asylum case, "the President may not 'override particular provisions of the INA' through the power granted him in" 8 U.S.C. § 1182(f), despite the breadth of language in that emergency provision.  *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 760 (9th Cir. 2018) (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2411 (2018)).  So too with § 265.

Defendants argue that § 265 *must* be read to conflict with the INA's specific protections, and that § 265 prevails because it applies only in health emergencies.  Gov't Br. 24.  But even if § 265 could be read to authorize some summary deportations (which it cannot), it must be read to accommodate Congress's subsequent specific legislative protections and commands.  *See Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 643 (D.C. Cir. 2000) ("A broad statute when passed 'may have a range of plausible meanings,' but subsequent acts can narrow those meanings . . . .") (quoting *Brown & Williamson*, 529 U.S. at 143); *Loving,* 742 F.3d at 1020-21.

Moreover, even if conflict were unavoidable, Defendants are wrong about which statutes are more specific.  The TVPRA, for example, is "a precisely drawn, detailed statute," *Brown v. GSA*, 425 U.S. 820, 834 (1976), that comprehensively delineates what the government must do before it seeks to remove an unaccompanied child.  The TVPRA sets forth specific, mandatory obligations, including that Defendants must place Plaintiff in regular removal proceedings and provide access to counsel.  8 U.S.C. § 1232(a)(5)(D).  And Congress did not create exceptions for public health or communicable diseases.  It is therefore the more specific provision when it comes to removal of children from the United States.  *See Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 152-54 (1976) (cited in Gov't Br. 24) (holding that the "mandatory" provision that "focus[ed] on the particularized problems of national banks" controlled over "broad" provision of separate statute); *Strawberry v. Albright*, 111 F.3d 943, 947 (D.C. Cir. 1997) (per curiam) (holding that "general prohibition of age discrimination" did not supersede subsequently enacted "mandatory retirement provisions" for specific employees).

14

Defendants seek to remove Plaintiff from the country.  Yet § 265 says nothing at all about removal; or children; or steps the government must take or may skip.  That § 265 applies only in the case of disease does not mean it represents Congress's most explicit regulation on the circumstances of this case.  *See East Bay Sanctuary Covenant*, 932 F.3d at 760.

Defendants also repeat that giving effect to the precise and careful protections in the INA would "render Section 265 a nullity."  Gov't Br. 27.  But as already explained, Congress enacted § 265 as a regulation on transportation companies and understood it would operate by keeping those companies from "introduc[ing]" people into the United States from abroad.  Indeed, that is precisely how it was used in 1929.  The nullity canon does not apply because on *any* interpretation, § 265 would do *at least* that significant work.  *See Wisc. Cent. Ltd.*, 138 S. Ct. at 2073 (provision not rendered superfluous even if it only does "modest work" compared to government's interpretation).  That § 265 does not authorize *this particular invocation*—an order singling out noncitizens, including children and asylum seekers, and overriding protections for those individuals—does not make the statute meaningless.

Defendants again invoke the legislative history of the 1893 Act to justify its claim that § 265 overrides all immigration law.  Gov't Br. 24-25.  But nothing in the legislative history of § 265 discusses the specific statutory protections for children and asylum seekers, which would not be enacted until decades after both the 1893 and 1944 Acts.  *See Brown & Williamson*, 529 U.S. at 143 ("[T]he implications of a statute may be altered by the implications of a later statute . . . particularly . . . where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand").  Indeed, it is notable that Congress has chosen *not* to permit concerns about disease to override legislative protections for children and noncitizens seeking protection.  Although noncitizens who have certain diseases may be subject to removal on that basis, under the immigration laws, the protections for children and asylum seekers take precedence and bar removal without the required procedures.  *See* IRAP Amicus at 6-7.

Paradoxically, Defendants invoke the broad powers of Congress over "the admission and exclusion of aliens."  Gov't Br. 28.  But Plaintiff does not attack what Congress has done—in fact, he relies on it.  He challenges Defendants' attempt to exercise power contrary to Congress's

enactments.  And invoking Congress's *immigration* powers lays bare that the Title 42 Process is really an *immigration* regulation—but one that Congress never authorized.

**B. The Assertion Of Power To Override Protections Is Not Entitled To Deference.**

CDC also defends its newfound immigration powers by invoking *Chevron* and *Skidmore* deference to justify overriding the laws specific to juveniles and those seeking protection.  Gov't Br. 31-32.  Yet "[a]gency authority may not be lightly presumed," and there are multiple reasons why CDC's resolution of the conflict between § 265 and the INA is owed no deference here.  *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 9, 13 (D.C. Cir. 2002) (quoting *Michigan v. EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001)).

First, as with its assertion of § 265's deportation power, *see supra*, CDC deserves no deference for its bald claim that its actions do not conflict with the INA.  The CDC Order, which governs only this particular invocation of § 265, is not the type of formal interpretation entitled to deference.  *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters[,] . . . policy statements, agency manuals, and enforcement guidelines . . . do not warrant *Chevron*-style deference.").  And CDC did not even cite any immigration provisions, much less explain how its actions square with the INA's mandatory requirements.  There can be no deference where there has been no actual interpretation.  *Judulang*, 565 U.S. at 53 n.8; *Kaufman v. Nielsen*, 896 F.3d 475, 485 (D.C. Cir. 2018) (*Skidmore* deference is owed only "proportional to its power to persuade").

Second, CDC concedes its lack of expertise in administering the immigration statutes.  Gov't Br. 36.  A court owes no deference to agency interpretations "outside the agency's particular expertise and special charge to administer."  *Prof. Reactor Operator Soc. v. NRC*, 939 F.2d 1047, 1051 (D.C. Cir. 1991); *see also Scheduled Airlines Traffic Offices, Inc. v. Dep't of Defense*, 87 F.3d 1356, 1361 (D.C. Cir. 1996) (similar).  *Cf. Hampton v. Mow Sun Wong*, 426 U.S. 88, 105, 116 (1976) (holding federal interest in immigration could not justify specific agency acting "so far removed from [its] normal responsibilities").

What is more, CDC purports to resolve a conflict between "distinct statutory regimes," which "'is a matter for the courts,' not agencies."  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612,

1629 (2018) (quoting *Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659, 686 (1975)).

Non-deferential review "preserve[s] the balance Congress struck in its statutes," and guards

against "[a]n agency eager to advance its statutory mission, but without any particular interest in

or expertise with a second statute." *Id.* And because CDC ceded implementation of its Orders to

DHS, 85 Fed. Reg. at 17067, "any claim to Chevron deference is weaker still," *Kaufman*, 896

F.3d at 485; *see id.* (divided administration undercuts deference). While CDC claims it "did not

contemplate that CBP would implement the immigration laws concurrently with [its] Order,"

Gov't Br. 33, CBP's implementation memorandum envisions just that. The CBP memo shunts

some noncitizens into the Title 42 Process, while applying the regular INA processes to others.

*See* U.S. Customs and Border Protection, COVID-19 CAPIO 2-3 [hereinafter "CBP Memo"],

Harrold Decl., Ex. E (describing noncitizens who are "not amenable to being expelled," and

allowing "agents . . . to process under existing statutory authorities found in Title 8"). CDC (and

DHS, for that matter) have not explained how this dual system squares with the INA's numerous

mandatory requirements. CDC thus gets no deference on its supposed "interpretation."

Most of Defendants' cases regarding agency interpretations "in the face of perceived

statutory conflicts," Govt. Br. 31, concern provisions within the *same statutory scheme*—the

scheme the agency was charged to administer. *See Scialabba v. Cuellar de Osorio*, 573 U.S. 41,

64 (2014) (plurality) (conflict within same INA provision); *W. Coal Traffic League v. Surface

Transp. Bd.*, 216 F.3d 1168 (D.C. Cir. 2000) (conflict within same statute); *Career College Ass'n

v. Riley*, 74 F.3d 1265 (D.C. Cir. 1996) (same). Defendants' other cases also provide them no

help.[10] For example, *National Ass'n of Home Builders v. Defenders of Wildlife*, deferred to a

regulatory interpretation jointly issued by multiple agencies, following their concerted and

reasoned attempt to reconcile inconsistencies. 551 U.S. 644, 665-68 (2007). Here, CDC

conclusorily asserts § 265 overrides other statutes it concededly has no expertise overseeing.

---

[10] *See Mylan Laboratories, Inc. v. Thompson*, 389 F.3d 1272, 1279 n.5 (D.C. Cir. 2004) (cited
Gov't Br. 32) (FDA gets no deference with patent statute it "is not charged with administering").

Third, Defendants' *Chevron* argument fails on its own terms.  Gov't Br. 32-33.  As explained above, the tools of statutory construction at *Chevron*'s first step show that § 265 does not override all other mandatory INA provisions.  CDC's construction is also unreasonable at *Chevron*'s second step for the same reason.  It also fails to even acknowledge—as explained below—numerous relevant factors, including the TVPRA and other mandatory obligations; the special protection needs of minors; and that ORR releases minors to the care of people who can ensure their safety.  *See Loving*, 742 F.3d at 1022.

Finally, although Defendants' counsel now offers its own explanation of how the agency's actions reconcile with Title 8, Gov't Br. 25-30, 32-33, positions advanced in litigation briefs are entitled to no deference.  *See Kisor*, 139 S. Ct. at 2417 (refusing to defer to litigation position or post hoc rationalization, rather than agency's "fair and considered judgment"); *DHS v. Regents of the Univ. of Cal.*, _ S. Ct.  _, 2020 WL 3271746 at *10 (2020) (courts may only consider "contemporaneous explanations," not "post hoc justifications . . . raised in court").

**C. J.B.B.C.'s Statutory Rights Were Unquestionably Violated.**

Defendants half-heartedly claim they are complying with *some* conflicting immigration provisions, but notably do not claim compliance with all the provisions applicable here.

First, and most importantly here, Defendants do not claim that they are transferring minors to ORR or providing them with full removal proceedings, as they concede the TVPRA would require absent the Title 42 Process.  Defendants' sole TVPRA argument is that the statute purportedly allows them to take longer than 72 hours to transfer a minor to ORR in "exceptional circumstances."  Gov't Br. 23 n.13.  But Defendants are seeking to *deport* Plaintiff, not transfer him to ORR after a delay, so Defendants' argument is beside the point.

Second, Defendants do not claim that they are complying with the asylum and withholding statute.  Nor could they do so, as the CBP Implementation Memo does not instruct agents to screen for asylum or withholding.

Third, Defendants' claim they are providing CAT screenings does not save the Title 42 Process, as they would still be in violation of the TVPRA, as well as the asylum and withholding statutes.  *See, e.g.*, *Soeung v. Holder*, 677 F.3d 484, 487 (1st Cir. 2012) (noting standard for

18

torture is more exacting than for asylum and withholding claims).  In any event, Defendants' cursory CAT screenings are not being lawfully conducted, as children are entitled to have their CAT claims decided in full removal proceedings.[11]

Notably, moreover, Defendants' claim that they are providing CAT screenings only undermines their own statutory arguments, as there is no reason why CAT should be viewed as somehow *more* mandatory than the INA's other obligations.  And apparently complying with CAT creates no significant conflict with CDC's authorities.

                                    *        *        *

For decades, Congress—fully aware that exigent circumstances might emerge—has enacted and reinforced unique protections for vulnerable children and asylum seekers, including those with communicable diseases, subject to narrow exceptions not applicable here.  Congress has, moreover, specifically chosen *not* to erase those protections even for those with diseases, relying instead on quarantine as the proper way to balance health concerns and the safety of children and those fleeing danger.  To permit Defendants to obliterate those protections would "contradict Congress' clear intent as expressed in its more recent, [child and asylum seeker] specific legislation."  *Brown & Williamson*, 529 U.S. at 143.  If there is to be a public health exception to those critical protections, Congress must be the Branch to enact it.

---

[11] Defendants' new Title 42 process does not satisfy CAT, as it requires anyone, including children, to "make an *affirmative, spontaneous"* claim of fear of torture.  CBP Memo 4 (emphasis added).  But traumatized individuals who lack any understanding of U.S. law, especially children, cannot be expected to know what they must "affirmatively" and "spontaneously" say.  Thus, this procedure is not meaningfully available to many noncitizens going through the Title 42 Process.

As to Plaintiff himself, Defendants say only they made an "assessment" of his CAT claim after this case is filed, without describing what procedures they used, or what standard they applied.  *See* ECF. No. 28-6 ¶ 6.  Nor did Defendants provide a written summary of the interviews, 8 U.S.C.§ 1225(b)(1)(B)(iii)(II), 8 C.F.R. § 208.30(e); any indication that a supervisor reviewed the negative determination, 8 C.F.R. § 235.3(b)(7); or note that J.B.B.C. was informed of his right to seek review before an immigration judge, *see* 8 U.S.C. § 1225(b)(1)(B)(iii)(III).  In sum, this meager procedure, inappropriate for a child and undertaken only in response to this litigation, does not comply with CAT.  Defendants also argue a CAT ruling is unreviewable.  Gov't Br. 22.  But Plaintiff is not seeking review of an individual CAT ruling.

## III.   DEFENDANTS' ACTIONS ARE ARBITRARY AND CAPRICIOUS.

Defendants have failed to "engage in 'reasoned decisionmaking'" as the APA requires. *Regents*, 2020 WL 3271746 at *7 (quoting *Michigan*, 576 U.S. at 50).  The Court's role here, contrary to Defendants' assertions, is to "assess" not only "'whether there has been a clear error of judgment'" but also "'whether the decision was based on a consideration of the relevant factors.'"  *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).  The agency was required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  And where the agency's logic has gaps—for example, where the agency "entirely failed to consider an important aspect of the problem"—a court cannot "supply a reasoned basis for the agency's action that the agency itself has not given."  *Id.*

**1.** The APA required Defendants to offer a "reasoned explanation" for applying the Title 42 Process to unaccompanied children, particularly those seeking protection.  *Regents*, 2020 WL 3271746, at *17; TRO Br. 15.  Defendants admit they offered no explanation here.  Gov't Br. 34-35.  That admission itself establishes an APA violation.  *Regents*, 2020 WL 3271746 at *17.

Defendants' omission of any rationale is particularly glaring, moreover, because it departs so starkly from Defendants' prior treatment of unaccompanied children.  Defendants have long recognized their mandatory obligations under the TVPRA to transfer unaccompanied minors into ORR custody and refer them to full removal proceedings under 8 U.S.C. § 1229a. The reasoned explanation requirement "ordinarily demand[s] that [an agency] display awareness that it *is* changing position.  An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  That did not happen here.

Defendants have also "entirely failed to consider . . . important aspect[s] of the problem." *State Farm*, 463 U.S. at 43.  In creating the Title 42 Process and applying it to minors like J.B.B.C., Defendants have failed to analyze the impact on unaccompanied children and those seeking protection.  Defendants argue that they did not need to acknowledge or explain the

impact of their actions on vulnerable groups because the APA "does not require an agency to address *every imaginable scenario*." Gov't Br. 35 (emphasis added). It was hardly speculative, however, that unaccompanied children and asylum seekers would come to the border seeking protection from harm. Yet CDC's reasoning does not address that it is keeping children from seeking protection and is returning them to danger, contrary to the TVPRA and protection statutes. *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1112-13 (D.C. Cir. 2019) (finding action arbitrary and capricious where it "failed to address the problem that would be created as a result" of its conduct).

Defendants also contend that they were under no obligation to consider "statutes administered by other agencies that may be impacted by a section 265 order." Gov't Br. 36. Yet CDC's actions have much more than a mere incidental effect on the immigration statutes—CDC seeks to cast those statutes aside, without any acknowledgment of the devastating impact on minors fleeing danger or, importantly, whether there was a way to safely process children, particularly given that under the TVPRA children spend less than 72 hours with CBP.

**2.** Defendants' explanations for their decisions also "runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.[12] Defendants claim that processing those without travel documents takes "hours or days." 85 Fed. Reg. at 17065. But Defendants' own contingency plans for a migration increase show they can process any necessary immigration paperwork for unaccompanied children within mere hours. Appellees' Supplemental Excerpts of Record, *Al Otro Lado v. Wolf*, No. 19-56417 (9th Cir. Dec. 23, 2019), ECF No. 33-5 at 149 (capacity for 1-2 hour processing time for unaccompanied children at Hidalgo); *id.* at 171 (2-4 hours for unaccompanied children at Progreso). CBP does not need to carefully screen unaccompanied children from noncontiguous countries, like J.B.B.C.; under the TVPRA that is done after transfer to ORR and placement in full removal proceedings.

Indeed, Defendants' implementation of the Title 42 Process shows they can hold children while minimizing risks to DHS officers and other unaccompanied children. Defendants kept

---

[12] Defendants have not produced the administrative record in this emergency posture. Plaintiff reserves the right to further challenge the agency's decisions after the record is disclosed.

J.B.B.C. in a hotel for *days* longer than the 72 hours permitted by the TVPRA, for the purpose of effectuating his deportation.  ECF No. 2-3 ¶ 4 (Corchado Decl.).  And if Defendants were complying with the TVPRA, there would be no need to hold children in CBP custody for prolonged periods at all—J.B.B.C. and other minors would be swiftly sent to ORR shelters.

Notably, Defendants say nothing about one of the CDC Orders' chief justifications, which is the "significant uncertainty that covered aliens would be able to effectively self-quarantine, self-isolate, or otherwise comply with existing social distancing guidelines" if released.  85 Fed. Reg. at 31508.  And for good reason, as CDC has not explained the factual basis for this assumption or cited any evidence for it.  Indeed, this justification is particularly wanting with respect to unaccompanied children, who are sent to sponsors who assume responsibility for their care, rather than simply released into the interior without supervision.  *See* 8 U.S.C. § 1232(c)(3)(A); ECF No. 18 ¶ 16 (public health experts).  Here, for instance, J.B.B.C. can be released to his father.  *See Regents*, 2020 WL 3271746, at *13 (finding failure to consider "alternative[s] . . . within the ambit of the existing [policy]" arbitrary and capricious).

Defendants also note that "children are not immune from [COVID-19]" as a justification for their failure to account for that population.  Gov't Br. 35.  Yet their reasoning fails to even acknowledge that children may be differently situated with respect to the disease, ECF No. 18 (public health experts), and CDC was obliged, at minimum, to weigh that difference.  Defendants' argument also carries even less force when applied against a child, like J.B.B.C., who has exhibited no symptoms.[13]

**3.** Although Defendants disclaim any obligation to consider the effects of their actions on unaccompanied child asylum seekers, they also argue that CDC's consultation with DHS, and

---

[13] Defendants assert that other countries have issued similar travel restrictions.  Gov't Br. 34. But numerous countries have kept their doors open to asylum seekers.  *See* European Council on Refugees and Exiles, COVID-19 Measures Related to Asylum and Migration Across Europe (Apr. 8, 2020), https://tinyurl.com/ybahhmro (listing countries that exempt persons seeking protection from bans, e.g., Denmark, Finland, France, Germany, and Italy).  And Canada expressly exempts unaccompanied children from its restrictions on non-U.S.-nationals seeking asylum between ports.  *See* Order in Council, Minimizing the Risk of Exposure to COVID-19 in Canada Order, P.C. 2020-0161, § 4(2)(d) (Mar. 20, 2020), https://tinyurl.com/y888f7yh.

the latter agency's implementation procedures, satisfy its APA obligations.  Gov't Br. 36-37.
But unlike in *Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 90 (2d Cir. 2000), the face of the
Orders shows no indication that CDC meaningfully consulted with DHS on the unique
circumstances of unaccompanied children seeking humanitarian relief.  *See Am. Wild Horse
Pres. Campaign v. Perdue*, 873 F.3d 914, 931 (D.C. Cir. 2017) (finding failure to consider
"broader, real-world impact" arbitrary and capricious).  If anything, the CDC Orders' silence
only emphasizes the flaws in the decisionmaking process here, as DHS was surely aware that it
regularly apprehends unaccompanied children and asylum seekers.

 And in any event, DHS's own implementation of the Title 42 Process is also flawed.  To
start, DHS has offered no public justification for its implementation procedures, which depart
drastically from normal immigration proceedings and ignore the special needs of children and
asylum seekers.  The mere "discretion" to exempt individuals "on a case-by-case basis, based on
. . . individual circumstances" is also inadequate, especially where there is no clear process or
standard for making such exemptions.  Gov't Br. at 35.

 Notably, CBP is perfectly willing to exempt individuals from the Title 42 Process when
doing so suits its immigration objectives.  CBP's Implementation Memo states that individuals
with certain criminal histories must be removed from the Title 42 Process and placed into the
immigration and criminal system.  *See* CBP Memo at 3 (exempting those with certain criminal
convictions as "[s]ubjects not amenable to being expelled").  Yet Defendants cannot claim that
having a prior conviction makes one less likely to transmit COVID-19.  Put simply, DHS—
apparently with CDC's sanction—is implementing the immigration statute when it chooses to,
and yet leaves itself free to ignore its statutory obligations under the TVPRA and the asylum,
withholding, and CAT provisions.  There is no health-related justification for that distinction.

## IV. THE BALANCE OF HARMS TIPS DECIDEDLY IN J.B.B.C.'S FAVOR.

 **1.** As set forth in Plaintiff's declarations, J.B.B.C. fled Honduras due to violent attacks,
the murder of a relative, and direct threats to his life.  If he is returned, he will likely be
persecuted or even killed.  ECF No. 2-3 ¶ 5 (Corchado Decl.); Declaration of Carlos Emilio
Barrera Rodriguez ¶¶ 4-19; Supplemental Declaration of Linda Corchado ¶¶ 9-10.  The State

Department acknowledges that Honduran children face horrendous dangers, including "death threats for failure to pay extortion, attempted recruitment by gangs, [and] witnessing criminal activity by gangs or organized crime." Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *2019 Country Reports on Human Rights Practices: Honduras* 16 (2020).[14] Yet, although Defendants offer no facts to rebut Plaintiff's declarations, they assert his fears are merely "unsubstantiated and speculative." Gov't Br. 39. Numerous courts have held that similar showings show irreparable injury. *See, e.g.*, *Demjanjuk v. Holder*, 563 F.3d 565 (6th Cir. 2009) (granting stay for noncitizen who asserted removal would violate CAT); *Grace v. Whitaker*, 344 F. Supp. 3d 96, 146 (D.D.C. 2018) (finding fear of "domestic violence, beatings, shootings, and death in their countries of origin" constitute irreparable injury); *Devitri v. Cronen*, 289 F. Supp. 3d 287, 296–97 (D. Mass. 2018) (risk of persecution if removed is irreparable harm). And there is "a public interest in preventing aliens from being wrongfully removed . . . to countries where they are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 436 (2009).

**2.** Defendants, in contrast, would incur comparatively little harm from a stay. A stay of this child's removal "would effectively balance the equities at stake and serve the public interest." *Thatikonda v. USCIS*, No. CV 19-685 (RC), 2020 WL 2126716, at \*6 (D.D.C. May 5, 2020). Defendants offer no explanation as to why staying a single healthy child's deportation would impinge significantly on their interests. But this one boy's removal is all that is at stake in this emergency motion. *See Ass'n of Reptile Keepers, Inc. v. Jewell*, 106 F. Supp. 3d 125, 128–29 (D.D.C. 2015) (granting preliminary injunction barring defendants from giving effect to challenged regulation as to plaintiffs). Defendants' attempt, therefore, to shift the focus beyond Plaintiff's specific circumstances and balance broader systemic equities is misplaced. Accordingly, Plaintiff makes only a few brief points about that broader balance of harms.

First, unaccompanied children like J.B.B.C. are released to sponsors under the TVPRA, which in most cases will be a parent or close relative who can ensure the child will self-quarantine as needed and will be subject to local restrictions. Insofar as children must spend

---

[14] https://www.state.gov/wp-content/uploads/2020/02/HONDURAS-2019-HUMAN-RIGHTS-REPORT.pdf

short periods in ORR's network of juvenile facilities before release, that network can deal with communicable diseases.

Second, contrary to the CDC Orders' stated justifications, this case shows the Title 42 Process does not make DHS officers safer, and in fact, likely increases any potential exposure. Under the TVPRA, juveniles like J.B.B.C. must be transferred to ORR or a sponsor within 72 hours. *See* 8 U.S.C. § 1232(b)(3). Yet deporting children under Title 42 almost invariably takes DHS longer than that, due to travel arrangements and confirming the sending country's receipt.

Third, even for adults, public health officials have overwhelmingly noted there are numerous safety measures that can be taken, including quarantines.[15] Defendants say that CDC has reached a different conclusion. Gov't Br. 40-41. But read carefully, the CDC Orders do not conclude that it is *unworkable* to process asylum seekers safely, but rather that it is not worth the resources or not worth trying. *See, e.g.*, 85 Fed. Reg. at 17067 (speculating that brief detention of noncitizens in Border Patrol stations would "divert [healthcare] resources away from the domestic population"). Thus, the Administration has just chosen to de-prioritize those fleeing danger, even as it permits or even encourage large recreational activities (such as beach outings), air travel by tens of thousands of foreign visitors, and other events and activities.

Finally, although Defendants claim that an injunction here would prevent "a court from effectuating statutes enacted by . . . its people," Gov't Br. 41, J.B.B.C. seeks to vindicate rights *Congress* gave him. "And it is squarely in the public interest to enable [children] . . . to partake of statutory . . . rights," especially "where, as here, it is consistent with the process prescribed by Congress." *Osorio-Martinez v. Att'y Gen.*, 893 F.3d 153, 179 (3d Cir. 2018); *see Ramirez v. ICE*, 310 F. Supp. 3d 7, 33 (D.D.C. 2018) ("The public interest surely does not cut in favor of permitting an agency to fail to comply with a statutory mandate.").

## CONCLUSION

For these reasons, the Court should stay Plaintiff's removal.

---

[15] *Letter to HHS Secretary Azar and CDC Director Redfield Signed by Leaders of Public Health Schools, Medical Schools, Hospitals, and Other U.S. Institutions*, Columbia Mailman School of Public Health (May 18, 2020), https://tinyurl.com/y8q3asun.

Dated: June 22, 2020

Respectfully submitted,

/s/ Lee Gelernt_____

Stephen B. Kang*
Cody Wofsy*
Morgan Russell*
Adrienne Harrold*
American Civil Liberties Union Foundation,
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770

Andre Segura**
Kathryn Huddleston**
Rochelle Garza
Brantley Shaw Drake
American Civil Liberties Union Foundation
of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, Texas 77007
Tel. (713) 942-8146

Jamie Crook (D.C. Bar No. 1002504)
Blaine Bookey
Karen Musalo
Center for Gender & Refugee Studies
200 McAllister St.
San Francisco, CA 94102
Tel: (415) 565-4877

Lee Gelernt*
Daniel A. Galindo*
Celso J. Perez (D.C. Bar No. 1034959)
American Civil Liberties Union Foundation,
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2600

Robert Silverman**
Oxfam America
Boston, MA 02115, Suite 500
Tel: (617) 482-1211

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation of
the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel: (202) 457-0800

*Attorneys for Plaintiffs*

*Admitted pro hac vice*
**Pro hac vice application forthcoming*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2020, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system.  Counsel for Defendants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: /s/ Lee Gelernt
LEE GELERNT