# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| J.B.B.C.,* A MINOR CHILD, by and through his father and Next Friend, Carlos Emilio Barrera Rodriguez, c/o American Civil Liberties Union 125 Broad Street, 18th Floor New York, NY 10004 | ) ) ) ) ) ) ) ) No. 20-cv-01509-CJN |

J.B.B.C.,* A MINOR CHILD, by and through his
father and Next Friend, Carlos Emilio Barrera
Rodriguez,
c/o American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004

E.Y.,* A MINOR CHILD, by and through his brother
and Next Friend, Fernando Barrios,
c/o American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004

*Plaintiffs*,

v.

CHAD F. WOLF, ACTING SECRETARY OF
HOMELAND SECURITY, in his official capacity,
Department of Homeland Security
245 Murray Lane SW
Washington, DC 20528;

MARK A. MORGAN, ACTING COMMISSIONER
OF U.S. CUSTOMS AND BORDER PROTECTION
("CBP"), in his official capacity,
U.S. Customs and Border Protection
1300 Pennsylvania Ave. NW
Washington, DC 20229;

TODD C. OWEN, EXECUTIVE ASSISTANT
COMMISSIONER, CBP OFFICE OF FIELD
OPERATIONS, in his official capacity
CBP Office of Field Operations
1300 Pennsylvania Ave. NW
Washington, DC 20229;

RODNEY S. SCOTT, CHIEF OF U.S. BORDER
PATROL, in his official capacity
U.S. Border Patrol
1300 Pennsylvania Ave. NW
Washington, DC 20229;

MATTHEW T. ALBENCE, DEPUTY DIRECTOR
OF U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, in his official capacity
U.S. Immigration and Customs Enforcement,
500 12th Street SW
Washington, DC 20536;

No. 20-cv-01509-CJN

ALEX M. AZAR II, SECRETARY OF HEALTH )
AND HUMAN SERVICES, in his official capacity, )
U.S. Department of Health and Human Services )
Hubert H. Humphrey Building )
200 Independence Ave. SW )
Washington, DC 20201; )
)
DR. ROBERT R. REDFIELD, DIRECTOR OF THE )
CENTERS FOR DISEASE CONTROL )
AND PREVENTION, in his official capacity, )
Centers for Disease Control and Prevention )
1600 Clifton Road )
Atlanta, GA 30329; )
)
HEIDI STIRRUP, ACTING DIRECTOR OF THE )
OFFICE OF REFUGEE RESETTLEMENT, in her )
official capacity )
Office of Refugee Resettlement, )
330 C Street SW, 5th Floor )
Washington, DC 20201; )
)
*Defendants*. )
)

## **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

(Violations of Trafficking Victims Protection Reauthorization Act of 2008, Public Health
Service Act, Refugee Act, Foreign Affairs Reform and Restructuring Act of 1998, Immigration
and Nationality Act, and Administrative Procedure Act)

*Proceeding under pseudonyms pursuant to Federal Rule of Civil Procedure 5.2(a).

## INTRODUCTION

1.      This case challenges the government's unprecedented new system for restricting immigration along the Canadian and Mexican borders in the name of public health and under the purported authority of 42 U.S.C. § 265.  This system is established in a set of agency documents—a new regulation, several orders, and an implementation memo—which Plaintiffs collectively refer to as the "Title 42 Immigration Process" or "Title 42 Process."

2.      Among other things, the Title 42 Process authorizes the summary expulsion of unaccompanied minors without any procedural protections—even if the child shows no signs of having COVID-19, and even if the child is fleeing danger and seeking protection in the United States.

3.      Plaintiffs J.B.B.C. ("J.") and E.Y. ("E.") are minors who came to the United States unaccompanied.

4.      J. is a 16-year-old boy from Honduras.  His father suffered persecution in Honduras and was forced to flee to the United States.  His father now lives in the United States and is awaiting his immigration proceedings.  Recently, J. was also forced to escape severe persecution in Honduras and sought to join his father in the United States.

5.      U.S. Customs and Border Protection ("CBP") apprehended J. on or about June 4, 2020, after he came to the United States unaccompanied.  He is currently in Office of Refugee Resettlement ("ORR") custody in the El Paso, Texas, area.

6.      Plaintiff E. is a 15-year-old boy from Guatemala.  He has suffered extreme familial abuse from his grandfather and aunt with whom he had lived in Guatemala, has been persecuted because his mother testified against her stalker, and has been threatened by gangs.  E. was ultimately forced to flee to the United States to seek protection.  His siblings live in the United

States.  Both were granted asylum protections last year and E.'s protection claims are materially the same as those of his siblings.

7.      CBP apprehended E. on or about June 26, 2020, after he came to the United States unaccompanied.  He is currently in CBP custody in the McAllen, Texas, area.

8.      Prior to the Title 42 Process, and pursuant to longstanding immigration statutes protecting children and those seeking protection, J. and E. should have been given shelter in children's facilities until they could be released to family members, and would have been entitled to a full hearing, and appeals, to determine their right to seek safety in the United States with their family members.

9.      Through the Title 42 Process, the Administration has sought to usurp Congress's role and bypass the entire immigration statutory scheme.  Specifically, the Administration contends that public health provisions in Title 42 of the U.S. Code—provisions that have rarely been used and never in this way—entitle it to set aside the immigration laws.

10.     But those public health provisions do not authorize this unprecedented Title 42 Immigration Process.  Title 42 authorizes various powers, such as testing and quarantines, but has never been interpreted to authorize the broad powers the government is claiming here.  And even if Title 42 permits the expulsion of some individuals, that power would not apply to children or those seeking protection from persecution or torture.  The statutes protecting children and those seeking protection were enacted after the Title 42 provisions and contain no exception for individuals with communicable diseases.

11.     In fact, communicable diseases have a long history in immigration law, and Congress has squarely addressed how to handle them.  Under the specific immigration provisions enacted by Congress, if a border official suspects that an arriving noncitizen has a communicable disease

deemed serious by the government, the official has numerous options, including testing and even quarantine. But children and others seeking protection may under no circumstances be deported without a hearing to determine their right to remain in the United States (even if that means a period of quarantine is required). The Administration's use of Title 42 is a transparent end-run around Congress's considered decision to provide protection to children and others fleeing danger even where communicable disease is a concern—and to address that concern through the use of testing and quarantines, not deportations.

12.     Not only does the Title 42 Process violate the immigration statutes, but its application to Plaintiffs J. and E. is patently arbitrary and capricious from a public health standpoint.

13.     The principal stated justifications for the Title 42 Process is that it is necessary to protect border officers and that the introduction of persons into congregate settings poses a danger to public health. Specifically, the government asserts that when a person arrives at the border seeking protection and lacks a visa, border agents from the Department of Homeland Security ("DHS") will be forced to spend additional time screening the individual under the immigration laws, thereby exposing the officers to great danger. But as public health experts have uniformly explained, numerous safety measures are available, including social distancing, face masks, and gloves. Under the normal operation of the immigration laws, Plaintiffs would have been promptly sent to a shelter where trained workers would have cared for them, or to the custody of a family member, who would have ensured they stayed safe.

14.     Moreover, under the regular operation of immigration laws governing children, an unaccompanied child who arrives from Central America, like Plaintiffs, is transferred to the custody of ORR within 72 hours of the child's apprehension.

3

15.     Instead, Plaintiff E. has remained in immigration custody for over five days, and at the time of the original Complaint Plaintiff J. had remained in custody for more than five days, in order for Defendants to arrange for their return to Honduras and Guatemala respectively.  This increases the risk of exposure to COVID-19 for Plaintiffs and border enforcement agents.  Thus, the Title 42 Process *increases* the amount of time children spend with border agents, because it takes time to find air transportation to deport them.

16.     Whatever the Administration's motivation for applying the Title 42 Process to children and adults seeking protection, the Process is unlawful.  Plaintiffs would face grave danger in Honduras and Guatemala and must be given the opportunity to remain to the United States to receive the statutory protections to which they are entitled under the laws passed by Congress.

## JURISDICTION AND VENUE

17.     This case arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq*.; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq*. and its implementing regulations; the Convention Against Torture ("CAT"), *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); and the Public Health Service Act of 1944, 42 U.S.C § 264, *et seq*.

18.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.  *See also* 5 U.S.C. § 702 (waiver of sovereign immunity).

19.     Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States and officers of the United States acting in their official capacity, and Defendants reside in this District.

## PARTIES

**Plaintiffs**

20.     Plaintiff J. is a 16-year-old boy from Honduras, who fled to seek protection in the United States.  After he entered the United States, he was apprehended by CBP.  He seeks to remain in the United States to seek protection from persecution and torture.  He sues by and through his father and Next Friend, Carlos Emilio Barrera Rodriguez.

21.      Plaintiff E. is a 15-year-old boy from Guatemala, who fled to seek protection in the United States.  After he entered the United States, he was apprehended by CBP.  He seeks to remain in the United States to seek protection from persecution and torture.  He sues by and through his brother and Next Friend, Fernando Barrios.

**Defendants**

22.     Defendant Chad Wolf is the Acting Secretary of Homeland Security, which is a cabinet-level department of the U.S. government.  In that capacity, Defendant Wolf is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103.  DHS's components include CBP and U.S. Immigration and Customs Enforcement ("ICE").

23.     Defendant Mark A. Morgan is the Acting Commissioner of CBP.  He is sued in his official capacity.  In that capacity, he directed the issuance of the CBP's memorandum implementing expulsions under the Title 42 Process, and is a supervisory official responsible for implementing the Title 42 Process.  CBP is the sub-agency of DHS that is responsible for the initial processing and detention of noncitizens who are apprehended at or between U.S. ports of entry.  CBP is responsible for implementing the Title 42 Process and conducts expulsions pursuant to its terms.

24.     Defendant Todd C. Owen is the Executive Assistant Commissioner of CBP's Office of Field Operations ("OFO").  He is sued in his official capacity.  OFO is the largest component of CBP and is responsible for border security, including immigration and travel through U.S. ports of entry.  Defendant Owen is a supervisory official responsible for implementing the Title 42 Process at ports of entry.

25.     Defendant Rodney S. Scott is the Chief of U.S. Border Patrol.  He is sued in his official capacity.  Border Patrol is responsible for border security between ports of entry.  Defendant Scott is a supervisory official responsible for implementing the Title 42 Process between ports of entry.

26.     Defendant Matthew T. Albence is the Deputy Director of ICE, and is the Senior Official Performing the Duties of the Director.  ICE is the sub-agency of DHS that is responsible for carrying out removal orders and overseeing immigration detention.  Defendant Albence is sued in his official capacity.

27.     Defendant Alex M. Azar II is the Secretary of Health and Human Services ("HHS"), which is a cabinet-level department of the U.S. government.  He is sued in his official capacity.  In that capacity, Defendant Azar is responsible for the oversight of both the Centers for Disease Control ("CDC") and ORR, which are components of HHS.

28.     Defendant Dr. Robert R. Redfield, M.D., is the Director of the CDC.  He is sued in his official capacity.  In that capacity, he authorized the Title 42 Process at issue in this case.

29.     Defendant Heidi Stirrup is the Acting Director of ORR.  She is sued in her official capacity.  ORR is statutorily responsible for the care and custody of unaccompanied children in federal immigration custody.  The agency oversees a network of shelters and facilities that house unaccompanied children; evaluates potential sponsors for the children; and operates various

programs designed to ensure that unaccompanied children access certain procedural protections in their removal proceedings. The agency is a component of HHS. In that capacity, Defendant Stirrup oversees the care and custody of unaccompanied children in immigration custody.

**FACTS**

**Unaccompanied Children in the Immigration System**

30.     Every day, unaccompanied children flee persecution and danger in their home countries and journey to the United States seeking safety. Many of them come from El Salvador, Honduras, and Guatemala because of the escalating influence of powerful gangs that control large swaths of these countries and frequently target children. Many unaccompanied children from these Central American countries are also fleeing gender-based, family-based, and other types of violence.

31.     In recognition of the unique vulnerabilities of unaccompanied children and their critical need for protection, Congress has passed two laws to guarantee their proper care and facilitate their efforts to seek humanitarian relief.

32.     In 2002, Congress included provisions in the Homeland Security Act that transferred responsibility for the care and custody of unaccompanied children from the former Immigration and Naturalization Service to ORR, which is part of HHS. 6 U.S.C. § 279(a). Congress enacted this provision because it saw that immigration enforcement-oriented agencies were ill-equipped to care for unaccompanied children. Congress therefore vested responsibility for the care of unaccompanied children, including the provision of housing and access to legal services to pursue claims for immigration relief, in an agency—ORR—that had demonstrated experience working with vulnerable immigrants and refugees.

33.     In 2008, Congress then enacted the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 8 U.S.C. § 1232, which established even stronger protections for unaccompanied children.  The TVPRA created a number of significant safeguards concerning the care, custody, and removal proceedings of unaccompanied children, and confirmed ORR's responsibility to ensure their care.[1]

34.     Under the TVPRA, unaccompanied children from "noncontiguous countries"—i.e., countries other than Canada and Mexico—must be transferred to ORR custody within 72 hours after their apprehension, absent exceptional circumstances.  8 U.S.C. § 1232(b)(3).  Children from Canada and Mexico are subject to an initial screening to determine whether they must be referred to ORR custody.  8 U.S.C. § 1232(a)(2)(A)(i)-(iii), (a)(3).

35.     After referral from CBP, ORR is responsible under the statute for housing and caring for unaccompanied children.  8 U.S.C. § 1232(c).  The statute requires ORR to "promptly" place the child "in the least restrictive setting that is in the best interest of the child."   8 U.S.C. § 1232(c)(2)(A).  Such placements can include referral to shelters or care facilities operated by entities that contract with ORR.

36.     ORR does not operate its own housing facilities for unaccompanied children.  Instead, ORR contracts with providers throughout the country who operate shelters, group homes, foster care programs, and other living situations for the children.  The shelter providers take care of the children's day-to-day needs, such as food, housing, education, and medical treatment.  The providers operate under ORR's direction and supervision, and must comply with federal standards and ORR guidelines governing the care of unaccompanied children.

---

[1] Although the TVPRA refers to HHS, ORR (as an HHS subagency) carries out these statutory functions.

37.     ORR is also statutorily required to evaluate options for the child's release from federal custody to a family member or other adult who can care for the child.  8 U.S.C. § 1232(c)(3)(A). Often, unaccompanied children traveling to the United States can reunite with parents or family members already here, which enables ORR to facilitate swift releases.

38.     The TVPRA also includes safeguards concerning the removal proceedings of unaccompanied children from noncontiguous countries, and those children from contiguous countries who pass the screening.  Most importantly, if DHS seeks to remove a child, the child must be put into full removal proceedings before an immigration judge, with the opportunity for an administrative appeal and review in the court of appeals.  Children cannot be removed via fast-track removal processes applicable to others.  8 U.S.C. § 1232(a)(5)(D)(i).

39.     Unaccompanied children are also entitled to other statutory procedural protections, including access to counsel, 8 U.S.C. § 1232(a)(5)(D)(iii), and eligibility for the appointment of a child advocate to look out for their interests, 8 U.S.C. § 1232(c)(6).  Through these provisions, Congress recognized that unaccompanied children require special safeguards to ensure their full access to humanitarian relief from removal.

40.     In short, an unaccompanied child from a country like Honduras and Guatemala must automatically be allowed to remain in the country, transferred within 72 hours to ORR custody, and placed in full immigration proceedings, where he can apply for asylum and other protections under which he may ultimately receive permission to remain in the United States.  There is no screening before the child is transferred to ORR and placed in immigration proceedings, other than checking that he is unaccompanied and from a non-contiguous country.

41.     Even apart from the TVPRA, unaccompanied children, like other noncitizens, have statutory rights to seek relief in the United States from persecution and torture.  Three forms of relief are possible: asylum, withholding of removal, and protection from torture.

42.     The Immigration and Nationality Act ("INA") provides, with certain enumerated exceptions—that do not include public health concerns—that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status," may apply for asylum.  8 U.S.C. § 1158(a)(1).  To qualify for asylum, a noncitizen must show a "well-founded fear of persecution" on account of a protected ground.  8 U.S.C. § 1101(a)(42)(A).  Congress has expanded asylum eligibility for unaccompanied children, by exempting them from various requirements applicable to adults, including the one-year deadline for filing an application.  8 U.S.C. § 1158(a)(2)(E).

43.     Second, in keeping with this country's obligations under the 1951 Refugee Convention and the 1967 Protocol relating to the Status of Refugees, Congress has barred the removal of an individual to a country where it is more likely than not that he would face persecution on a protected ground.  8 U.S.C. § 1231(b)(3).  This form of relief, known as "withholding of removal," requires the applicant to meet a higher burden with respect to the likelihood of harm but is mandatory if the standard is met.

44.     Third, the Convention Against Torture ("CAT"), implemented by FARRA, prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture.  *See* 8 U.S.C. § 1231 note.

**The Treatment of Communicable Diseases Under the Immigration Laws**

45.     The immigration system has long had to deal with communicable diseases.  Congress has thus enacted specific immigration provisions to address them, dating back to the late 1800s when Congress first began regulating immigration.

46.     8 U.S.C. § 1182(a)(1) contains various "health-related" grounds of inadmissibility.  The statute applies to various noncitizens who present specified public health concerns, such as noncitizens who have "communicable disease[s] of public health significance," *id.* § 1182(a)(1)(A)(i); who have not been vaccinated against certain widespread infectious diseases (e.g., mumps, measles, rubella), *id.* § 1182(a)(1)(A)(ii); who have "physical or mental disorder[s]" that may present "threat[s] to the property, safety, or welfare" of self or others, *id.* § 1182(a)(1)(A)(iii); or "drug abuser[s] or addict[s]," *id.* § 1182(a)(1)(A)(iv).  But these statutes do not permit the deportation of individuals without a screening for persecution or torture, and do not permit the summary deportation of children in violation of the TVPRA.

47.     The immigration statute also contains a detention provision that applies to certain noncitizens "arriving at ports of the United States" who may be inadmissible on the health-related grounds, or who come "from a country or have embarked at a place where any of such diseases are prevalent or epidemic."  8 U.S.C. § 1222(a).  Such noncitizens may only be detained "for a sufficient time to . . . subject [them] to observation and an examination," *id.*, but may not be deported without a screening for persecution or torture as the immigration statutes require.

**The Administration's Efforts to Bar Immigrants and the New Title 42 Process**

48.     The current Administration has repeatedly and publicly stated that restricting access to asylum, as well as eliminating the TVPRA, are among its key immigration objectives.  The President, his close advisors, and a succession of agency officers have repeatedly stated that the

TVPRA creates a "loophole" in the border that they seek to close.  They have characterized unaccompanied children as dangerous gang members seeking to exploit the immigration laws.

49.     The administration has also sought to use numerous regulatory and policy mechanisms to prevent noncitizens from seeking protection in this country, but the Title 42 Process at issue here goes further than any of those efforts because it leaves almost no avenue open to seek protection.

50.     Before COVID-19, Administration officials discussed using public health powers to restrict immigration and circumvent the protections in the immigration laws.

51.     Notwithstanding the clear statutory framework that requires the United States to allow people arriving at the border (with or without valid travel documents) to apply for asylum, withholding of removal, and CAT relief, and to provide special protections to unaccompanied children, the President announced on March 20, 2020, that the CDC would issue an order pursuant to the public health provisions of Title 42 of the U.S. Code "to suspend the introduction of all individuals seeking to enter the U.S. without proper travel documentation" across the northern and southern borders.  The President stated that the order would be executed by "immediately returning" such individuals "without delay."

52.     The specific provision of Title 42 invoked by the Administration was § 265.  That provision dates to 1893 and was later reenacted in substantially the same language in the modern Public Health Service Act of 1944.  Section 265 provides in relevant part: The Surgeon General may "prohibit . . . the introduction of persons or property" from designated places where "by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States."[2]

---

[2] In 1966, the Surgeon General transferred its § 265 authority to what is now HHS.  In 2001, HHS delegated this authority to the CDC.  The President's functions under § 265 were assigned to the Secretary of HHS in a 2003 executive order.

53. Deportation has never been an available penalty under § 265, and in fact, § 265 applies to both noncitizens and citizens. Rather, the Public Health Service Act prescribes certain civil and criminal penalties for violations of § 265, including "a fine of not more than $1,000 or . . . imprisonment for not more than one year, or both." 42 U.S.C. § 271(a).

54. Although § 265 and its predecessors have existed since 1893, no regulation implementing that statute has ever authorized the broad immigration powers Defendants are claiming here.

55. To exercise this new immigration power, the CDC thus issued a new regulation, without advance notice and comment, on the same day as the President's announcement. Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16559-01 (Mar. 24, 2020) (effective date Mar. 20, 2020).

56. Specifically, the regulation added a new provision, 42 C.F.R. § 71.40, which provides that the CDC may prohibit the "introduction into the United States of persons" from foreign countries. 85 Fed. Reg. at 16,563; *see* 42 C.F.R. § 71.40(a). The public notice of the regulation interpreted the "introduction of persons" in 42 U.S.C. § 265 to "encompass those who have physically crossed a border of the United States and are in the process of moving into the interior in a manner the [CDC] Director determines to present a risk of transmission of a communicable disease." 85 Fed. Reg. at 16,563; *see* 42 C.F.R. § 71.40(b)(1). And it interpreted "serious danger of the introduction of [a particular communicable] disease into the United States" in § 265 as meaning "the potential for introduction of vectors of the communicable disease into the United States, even if persons or property in the United States are already infected or contaminated with the [same] communicable disease." 85 Fed. Reg. at 16,563; *see* 42 C.F.R. § 71.40(b)(2).

57.     The regulation exempted U.S. citizens, lawful permanent residents ("LPRs"), and members of the armed forces, stating that the "CDC believes that, at present, quarantine, isolation, and conditional release, in combination with other authorities, while not perfect solutions, can mitigate" the spread of COVID-19 by such individuals.  85 Fed. Reg. at 16,564; *see* 42 C.F.R. § 71.40(e), (f).

58.     The regulation also provides that, if an order suspending the introduction of persons "will be implemented in whole or in part" by CBP, "then the [CDC] Director shall, in coordination with the Secretary of Homeland Security or other applicable Federal department or agency head, explain in the order the procedures and standards by which any authorities or officers or agents are expected to aid in the enforcement of the order."  42 C.F.R. § 71.40(d)(2); *see* 85 Fed. Reg. at 16,564.

59.     Pursuant to its new regulatory authority, the CDC issued a 30-day "Order Under Sections 362 and 365 of the Public Health Service Act [42 U.S.C. §§ 265, 268] Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists."  85 Fed. Reg. 17,060-17088 (Mar. 26, 2020) (effective date Mar. 20, 2020).  The Order directed the "immediate suspension of the introduction" of certain persons, referred to as "covered aliens." 85 Fed. Reg. at 17,067.  "Covered aliens" are those seeking to enter the United States through Canada or Mexico who "seek[] to enter . . . at POEs [ports of entry] who do not have proper travel documents, aliens whose entry is otherwise contrary to law, and aliens who are apprehended near the border seeking to unlawfully enter the United States between POEs."  85 Fed. Reg. at 17,061.  Section 365 of the Act, codified at 42 U.S.C. § 268, provides that "[i]t shall be the duty of the customs officers and of Coast Guard officers to aid in the enforcement of quarantine rules and regulations."  42 U.S.C. § 268(b).

60.     A principal justification for these restrictions was that "[t]he introduction into congregate settings in land POEs and Border Patrol stations" of such individuals risks "transmission and spread of COVID-19 to CBP personnel" and others.  85 Fed. Reg. at 17,061.

61.     The Order directs the forcible return of individuals back to the country from which they entered (Canada or Mexico), their home country, or another location.  85 Fed. Reg. at 17,067.

62.     Although the Order is issued by the CDC, and the regulation provides that the CDC and DHS must coordinate in developing corresponding procedures and standards, 42 C.F.R. § 71.40(d)(2), the Order states that CBP "developed an operational plan for implementing the order."  85 Fed. Reg. at 17,067.

63.     In addition to repeating the regulatory exceptions for U.S. citizens and LPRs, the Order exempts from the ban the spouses and children of citizens and LPRs (whether or not they have valid documents); persons from foreign countries with valid travel documents; and persons from countries in the visa waiver program who present at ports of entry. 85 Fed. Reg. at 17,061.  The visa waiver program applies to nationals of 39 countries.

64.     The Order also states that DHS customs officers could, in their discretion, determine that a noncitizen "should be excepted [from the Order] based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests."  85 Fed. Reg. at 17,061.  Other than stating that a supervisor must approve such exceptions, the Order contains no standards or further procedures for exercising that discretion.  *See id.*

65.     The Order and regulation are silent on their application to individuals seeking asylum, withholding of removal, or CAT protection, and are likewise silent regarding their application to unaccompanied children.

66.     The March 20 Order was extended for an additional 30 days on April 20, 2020. Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 22,424 (Apr. 22, 2020) (effective date Apr. 20, 2020).

67.     On May 20, 2020, the CDC extended the Order indefinitely, and amended it to cover both land and coastal ports of entry and Border Patrol stations.  Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act, 85 Fed. Reg. 31,503 (May 26, 2020) (effective date May 21, 2020).

68.     The May 20 amended Order acknowledges that "certain areas of the country are beginning a phased reopening of their communities," but states that "[a]t this critical juncture, it would be counterproductive to . . . relax[] restrictions" on the immigration of persons "who pose a risk of further introducing COVID-19 into the United States."  85 Fed. Reg. at 31,505.  As with the prior two 30-day Orders, a principal justification articulated for the indefinite Order was the danger to border agents who would have to inspect persons who come without documents.

69.     The CDC acknowledged that there were alternatives to expulsion but concluded that it was not worth the resources for those, like children and asylum seekers, who lacked documents. The CDC also presumed, without evidence, that those without documents covered by the Order would lack a means of self-quarantining.

**CBP's Implementation of the Title 42 Process**

70.     On April 2, 2020, CBP issued a memorandum ("CBP Memo") describing the agency's implementation of the Title 42 Process, an effort it calls "Operation Capio."  CBP Memo 2.

71.     To determine whether a noncitizen is "subject to the CDC Order," the CBP Memo instructs officers to use "experience" and "physical observation" to determine whether they "believe[] that it is more likely than not" that the person whom they encounter in "[e]nforcement

efforts on the SWB [southwestern border] and NB [northern border]," anywhere "within the area of operation of a Border Patrol station or POE operated by CBP," is "seeking to enter" without proper travel documents at or between POEs.  CBP Memo 1.

72.     Covered noncitizens "will be transported to the nearest POE and immediately returned to Mexico or Canada, depending on their point of transit."  CBP Memo at 3.  Those who are "not amenable to immediate expulsion to Mexico or Canada, will be transported to a dedicated facility for limited holding prior to expulsion" to their home country.  *Id*.  Such facilities can be "a tent, soft-sided facility or predesignated CBP/USBP facility with dedicated space."  *Id*.

73.     The CBP Memo provides no instructions on medical screenings or other procedures for determining whether a covered noncitizen may have COVID-19.

74.     The CBP Memo does not exempt minors from forcible expulsion.

75.     CBP deported nearly 1,000 unaccompanied children in March and April.  In May, over 1,000 unaccompanied children were taken into CBP custody, and only 39 of these children were transferred to ORR shelters rather than being summarily expelled.

76.     CBP has turned back multiple children to Mexico in the middle of the night.

77.     The number of referrals of unaccompanied children to ORR has thus plummeted.  Before the Title 42 Process, ORR shelters received as many as 77 children daily.  But in April, daily referrals dropped to the single digits, and ORR stated it received only 58 children from CBP that month.  That same month, CBP apprehended over 700 unaccompanied children at the Southwest border.  In May 2020, the total number of children in ORR custody was reportedly about 1,600, down from approximately 12,500 children in April 2019.  As of mid-June, ORR had less than 975 children, a 72% decline from the number of children in custody in late March.

78.     CDC suggested in the May 20 Order that there has been a reduced rate of transmission and that this is due to reduced number of "covered aliens" at ports of entry and border patrol stations.  CDC, however, offered no evidence of this causal link.

79.     This complaint refers to the new regulation, all three of the CDC Orders—the original March 20 order, the April 20 extension, and the May 20 indefinite extension and amendment— and the CBP Memo collectively as the "Title 42 Immigration Process" or "Title 42 Process."

**Defendants Seek to Expel Plaintiffs to Honduras and Guatemala Under the Title 42 Process**

80.     Plaintiffs J. is a 16-year-old boy from Honduras and Plaintiff E. is a 15-year-old boy from Guatemala.  They are two of the many unaccompanied children subject to summary expulsions by CBP pursuant to the Title 42 Process.  They face deportation back to Honduras and Guatemala, respectively.

81.     Plaintiff J.'s father, Mr. Barrera Rodriguez, lives in the United States and has a pending asylum case.

82.     J. experienced persecution in Honduras.  He witnessed a gang member murder a young man.  Gang members then came to the store where his aunt worked, and where J. also helped, threatening him and ordering that the store had to close.  Another relative was also beaten by gang members near where J. lived.  J. was terrified to leave the house after these events, even to go to school.

83.     J. fled Honduras because he was afraid for his life and journeyed to the United States to seek safety and reunite with his father.

84.     On or around June 4, 2020, J. entered the United States near El Paso, Texas, where CBP apprehended him.  Until the original Complaint was filed, CBP officials did not give him any opportunity to raise his fear of return to Honduras.

85.     His father received a call the afternoon of June 4 asking for his name and address, and to confirm that he was J.'s father.  The official on the phone said that they would call the father again with more information.

86.     On June 5, J.'s father received a call from the same phone number and was able to speak with J. but was unable to speak with officials again to get further information about what would happen to his son.

87.     J. was moved to a hotel before or on June 6.  He remained in the hotel as officials waited to place him on a flight to Honduras.

88.     At the time the original Complaint was filed, J. had spent at least five days in CBP custody.

89.     J. has not exhibited any symptoms of COVID-19 and is in good health.

90.     At the time the original Complaint was filed, J.'s removal to Honduras was imminent. J.'s counsel and father attempted to obtain information from CBP about his whereabouts and whether Defendants planned to deport him to Honduras.  On June 9, 2020, at 8:20 a.m. MST, a DHS official confirmed via email to J.'s counsel that J. "is pending expulsion under Title 42" and that, "[a]t this time, there is no legal impediment to the imminent expulsion of [J.]."

91.     Later on June 9, at 11:17 a.m. MST, a DHS official further stated in email to J.'s counsel that J. was "scheduled to depart via an ICE Air flight within the next few days" and that the Honduran consulate "has been advised."

92.     In a subsequent conversation with a DHS official on the evening of June 9, counsel for J. learned that J. was scheduled to be flown to Honduras the next day, June 10.

93.     Both J.'s counsel and his father sought to communicate to the government officers holding J. in custody that the boy is afraid return to Honduras because he fears persecution and torture there.

94.     Plaintiff E. experienced persecution in Guatemala.  His grandfather and aunt with whom he had lived have repeatedly abused him; his uncle has stalked and abused E.'s mother and targeted E.; and gang members have sought out E. and threatened to harm him.  E.'s siblings, both of whom escaped their grandfather and aunt's home, received grants of asylum last year based on materially the same claims of asylum.  In fact, E.'s abuse at the hands of his grandfather and aunt has gone on longer because he was not able to escape until recently.

95.     The various ways in which E. has been persecuted are connected: His mother spoke out and testified in judicial proceedings against his uncle, who had sexually abused her and, in one attack, beheaded a relative of E.'s father.  The uncle has since stalked and threatened E.'s mother and E., including from the prison where he was incarcerated, by sending gang members and other family to approach E.  The uncle either was recently released from incarceration or is about to be released, thus putting E. in further harm.  And the gang members sent by the uncle to threaten E. have in turn offered to protect E. from the uncle, but only if he joins the gang.  E.'s grandfather and aunt physically abused him and his siblings, and when beating them would tell them that they were being punished for their uncle's crimes.

96.     E. was forced to flee Guatemala to escape persecution and seek safety.

97.     E. entered the United States on or about June 26, 2020, near Roma, Texas, and CBP apprehended him.

98.     E. told CBP officers that he came to the United States because he was in danger in Guatemala.  He also gave CBP the name and number of family members here in the United States, including his parents.

99.     On June 27, E.'s parents were informed by CBP officials that he was in their custody.  On June 28, E.'s mother spoke to E. by phone and confirmed that E. had raised his claims of fearing return to Guatemala with CBP officers.  She also told an officer who arranged the call that E. cannot return to Guatemala because he is being abused by his grandfather and an aunt, and his uncle wants to kill him.  The CBP officer told E.'s mother there was nothing she could do and that they were going to put E. on a plane.

100.    E. has spent at least five days in DHS custody.

101.    E. has not exhibited any symptoms of COVID-19 and is in good health.

102.    E.'s removal to Guatemala is likely imminent.  DHS officials have confirmed to an attorney for E. that he will be sent to Guatemala by plane soon, but have not provided further details or responded to numerous inquiries.

103.    On June 30, 2020, a CBP official confirmed over the phone to E.'s counsel that E. was being treated under Title 42.

104.    The threat of persecution and torture to J. and E. is imminent and real.  Honduras and Guatemala are among the most violent countries in the world.  And children are not exempt from this widespread danger.  Indeed, many children are targeted specifically by gang members for recruitment.  Children have experienced extreme harms ranging from threats against their lives and physical abuse to rape, kidnapping, and murder.

105.    If J. and E. are allowed to remain the United States, they could live with their respective family members, who currently reside in the United States, and are waiting for them.

106.    Even if Plaintiffs were required to first reside for a short time in an ORR children's shelter, they could do so safely.  There are ORR facilities that have experience with communicable diseases.  Moreover, because ORR facilities are currently well under capacity, social distancing and quarantine would be possible.

107.    Even before the Title 42 Process took effect, the ORR-contracted shelter network was operating significantly below capacity.  The system can house approximately 14,000 children. News reports stated that in the first two months of 2020, ORR was housing only about 2,000 to 3,000 children nationwide.

108.    After the Title 42 Process went into place, the numbers dropped even more precipitously. As of May 2020, the number of children detained in ORR custody was reportedly at about 1,600—approximately 11 percent of total capacity.

109.    Because Plaintiffs could have been transferred directly to their family members or to an ORR shelter, they would pose minimal, if any, additional risk to border agents.

110.    Plaintiffs have been required to remain in DHS custody far longer than the time it would have taken to transfer them to their family members or to an ORR facility.

111.    The Title 42 Process is not justified by public health concerns.  A principal justification is that border agents will have greater exposure if they are required to process individuals who lack documents and that it is therefore necessary to deport such individuals to reduce the risk to agents.  But, as Plaintiffs' facts illustrate, arranging for air transport to deport individuals will take longer than the 72 hours in which DHS must transfer children to ORR or family members. In addition, where the individual shows no signs of COVID-19, the risk is even less.  J. and E., for example, have shown no COVID-19 symptoms.

**The Title 42 Process Is An Extreme Outlier**

112.    The Title 42 Process at issue here follows other invocations of COVID-19 by the

Administration to ban immigration, but it is far more extreme in seeking to eliminate statutory

protections for vulnerable noncitizens and children.  And it is not only a ban on entry, but

provides for summary expulsion for those who entered the country.

113.    For example, in February and March of 2020, the President issued a series of

Proclamations under 8 U.S.C. § 1182(f) to prohibit the entry of certain persons traveling from

China, Iran, and certain European countries where COVID-19 was prevalent.  However, unlike

the Title 42 Process, those Proclamations expressly stated that they did not restrict "any

individual's eligibility for asylum, withholding of removal, or protection under the regulations

issued pursuant to the legislation implementing the Convention Against Torture."

114.    At the same time, the government continues to permit large numbers of people to enter

the United States.  In addition to the Title 42 Process at issue here, DHS issued two other orders

on March 20, 2020, which temporarily suspended "non-essential" travel from Canada and

Mexico.  Under these orders, permitted "essential travel" broadly includes citizens, returning

LPRs, individuals traveling for medical purposes, individuals traveling to attend education

institutions, individuals traveling to work in the United States (e.g., agricultural workers), truck

drivers moving cargo between the United States and Canada, emergency responders, and those

engaged in military travel and operations.

115.    On May 22, 2020, Defendant Wolf issued an "exemption" from the President's

Proclamations under 8 U.S.C. § 1182(f), which additionally permitted certain professional

athletes, their staff, and their dependents to enter the country.  Defendant Wolf determined that it

served "the national interest" to permit noncitizens who compete in, inter alia, the National

Basketball Association, the Professional Golfers' Association Tour, and the National Hockey League, to enter the country and participate in sporting events.

116.   Hundreds of thousands of individuals continue to move back and forth across the U.S.-Mexico border every day.  Since March 20, 2020, when the Title 42 Process first went into effect, numerous individuals exempted from the ban have come into the United States.

117.   The Title 42 Process is inconsistent with how other countries have handled migration in the time of COVID-19, particularly with respect to asylum seekers and other vulnerable populations.  Numerous countries in Western Europe, such as Denmark, France, and Germany, have exempted asylum seekers from their immigration prohibitions, and permitted them to seek relief from persecution from inside their countries.  And while Canada has imposed certain restrictions on the migration of adults without documentation if they do not enter at official ports of entry, it expressly exempts unaccompanied children from those restrictions.

118.   Despite Defendants' claimed fear of "introducing" infected individuals into the country, the United States is experiencing an outbreak of COVID-19 that is substantially more serious than most of its neighbors.  This country has the highest COVID-19 death toll and one of the highest infection rates in the entire world.  As of June 29, 2020, the United States had over 2.56 million confirmed cases of COVID-19, a rate of 7.81 people per thousand.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### (VIOLATION OF TVPRA, 8 U.S.C. § 1232, AND ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 706(1), 706(2)(A))

119.   All of the foregoing allegations are repeated and realleged as if fully set forth herein.

120.   The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

U.S.C. § 706(2)(A).  The APA also provides relief for a failure to act: "The reviewing court shall

. . . compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

121.    The TVPRA, 8 U.S.C. § 1232, includes mandatory requirements for the processing,

custody, release, and removal of unaccompanied children.  Defendants' subjection of Plaintiffs

to the Title 42 Process violates the statute in numerous ways, including that they should have

been referred to the custody of HHS or their family member (rather than be facing expulsion to

Honduras and Guatemala); that they should have been placed in full removal proceedings before

an immigration judge, where they would have a full and fair opportunity to litigate their claims

for relief; and that they have been deprived of numerous statutory safeguards designed to

facilitate their safe release into the United States and ensure the fairness of their removal

proceedings.

122.    Defendants' subjection of Plaintiffs to the Title 42 Process violates the TVPRA.

123.    As a result, Defendants' application of the Title 42 Process and regulation to Plaintiffs is

contrary to law.  *See* 5 U.S.C. § 706(2)(A).

124.    Moreover, by refusing to grant Plaintiffs the statutory protections to which the TVPRA

entitles them, and instead planning to expel them to countries where they face threat of

persecution and torture, Defendants have withheld and unreasonably delayed actions mandated

by the statute.  5 U.S.C. § 706(1).

## SECOND CLAIM FOR RELIEF

### (*ULTRA VIRES*, VIOLATION OF THE PUBLIC HEALTH SERVICE ACT, 42 U.S.C. 265, AND THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A))

125.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

126.    Title 42 of the U.S. Code does not authorize the expulsion of noncitizens from the United

States.

127.    Title 42 of the U.S. Code also does not authorize the expulsion of children from the United States without affording them the protections of the TVPRA or other statutory protections afforded under the INA.  As a result, the application of the Title 42 Process to Plaintiffs, which will result in their expulsion from the United States and return to Honduras and Guatemala, is contrary to law.  *See* 5 U.S.C. § 706(2)(A).

128.    The Title 42 Process which was purportedly established pursuant to the authority of 42 U.S.C. § 265, was not authorized by that provision and is *ultra vires*.

129.    The application of the Title 42 Process to Plaintiffs is contrary to law.  *See* 5 U.S.C. § 706(2)(A).

**THIRD CLAIM FOR RELIEF**

**(VIOLATION OF 8 U.S.C. § 1231(b)(3), WITHHOLDING OF REMOVAL,<br>AND ADMINISTRATIVE PROCEDURE ACT,<br>5 U.S.C. §§ 706(1), 706(2)(A))**

130.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

131.    The "withholding of removal" statute, INA § 241(b)(3), *codified at* 8 U.S.C. § 1231(b)(3), bars the removal of an individual to a country where it is more likely than not that he would face persecution.

132.    Only an immigration judge can determine whether a minor faces a risk of persecution and is entitled to withholding of removal after full removal proceedings in immigration court.  8 C.F.R. § 1208.16(a).

133.    Defendants applied the Title 42 Process and regulation to Plaintiffs without any of these required safeguards.

134.    Application of the Title 42 Process and regulation to Plaintiffs therefore violated 8 U.S.C. § 1231(b)(3), and its implementing regulations.

135.    As a result, Defendants' actions against Plaintiffs are contrary to law.  *See* 5 U.S.C. § 706(2)(A).

136.    In addition, by refusing to grant Plaintiffs the procedures mandated by 8 U.S.C. § 1231(b)(3), and its implementing regulations, Defendants have withheld and unreasonably delayed actions mandated by the statute.  5 U.S.C. § 706(1).

### FOURTH CLAIM FOR RELIEF

### (ASYLUM: VIOLATION OF 8 U.S.C. § 1108(a), AND ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 706(1), 706(2)(A))

137.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

138.    The INA provides, with certain exceptions, that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section . . . ."  8 U.S.C. § 1158(a)(1).

139.    Defendants' application of the Title 42 Process to Plaintiffs has prevented them from applying for asylum in accordance with 8 U.S.C. § 1158(a)(1), and was therefore contrary to law, *see* 5 U.S.C. § 706(2)(A).

140.    In addition, by refusing to grant Plaintiffs the meaningful opportunity to apply for asylum to which they are entitled, Defendants have withheld and unreasonably delayed actions mandated by the statute.  5 U.S.C. § 706(1).

### FIFTH CLAIM FOR RELIEF

### (VIOLATION OF THE FOREIGN AFFAIRS REFORM AND RESTRUCTURING ACT OF 1998, CODIFIED AT 8 U.S.C. § 1231 NOTE, AND ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 706(1), 706(2)(A))

141.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

142.     FARRA prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture.

143.     It is more likely than not that Plaintiffs J. and E. will face torture if they are returned to Honduras and Guatemala respectively.

144.     Pursuant to regulation, only an immigration judge, after full removal proceedings in immigration court, can determine whether a minor faces a risk of torture if removed from the United States.  8 C.F.R. § 1208.16(a).

145.     Defendants applied the Title 42 Process and regulation to Plaintiffs, to provide for their summary expulsion without placing them into full removal proceedings.

146.     The application of the Title 42 Process to Plaintiffs therefore violated § 1231(b)(3), FARRA, and their implementing regulations.

147.     Defendants' actions were contrary to law.  *See* 5 U.S.C. § 706(2)(A).

148.     In addition, by refusing to grant Plaintiffs access to full removal proceedings, Defendants have withheld and unreasonably delayed actions mandated by the statute.  5 U.S.C. § 706(1).

## SIXTH CLAIM FOR RELIEF

### (VIOLATION OF 8 U.S.C. § 1101, ET SEQ., AND ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 706(1), 706(2)(A))

149.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

150.     The INA, 8 U.S.C. § 1101, *et seq.*, sets out the sole mechanisms established by Congress for the removal of noncitizens.

151.     The INA provides that removal proceedings before an immigration judge under 8 U.S.C. § 1229a is "the sole and exclusive procedure" by which the government may determine whether to remove an individual, "[u]nless otherwise specified" in the INA.  8 U.S.C. § 1229a(a)(3).

152.     The Title 42 Process creates an alternative removal mechanism.  The Title 42 Process purports to operate outside of the immigration laws set forth by Congress in Title 8.

153.     Because the Title 42 Process provides for the expulsion of Plaintiffs without the procedures specified in the INA, it violates 8 U.S.C. § 1229a and the INA.

154.     As a result, Defendants' actions against Plaintiffs were contrary to law.  *See* 5 U.S.C. § 706(2)(A).

155.     In addition, by refusing to grant Plaintiffs access to the procedures specified in the INA, Defendants have withheld and unreasonably delayed actions mandated by the statute.  5 U.S.C. § 706(1).

**SEVENTH CLAIM FOR RELIEF**

**(VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
5 U.S.C. § 706(2)(A))**

156.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

157.     Defendants' actions are arbitrary, capricious, and contrary to law.  Defendants have not articulated a reasoned explanation for their decision to apply the Title 42 Process to Plaintiffs; failed to consider relevant factors in applying the Title 42 process to them, including their statutory protections as unaccompanied children and their fear of persecution and torture; relied on factors Congress did not intend to be considered; failed to consider reasonable alternatives that were less restrictive; and offered no explanation for their decision to expel them from the country.

158.     Plaintiffs' subjection to the Title 42 Process is arbitrary, capricious, and contrary to law because it also departs from the agency's existing policies for the processing, care, custody, and removal of unaccompanied children, including unaccompanied minors with contagious diseases,

as well as prior policies prohibiting the return of individuals who fear persecution or torture, without providing a reasoned explanation for departing from these policies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs J. and E. respectfully prays this Court to:

a.      Declare unlawful the Title 42 Process as applied to Plaintiffs;

b.      Enter an order enjoining Defendants from applying the Title 42 Process to Plaintiffs;

c.      Enter an order providing relief for Plaintiffs by ordering that Defendants stay their expulsion, remove them from the Title 42 Process, and to afford them the TVPRA's statutory requirements and protections, as well as the procedures guaranteed by the INA including access to asylum, withholding of removal, CAT relief, and all other forms of relief to which they is eligible;

d.      Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and,

e.      Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: July 2, 2020                          Respectfully submitted,

                                             /s/ Lee Gelernt                          
Stephen B. Kang*                             Lee Gelernt*
Cody Wofsy*                                  Daniel A. Galindo*
Morgan Russell*                              Celso J. Perez (D.C. Bar No. 1034959)
Adrienne Harrold*                            American Civil Liberties Union Foundation,
American Civil Liberties Union Foundation,   Immigrants' Rights Project
Immigrants' Rights Project                   125 Broad Street, 18th Floor
39 Drumm Street                              New York, NY 10004
San Francisco, CA 94111                      Tel: (212) 549-2600
Tel: (415) 343-0770

Andre Segura                                 Robert Silverman**
Kathryn Huddleston                           Oxfam America
Rochelle Garza                               226 Causeway Street, Suite 500
Brantley Shaw Drake                          Boston, MA 02114
                                             Tel: (617) 482-1211

American Civil Liberties Union Foundation
of Texas, Inc.
5225 Katy Freeway, Suite 350
Houston, Texas 77007
Tel. (713) 942-8146

Jamie Crook (D.C. Bar No. 1002504)
Blaine Bookey
Karen Musalo
Center for Gender & Refugee Studies
200 McAllister St.
San Francisco, CA 94102
Tel: (415) 565-4877

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation of
the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel: (202) 457-0800

*Attorneys for Plaintiffs*

*\*Admitted pro hac vice*
*\*\*Pro hac vice application forthcoming*